# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## STATESBORO DIVISION

MIGUEL JACKSON; and KELVIN
STEVENSON,

         Plaintiffs,

     v.

JOSEPH CATANZARITI, et al.,

         Defendants.

CIVIL ACTION NO. 6:12-cv-113

## O R D E R

Presently before the Court is Defendants' Joint Motion to Exclude Expert Testimony. (Doc. 242.)  Defendants Joseph Catanzariti, Andrew McFarlane, Timothy Simmons, Nathaniel Milton, Sheldon Deloach, Melvin Wells, Jarrod Bennett, Gordon Pittman, Gary Mitchell, Michael Deloach, Caleb Harrison, Sherry Ritchie, Joshua Eason, and Darius Attical ("Defendants") move to exclude the testimony of Plaintiff's expert, Eugene E. Atherton, pursuant to Federal Rule of Evidence 702.  (Id.)  Defendants contend that Mr. Atherton's proposed opinions are not based on reliable methodology, would not assist the trier of fact, and exceed the scope of his qualifications in certain instances.  (Doc. 242-1.)  Plaintiffs Miguel Jackson and Kelvin Stevenson filed a Response in Opposition, (doc. 287), and Defendants filed a Reply, (doc. 297).  For the reasons and in the manner set forth below, the Court **GRANTS in part** and **DENIES in part** Defendants' Joint Motion to Exclude Expert Testimony.  (Doc. 242.)

This case concerns the use of force against two prisoners, and Mr. Atherton is undoubtedly well qualified in this field.  As explained more fully below, however, several of Mr. Atherton's opinions would not assist the trier of fact and several go beyond the matters on which he is qualified

to speak.  Nonetheless, Mr. Atherton will be permitted to provide expert testimony regarding general and permissible use of force standards in the field of corrections and may answer appropriate hypothetical questions regarding the same.  Mr. Atherton's expert testimony in this action will be strictly limited to these opinions and matters alone, and the Court excludes the remainder of his opinions.  Plaintiffs are prohibited from introducing or otherwise relying upon any other opinions or expert testimony by Mr. Atherton.

## BACKGROUND

### I.     Procedural History

Plaintiffs, formerly inmates at Smith State Prison ("Smith State") in Glennville, Georgia, brought this 42 U.S.C. § 1983 action on December 10, 2012, alleging that Defendants, correctional officers, violated their constitutional right to be free from excessive force while they were incarcerated at Smith State.  (Doc. 1.)  Plaintiffs filed their First Amended Complaint on January 25, 2013, specifically claiming that, during a prison disturbance occurring the night of December 31, 2010, Defendants used excessive force against them, failed to intervene in other officers' use of excessive force against them, or both.  (Doc. 24.)  Thereafter, the Court stayed the proceedings in this case while criminal actions against Plaintiffs, stemming from the December 31, 2010 incident at Smith State, ran their course.  (Doc. 81.)

Over three years later, following the resolution of criminal proceedings against Plaintiffs, the Court lifted the previously-imposed stay on June 7, 2016.  (Doc. 118.)  A lengthy, disputed, and heavily litigated discovery period ensued.  (See, e.g., Docs. 168, 175, 177, 196, 202, 221, 222, 224–26, 228.)  After multiple extensions and several disputes were resolved, discovery in this case finally closed on December 15, 2017, with motions to exclude expert testimony due on February 5,

2018. (Docs. 221, 228.) Pursuant to this deadline, Defendants filed the present Joint Motion to Exclude Expert Testimony on February 5, 2018.[1] (Doc. 242.)

## II. Plaintiffs' Claims

As noted above, this case arises out of a disturbance that occurred on December 31, 2010, at Smith State Prison. (Doc. 24.) Defendants are officers employed by the Georgia Department of Corrections ("GDC") who were on duty at Smith State when and where the subject disturbance took place. (Id. at pp. 5–12.) Plaintiffs bring Eighth Amendment excessive force and failure to intervene claims against these officer Defendants. (Id. at pp. 17–20.)

According to Plaintiffs, on the night in question, Defendants conducted a search, or "shake down," of Plaintiffs' dormitory. (Id. at p. 12.) During the search, Plaintiff Jackson and Defendant Catanzariti got into an altercation where it is alleged that Defendant Catanzariti maliciously attacked a handcuffed and non-resistant Plaintiff Jackson with an object, either a hammer or flashlight, while other Defendants looked on without intervening on Jackson's behalf. (Id. at pp. 12–15.) Plaintiffs also allege that Defendants continued to beat Plaintiff Jackson, failed to intervene on his behalf, or both, as he was taken from the dormitory and to the infirmary and also while he waited in the infirmary. (Id.)

During this same search, Plaintiffs allege that Defendant Catanzariti attacked Plaintiff Stevenson with a hammer or other object, even though Stevenson was handcuffed and non-resistant. (Id. at p. 13.) Plaintiffs aver that, as Defendant Catanzariti struck Plaintiff Stevenson with the object, other Defendants failed to take reasonable measures to stop Catanzariti's use of

---

[1] In addition, several Defendants seeking to exclude Mr. Atherton's testimony filed Motions for Summary Judgment that remain pending. (See Docs. 233, 238, 240, 244.) As Plaintiffs rely, in part, on Mr. Atherton's proffered expert testimony in their opposition to Defendants' summary judgment motions, (see docs. 277-1, 278, 282, 283; see also doc. 259), the Court first addresses the propriety of this testimony before turning, by separate order, to whether summary judgment should be granted to any Defendant so moving.

gratuitous force on the non-resisting Stevenson. (<u>Id.</u> at p. 14.) As with Plaintiff Jackson, Plaintiff Stevenson alleges that Defendants continued to attack him while he was handcuffed in the prison infirmary. (<u>Id.</u> at p. 15.) According to Plaintiffs, their medical records demonstrate that they each suffered serious and long-term head injuries resulting from Defendants' conduct on December 31, 2010. (<u>Id.</u> at pp. 15–16.) Further, Plaintiffs contend video evidence of the events in question supports the allegations in their First Amended Complaint. (<u>Id.</u> at pp. 3–4, 13, 17–18.)

The interpretation of this video evidence by Mr. Atherton, and the extent to which he may offer expert testimony based on his interpretation of the events shown by the video, form the core dispute as to the admissibility of Mr. Atherton's proffered expert opinions.

## III.   Mr. Atherton's Expert Report

During the discovery period, Plaintiffs retained Mr. Atherton, a former Colorado Department of Corrections official with expertise on the use of force in prisons, to provide expert witness services in their action against Defendants. (Doc. 242-2.) On July 13, 2017, Mr. Atherton drafted an "Expert Witness Report" in which he states that, since June 2004, he has been President of Correctional Consulting Services Group, Inc. (<u>Id.</u> at pp. 2–3.) This company "is a criminal justice consulting agency" that provides a broad array of services in the corrections field, including "use of force event assessment and systems development" and "expert witness services." (<u>Id.</u>) For the past seventeen years, Mr. Atherton has also been a part-time trainer and consultant for the National Institute of Corrections, a division of the U.S. Department of Justice. (<u>Id.</u> at p. 5.) In this position, Mr. Atherton provides, *inter alia*, security audits and compliance management training, curriculum development for correctional emergency training, and strategies for managing dangerous and disruptive inmates. (<u>Id.</u>)

Throughout much of the Report, Mr. Atherton details his extensive experience working in the criminal corrections field, which spans forty years. (Id. at pp. 3–7, 11.) Prior to working as a consultant, Mr. Atherton spent twenty-seven years at the Colorado Department of Corrections where he served in various capacities, including Assistant Director of Prisons for the Western Region of Colorado and Warden at both Colorado State Penitentiary and Buena Vista Correctional Facility. (Id. at pp. 3–4.) Prior to these positions, Mr. Atherton was a Security Specialist for the Colorado Department of Corrections, a position that involved departmental use of force reviews. (Id. at p. 4.) Mr. Atherton has significant "hands-on experience, working directly with inmates and with staff who have daily contact with inmates and with medical and mental health service providers." (Id.) In addition, he has authored or edited numerous publications related to the corrections filed, including, as relevant here, guides on the use of force and prison disturbance management. (Id. at pp. 5–6.) Mr. Atherton holds a B.A. in Social Science with an emphasis in Personnel Management and Industrial/Labor Relations and has been recognized for his contributions to the Colorado Department of Corrections. (Id. at p. 7.) Based on his credentials and background, Mr. Atherton states that "[h]e is fully experienced in the evolution of policy, training, administrative practices, and organizational development related to . . . use of force, unprofessional staff conduct, security systems, and emergency management." (Id. at pp. 6–7.)

Over the past four years, Mr. Atherton has provided expert testimony in six cases dealing with use of force or failure to protect. (Id. at pp. 7–8.) In preparing his Expert Report for this case, Mr. Atherton reviewed handheld video of the prison disturbance, inmate Clinton Michael Briscoe's deposition transcript, and fifty-four pages of inmate interviews.[2] (Id. at p. 8.) Mr.

---

[2] Mr. Atherton expressly reserved the right to amend, alter, add to, or delete any of his observations and opinions whenever additional testimony, documents, or evidence is made available. (Docs. 242-2, p. 8.) At his deposition on January 5, 2018, Mr. Atherton added that he had since reviewed every other deposition that had been taken, amounting to nearly 5,000 pages of testimony and photographic exhibits. (Doc. 242-

Atherton begins by setting forth an overview of the events in question: "On December 31, 2010, . . . officers were searching for contraband [in Plaintiffs Jackson and Stevenson's dormitory] and inmates and officers began to fight. Other officers responded to the living unit and the disturbance was brought under control with several inmates placed in restraints." (Id. at pp. 8–9.)

As to Plaintiff Stevenson, Mr. Atherton states:

> Evidence indicates that at least the two [P]lainitffs were in wrist restraints and placed on the floor or against a wall by officers. Further, it appears that both [P]laintiffs were repeatedly struck with blows to the body and head using a hammer and flashlight after restraint had been achieved. Sergeant Catanzariti was at the head of the collection of staff pinning inmate Kelvin Stevenson to the floor of the second tier of the living unit. In that position [Catanzariti] was pumping his right arm in a rapid up and down motion.

(Id. at p. 9.) Mr. Atherton posits three opinions from his review of the evidence: (1) Defendant Catanzariti's "movements were blows to the head of [Plaintiff] Stevenson during the time in which he was fully restrained with handcuffs and body pressure from surrounding staff";[3] (2) in prisons, combative conditions among staff and inmates "are exceptional and generate[] a great amount of passion when [they] happen[]"; and (3) inmates have the right to be free from unwarranted attack by correctional staff and "the use of force by [Defendant] Catanzariti[] was an unwarranted attack with the sole intent of causing harm." (Id.) Furthermore, because Plaintiff Stevenson "was restrained and no longer represented an ability to attack," Mr. Atherton opines "that there was no

---

3, pp. 21–23.) Mr. Atherton also reviewed related Georgia Bureau of Investigation ("GBI") reports and statements from officers. (Id. at p. 23.) Review of this additional material, however, did not cause Mr. Atherton to amend his Expert Report. (Id. at p. 28.)

[3] Mr. Atherton adds that "the wounds to the face of [Plaintiff] Kelvin Stevenson are entirely consistent [with] those blows." (Doc. 242-2, p. 9.) At his deposition, Mr. Atherton clarified this opinion, stating that he could not say exactly, and was "not absolutely certain," what the object in Defendant Catanzariti's hand was. (Doc. 242-3, p. 11.) Nonetheless, he stood by his observation "that [Defendant Catanzariti] had something in his hand that he was using to strike [Plaintiff Stevenson]." (Id.) Further, Mr. Atherton testified that he observed Defendant Catanzariti on the handheld video striking Plaintiff Stevenson "on the floor, with an object in his hand repeatedly. And then I watched [Catanzariti] approach [Plaintiff Jackson], pinned against the wall with something in his hand, as well with motions towards [Jackson's] upper body." (Id. at p. 12.)

justification for blows to the head that continued beyond restraint." (Id. at p. 11.) Defendant Catanzariti's blows to Plaintiff Stevenson's head, Mr. Atherton posits, "represent a particularly vicious and dangerous punishment." (Id.)

As to Plaintiff Jackson, Mr. Atherton states that, per Jackson's testimony, "he was st[r]uck in the head with an object while handcuffed on the second floor of the dormitory shortly after the incident between guard[s] and inmates was under control." (Id. at p. 10.) Video evidence shows Defendant Catanzariti "standing near Jackson while he is handcuffed and this video reflects when Jackson claims Catanzariti struck him." (Id.) If Plaintiff Jackson's testimony is believed by a jury, Mr. Atherton opines "that [Defendant] Catanzariti's use of force was an unwarranted attack with the sole intent of causing harm," in violation of Plaintiff Jackson's constitutional right to freedom from unwarranted attack. (Id.) Furthermore, Mr. Atherton opines that, if a jury believes Plaintiffs' testimony about continued attacks from correctional staff while they were being escorted and outside the dormitory, then "this type of use of force [on handcuffed inmates] was an unwarranted attack with the sole intent of causing harm." (Id.)

Mr. Atherton also opines on general standards for use of force incidents. With respect to head injuries and the use of force, Mr. Atherton states, "In years of exposure to use of force training, it is the expert's opinion that unless conditions represent a serious risk of immediate danger to staff, a blow to the head of a resisting inmate is dangerous and without justification." (Id. at pp. 10–11.) He continues, explaining that "except under the most extreme circumstances, techniques for the use of all non-lethal weapons force options, blows to the head are forbidden." (Id. at p. 11.) Based on his correctional experience and published standards on the use of force, Mr. Atherton states: "When the inmate ceases to resist and a reasonable amount of control has

been achieved, staff are obligated to de-escalate the amount of force being applied and to follow protocol for after action reporting and medical assessment." (Id.)

In this case, Mr. Atherton concludes "that at the time during the use of force incident against [Plaintiffs] Miguel Jackson and Kelvin Stevens[o]n at the Smith State Prison [in] Georgia, their constitutional rights were violated in that standard practices were not employed [which] could be expected to protect them from harm. Instead they were exposed to brutal, harmful treatment" that violated their rights. (Id. at p. 12.)

## IV. Defendants' Joint Motion to Exclude Mr. Atherton's Expert Testimony

Defendants seek to exclude four of Mr. Atherton's expert opinions, each of which specifically relates to this case.[4] (Doc. 242-1, p. 3.) For Plaintiff Stevenson, Defendants argue Mr. Atherton should be precluded from opining that Defendant Catanzariti engaged in an unwarranted attack, with the intent to cause harm, by striking a handcuffed, restrained Stevenson in the head with a hammer; and from opining that Plaintiff Stevenson's wounds from the incident are entirely consistent with the afore-described blows to the face by Defendant Catanzariti. (Id.) For Plaintiff Jackson, Defendants argue Mr. Atherton should be precluded from opining that, if the jury believes Jackson's testimony, Defendant Catanzariti's use of force was an unwarranted attack with the sole intent of causing harm. (Id.) Lastly, Defendants argue he should be precluded from testifying, as he did during his deposition, that restrained Smith State inmates were subjected

---

[4] Defendants do not directly oppose Mr. Atherton's ability to opine generally, as an expert, upon permissible use of force standards. (Doc. 242-1, pp. 10–11 & n. 4 (noting "the theory that the use of force beyond the point of restraint is generally improper" would "likely be admissible"); see also id. at p. 5 ("Defendants do not dispute Mr. Athe[r]ton's qualifications to discuss the use of force in corrections, generally.").) They do, however, contend that this testimony should nonetheless be excluded as unnecessary since there is no dispute that compliant inmates should not be gratuitously beaten. (Id. at pp. 10–11.)

to excessive force as punishment, by unnamed officers, while they were being escorted to the medical unit.  (Id. (citing doc. 242-3, p. 27).)

Pursuant to Federal Rule of Evidence 702 and the expert witness standard established in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), Defendants assert that Mr. Atherton's proposed expert opinions should be excluded for three reasons: "(1) He did not reliably apply his own methods, (2) his testimony will not assist the trier of fact, and (3) his testimony as to the causation of [Plaintiff] Stevenson's facial injuries is not reliable because Mr. Atherton lacks relevant medical expertise."  (Id. at p. 4 (numbers added).)

First, in their attack on Mr. Atherton's methodology, Defendants aver that he ignored critical evidence and, in doing so, failed to reliably apply his professed methods for reviewing and evaluating use of force incidents.  (Id. at pp. 4–5.)  Mr. Atherton testified that proper evaluation of use of force incidents requires consideration of all relevant documentation, including incident reports, medical assessments, and witness statements from both inmates and staff.  (Id. at p. 5.)  Here, Defendants claim, Mr. Atherton "cherry-picked" data by ignoring staff testimony and failing to review all available video.  (Id. at pp. 5–6.)

Second, in challenging the helpfulness of Mr. Atherton's proposed expert opinions, Defendants assert that they would not assist the trier of fact because their "primary purpose seems to be buttressing Plaintiffs' interpretation of the Handheld Video[5] while offering opinions on standards of conduct that are not really at issue."  (Id. at p. 7.)  Defendants argue Mr. Atherton's testimony is aimed at deciding what the video shows, which is a matter that should be up to the jury.  (Id. at pp. 8–10.)  They assert Mr. Atherton lacks any basis, other than his own perceptions

---

[5]  In this case, there is video evidence of the events in question shot from four separate video cameras, one of which is a handheld video camera used by an officer, and the other three of which are stationary security cameras located in the subject dormitory.  (See Doc. 241.)

of the handheld video footage, for his testimony that Defendant Catanzariti gratuitously struck Plaintiffs. (<u>Id.</u> at p. 9.) In other words, Mr. Atherton "would simply use his status as an expert to urge the jury to adopt the version of [] facts advanced by [Plaintiffs]," Defendants argue. (<u>Id.</u> at p. 11.) Furthermore, Defendants contend that Mr. Atherton's testimony regarding use of force standards would also not aid the jury because there is no dispute that attacking compliant, non-resisting inmates is impermissible. (<u>Id.</u> at p. 10.)

Third, in disputing Mr. Atherton's testimony on the cause of Plaintiff Stevenson's injuries to his head and face, Defendants maintain that he is not qualified to opine as to issues of medical causation. (<u>Id.</u> at pp. 12–14.) Because Mr. Atherton's expert qualifications are limited to the field of corrections, which Mr. Atherton acknowledged by stating he is "not medically qualified," Defendants assert he may not testify to the cause of Plaintiff Stevenson's head injuries. (<u>Id.</u> at p. 12 (citation omitted).) Moreover, Defendants argue Mr. Atherton's purported basis for his causation opinion—that, in his experience, the severity of Stevenson's injuries are consistent with deliberate blows to the head—is "lay opinion masquerading as science." (<u>Id.</u> at p. 13.) Defendants thus urge the Court to exclude Mr. Atherton's opinions in this regard. (<u>Id.</u> at p. 14.)

In their Response in Opposition, Plaintiffs take issue with Defendants' understanding and characterization of Mr. Atherton's proposed opinions, arguing that they "misconstrue the purpose of Atherton's proffered expert testimony and misapply the <u>Daubert</u> standard. Atherton's expert testimony is proffered with respect to whether Defendants' actions, *as supported by the record*, violated institutional norms in the use of force against [inmates] beyond its use for restraint." (Doc. 287, p. 1 (emphasis in original).) Plaintiffs contend that "Atherton's testimony will assist the jury in understanding the level of force permissible under the circumstances of this case, and it is the prerogative of the jury to determine the weight they afford to [his] testimony after

Defendants' cross-examination." (Id. at p. 8.) As to Mr. Atherton's methodology, Plaintiffs aver that his opinion was based on "an exhaustive factual foundation," which includes GBI interview summaries, deposition testimony from eyewitness-inmate Briscoe, the handheld video footage, and nineteen additional depositions from various GDC officers and Smith State inmates. (Id. at pp. 8–11, 13.) Lastly, as to Mr. Atherton's purported medical testimony, Plaintiffs contend he is not offering any medical determinations but is, instead, offering an opinion on the use of force at issue based on all the all evidence, which includes the pictures of Plaintiffs' injuries. (Id. at pp. 12–13.)

Defendants filed a Reply to Plaintiffs' Response, wherein they reiterate that Mr. Atherton's testimony would not aid the jury because there is no dispute as to whether striking compliant inmates with objects constitutes excessive force. (Doc. 297, pp. 3–4.) The real issue, Defendants state, is whether Plaintiffs were actually struck with objects, and Mr. Atherton may not "bootstrap [his] inadmissible lay opinion on the video evidence by claiming it is part and parcel" of his testimony regarding use of force standards. (Id. at p. 2.) Additionally, Defendants continue to take issue with Mr. Atherton's purported failure to review all of the available evidence prior to drafting his report, which they claim was a violation of his own methodology, notwithstanding his later review of additional evidence and determination that his opinions were unaffected. (Id. at pp. 4–5 & n.2.) As to the claimed medical testimony, Defendants argue Mr. Atherton may not expertly opine on the cause of injuries after a use of force based on pictures of Plaintiffs' facial injuries. (Id. at p. 6.)

## STANDARD OF REVIEW

In <u>Daubert</u>, 509 U.S. at 588–93, the United States Supreme Court interpreted Federal Rule of Evidence 702 ("Rule 702"), which governs expert testimony. The Supreme Court made clear that Rule 702 "compels the district courts to perform the critical 'gatekeeping' function concerning the admissibility of expert *scientific* evidence." <u>United States v. Frazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (emphasis in original) (citing <u>Daubert</u>, 509 U.S. at 589 n.7, 597). The Supreme Court later held that "<u>Daubert</u>'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 141 (1999) (citing Fed. R. Evid. 702). Having adopted these decisions, amended Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Court of Appeals for the Eleventh Circuit has established a three-pronged inquiry encompassing the requirements of <u>Daubert</u> and its progeny and Rule 702. Under this inquiry, a court determining the admissibility of expert testimony must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is

> sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Frazier, 387 F.3d at 1260 (citations omitted). The proponent of the expert opinion bears the burden of establishing qualification, reliability, and helpfulness by a preponderance of the evidence. Daubert, 509 U.S. at 592 & n.10. The ultimate objective of a court's Daubert gatekeeping function is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152.

For the first prong, "experts may be qualified in various ways. While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." Frazier, 387 F.3d at 1260–61; see also Fed. R. Evid. 702 (A witness may be qualified as an expert by "knowledge, skill, experience, training, or education."). The overarching requirement is that the expert have "specialized knowledge" regarding their proposed area of testimony. Fed. R. Evid. 702(a). When assessing qualification, courts generally look to a proposed expert's education and experience and ask whether the witness's intended testimony is sufficiently within his or her area of expertise. See Maiz v. Virani, 253 F.3d 641, 665 (11th Cir. 2001). However, "the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable *any* conceivable opinion the expert may express." Frazier, 387 F.3d at 1261 (emphasis in original).

Consequently, the second prong, reliability, "remains a discrete, independent, and important requirement for admissibility." Id. Under Rule 702, the proponent of the expert testimony must establish that "[1] the testimony is based on sufficient facts or data, [2] the testimony is the product of reliable principles and methods, and [3] the expert has reliably applied

the principles and methods to the facts of the case." Moreover, the facts or data underlying the expert's opinion must be of a type that "experts in the particular field would reasonably rely on . . . in forming an opinion on the subject." Fed. R. Evid. 703.

The Supreme Court in <u>Daubert</u> "set out a list of 'general observations' for determining whether expert testimony is sufficiently reliable to be admitted under Rule 702." <u>United States v. Brown</u>, 415 F.3d 1257, 1267 (11th Cir. 2005) (citation omitted). These factors or observations inquire into the expert's "theory or technique" and are: "(1) whether it can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) what its known or potential rate of error is, and whether standards controlling its operation exist; and (4) whether it is generally accepted in the field." <u>Id.</u> (citation omitted). "Sometimes the specific <u>Daubert</u> factors will aid in determining reliability; sometimes other questions may be more useful. As a result, 'the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" <u>Frazier</u>, 387 F.3d at 1262 (quoting <u>Kumho Tire</u>, 526 U.S. at 152). "Indeed, the Committee Note to the 2000 Amendments of Rule 702 expressly says that, '[i]f the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" <u>Id.</u> at 1261 (emphasis in original) (citation omitted).

Third, and finally, expert opinion testimony must assist the trier of fact. Fed. R. Evid. 702(a). "By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." <u>Frazier</u>, 387 F.3d at 1262 (citation omitted). Proffered expert testimony generally will not help the trier of fact, and is inadmissible, "when it offers nothing more than what lawyers for the parties can argue in closing arguments." <u>Cook v.</u>

Sheriff of Monroe Cty., 402 F.3d 1092, 1111 (11th Cir. 2005) (citation omitted). Stated differently, expert testimony that offers something "beyond the understanding and experience of the average citizen" helps the trier of fact and can be admitted. Id. (quoting United States v. Rouco, 765 F.2d 983, 995 (11th Cir. 1985)).

## DISCUSSION

As the proponents of Mr. Atherton's testimony, Plaintiffs must satisfy all prerequisites of expert admissibility, by a preponderance of the evidence, as to each proposed opinion. Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999) (citation omitted). "Where the burden has not been satisfied, [Rule] 702 precludes expert testimony. Siharath v. Sandoz Pharm. Corp., 131 F. Supp. 2d 1347, 1351 (N.D. Ga. 2001) (citations omitted)."

The Court proceeds in its Daubert analysis by first looking at the threshold issue of whether Mr. Atherton reliably applied his methodology when assessing the use of force at issue, and then second, by determining whether Mr. Atherton's proffered opinions, as delineated by the parties, would assist the trier of fact and be admissible in the matter at hand.[6] Lastly, the Court addresses whether Mr. Atherton may opine on the cause of Plaintiff Stevenson's head injuries. As explained below, the Court finds Mr. Atherton reliably applied his methodology for reviewing use of force incidents and that his testimony regarding general use of force standards, including responses to appropriately posed hypotheticals, would assist the trier of fact; this testimony is thus admissible. However, Mr. Atherton's interpretations of the handheld video evidence, as well as his opinion on the severity and cause of Plaintiff Stevenson's head injuries, are not admissible due to the unhelpfulness of the former and Mr. Atherton's lack of qualifications on the latter; thus he may not testify in this regard.

---

[6] Mr. Atherton's qualifications as an expert on the use of force in correctional institutions are not at issue. (Doc. 242-1, p. 5; doc. 287, p. 7; see also doc. 259-4, pp. 13–39 (Mr. Atherton's Curriculum Vitae).)

# I.    Whether Mr. Atherton Reliably Applied his Methodology

In reviewing use of force incidents, Mr. Atherton's self-described methodology involves evaluating and considering all documentation, including the incident report, medical assessments, witness statements from inmates and officers, and available video evidence. (See Doc. 242-3, pp. 10–11.) Defendants charge that Mr. Atherton failed to reliably apply this method because his opinions are "based only upon the Handheld Video and the version of events given by inmates." (Doc. 242-1, p. 6.) Although it is true that Mr. Atherton's Expert Report—which was based only on the handheld video, an inmate's deposition, and GBI inmate interview summaries—did not account for all of the evidence eventually obtained, Defendants' assertion relies on an overly strict interpretation of Mr. Atherton's methodology and is refuted by his testimony.

As Mr. Atherton made abundantly clear at his deposition, his final expert opinions were based on his review of *all* the depositions taken, including numerous officer depositions and attached exhibits. (Doc. 242-3, pp. 16, 21–23, 28; see also doc. 259, p. 40 (Atherton Declaration of Depositions Reviewed).) Mr. Atherton also considered related GBI reports and statements. (Doc. 242-3, p. 23.) In their Reply, Defendants protest that Mr. Atherton's methodology does not permit him to revisit his opinion as more evidence becomes available, but they cite no support in the record for this claim. (See Doc. 297, p. 5 n. 2.) The methodology employed by Mr. Atherton does involve him considering all the documentation for an incident, but it does not prohibit him from considering additional evidence as it is made available to him. (See 242-3, pp. 10–11.) Moreover, Defendants cite no legal support for their contention that an expert may not revisit the opinions stated in his or her report as more evidence becomes available.

On the contrary, the Federal Rules of Civil Procedure *require* an expert, such as Mr. Atherton, to "supplement" any testimony stated in a report or at a deposition up through the time

for pretrial disclosures. Fed. R. Evid. 26(e). This is what occurred here. At his deposition, Mr. Atherton supplemented the record underpinning his opinions to include eleven officer depositions, additional reports, and additional inmate depositions. (Doc. 287, pp. 10–11; doc. 249, p. 40.) Upon review of this supplementary material, Mr. Atherton confirmed that his Report, and the opinions contained therein, remained unchanged. (Doc. 242-3, pp. 26–27, 29.)

Moreover, at the time Mr. Atherton made his Report, July 13, 2017, much of the deposition evidence he later reviewed, and which Defendants claim was not properly considered, did not yet exist. (See, e.g., Docs. 266–74.) The discovery period in this case was prolonged and fraught with disputes—some due to Defendants' reluctance to engage in discovery, (e.g. docs. 5, 36, 68, 148, 226)—which may explain why Mr. Atherton rendered his Report prior to the taking of all relevant depositions. No matter the reason, the critical point remains that, by the time of his deposition, Mr. Atherton had reviewed the great majority of available evidence, not just what was available to him at the time of his Report, and concluded that his opinions in this matter were unchanged. Importantly, he had considered the corrections officers' depositions and additional GBI material, which Defendants wrongly imply he ignored. Thus, on balance, Plaintiffs have established that in this case Mr. Atherton reliably applied his methodology of reviewing all available documentation generated by a use of force incident.[7]

## II.    Whether Mr. Atherton's Proposed Testimony Would Assist the Trier of Fact

Defendants argue that Mr. Atherton should be precluded from offering both case-specific expert testimony and general expert testimony on permissible use of force standards because his "primary purpose seems to be buttressing Plaintiffs' interpretation of the Handheld Video while

---

[7] To the extent Defendants object to Mr. Atherton not reviewing a particular document or other video evidence, "such factors go to the weight to be afforded his opinion[s] and not their admissibility." Martin v. Luckett, No. 07 C 2800, 2011 WL 1231024, at *1 (N.D. Ill. Mar. 30, 2011). Defendants may probe these issues of credibility on cross-examination.

offering opinions on standards of conduct that are not really at issue." (Doc. 242-1, p. 7.) As such, Defendants contend his testimony would not assist the trier of fact. (Id. at pp. 7–8.) In contrast, Plaintiffs submit that Mr. Atherton's "testimony is fundamental for explaining the force permitted in quelling a prison disturbance once an inmate has been subdued." (Doc. 287, p. 7.)

A. **Mr. Atherton's Use of Force Testimony on Defendants' Alleged Conduct**

Arguing that he would not assist the trier of fact, Defendants challenge Mr. Atherton's ability to testify that: (1) Plaintiff Stevenson was "fully restrained with hand cuffs" when Defendant Catanzariti administered "blows to the head" with an object; (2) Plaintiff Jackson was "st[r]uck in the head with an object while handcuffed"; and (3) both of these alleged events were "unwarranted attacks with the sole intent of causing harm." (Doc. 242-1, p. 7 (quoting doc. 241-2, pp. 9–10).) These opinions are primarily based on Mr. Atherton's review of the handheld video in conjunction with inmate testimony. (See Doc. 242-2, pp. 8–10; doc. 242-3, pp. 11–12.) Defendants dispute Mr. Atherton's interpretation of this video footage, arguing that it depicts hand strikes to the shoulder area rather than Plaintiffs being struck in the head with objects, as Mr. Atherton says it does. (See Doc. 242-1, pp. 9–11.) Defendants thus assert that any testimony on Mr. Atherton's observations from the handheld video would not assist the trier of fact because "[t]he jury is competent to view the video and decide what it shows for themselves, and there is nothing about Mr. Atherton's training or experience that makes him more capable than the jury in viewing the video and deciding what it shows." (Doc. 242-1, p. 8.) The Court agrees.

In their Response, Plaintiffs offer little in the way of rebuttal to these arguments or rehabilitation of Mr. Atherton's proffered case-specific testimony. (See Doc. 287.) Although they point out that experts may permissibly rest their opinions on a particular version of disputed facts, Plaintiffs fail to show how Mr. Atherton's opinions on what actually occurred, based on what is

portrayed in the handheld video, would assist the tier of fact. (See id. at pp. 5, 7–10.) Plaintiffs do not, for example, attempt to show that Mr. Atherton's expertise and experience in the corrections field allow him to offer technical insight as to who can be seen doing what on the handheld video. Merely offering general observations on what this video shows without any accompanying expert gloss or explanation would not assist the trier of fact, because the straight-forward act of observing video footage and ascertaining what it shows (as far as whether Plaintiffs were restrained or struck) is within the common experience of the average citizen.

At best, in his Report, Mr. Atherton explains that he believes Defendant Catanzariti struck Plaintiff Stevenson in the head based on the specific movements shown in the handheld video. (Doc. 242-2, p. 9.) Mr. Atherton states that Defendant Catanzariti "was pumping his right arm in a rapid up and down motion" toward a pinned down Plaintiff Stevenson, and he opined that "those movements were blows to the head of [Plaintiff] Stevenson during the time in which he was fully restrained with handcuffs and body pressure from surrounding staff." (Id.) In theory, a use-of-force expert could offer testimony explaining specific force techniques seen on a video in a way that would be deemed more than mere lay observation and instead something that would assist the trier of fact, but that is not the case here. While it may be true that rapid up-and-down arm movements can deliver blows to the head, this conclusion is nothing more than a general description of what Mr. Atherton believes he saw on the handheld video. It is just as true that rapid up-and-down arm movements can deliver blows to the shoulder area of someone restrained on the ground in a prone position. Mr. Atherton did not endeavor to specify how the right arm movements seen on the handheld video are more consistent with blows to the head rather than blows to the shoulder area.[8] Nor did Mr. Atherton distinguish, as matter of corrections techniques, up-and-

---

[8] At his deposition, Mr. Atherton added that "in past experience, [he's] seen similar blows delivered with a vertical up-and-down motion [on a prone inmate from the same position and angle as Defendant

down arm movements used to deliver head blows from up-and-down arm movements used to deliver shoulder blows. In other words, Mr. Atherton does not connect his observations from the handheld video to his corrections experience and expertise such that his proposed testimony would be helpful to the trier of fact.

Each of Mr. Atherton's opinions on Defendants' alleged conduct suffers from this same infirmity—a lack of expert analysis that would assist the trier of fact in determining exactly what the handheld video shows. Plaintiffs' attempt to support Mr. Atherton's opinions in this regard by showing that he may permissibly base his opinion on Jackson and Stevenson's disputed testimony, instead of the officers' testimony, is of no moment. (Doc. 287, p. 8 (citations omitted).) While Rule 702 permits experts to make conclusions based on competing versions of the facts,[9] those conclusions must still assist the trier of fact by explaining something "beyond the understanding and experience of the average citizen." Rouco, 765 F.2d at 995. Here, Mr. Atherton's proffered case-specific opinions offer nothing to assist the tier of fact in determining what exactly occurred in the handheld video; rather, they are unexplained interpretations of video evidence that the jury itself is fully capable of reviewing in the first instance. In other words, because Mr. Atherton's

---

Catanzariti], which indicates . . . [a] strik[e] to the head, not to other parts of torso." (Doc. 242-3, p. 14.) He concluded "[t]hat's my opinion," (id.), but also later added that Plaintiff Stevenson's testimony and the severity of his facial wounds bolstered this conclusion, (id. at p. 15). Based on this brief explanation, the Court finds that Mr. Atherton's testimony as to where Defendant Catanzariti struck Plaintiff Stevenson would not assist the trier of fact, because the jury is fully capable of viewing the video evidence in combination with Stevenson's testimony and medical records and reaching a conclusion without expert assistance. This is not a determination "beyond the understanding of the average lay person." Frazier, 387 F.3d at 1262 (citation omitted).

[9] The Advisory Committee's Note to the 2000 Amendments to Rule 702 states: "When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of facts and not the other." As to Mr. Atherton's case-specific opinions on the video evidence, however, the Court excludes them not because he based them in part on Plaintiffs' disputed testimony, but because they are not helpful to the trier of fact as stated in his Report and at his deposition.

opinions on Defendants' alleged conduct are primarily conclusory observations from the handheld video, they will not assist the tier of fact in determining what the video actually shows of the disputed events. These opinions as stated, moreover, are within the jury's province to conclude what occurred based on its credibility determinations of fact witnesses as supplemented by video, medical, and other evidence. See Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990) (experts may opine on ultimate fact issues but may not "merely tell the jury what result to reach" (citations omitted)); see also Samples v. City of Atlanta, 916 F.2d 1548, 1551 (11th Cir. 1990) (use-of-force expert's testimony on whether specific officer "acted reasonably" in discharging gun tends to "invade the province of the jury . . . to decide the reasonableness of the officer's actions").

Accordingly, Mr. Atherton will not be permitted to opine on what he interpreted the video to show of Defendants' alleged conduct, because these opinions as formulated by Mr. Atherton would not assist the trier of fact. Plaintiffs have failed to meet their burden of admissibility in this regard. Specifically, Mr. Atherton may not testify that the video shows Defendant Catanzariti striking non-resistant Plaintiffs with an object or that Defendant Catanzariti's use of force against Plaintiffs was an unwarranted attack with the sole intent of causing harm. See Hopkins v. City of Huntsville, No. CV-13-S-429-NE, 2014 WL 5488403, at *5 (N.D. Ala. Oct. 29, 2014) (expert not permitted to opine on whether either of the defendants used excessive force); Doby v. Berry, No. 3:04CV1044 J32MMH, 2006 WL 3518611, at *5 (M.D. Fla. Dec. 6, 2006) (expert not permitted to opine on the propriety of the defendant's use of force and whether it was punitive). Therefore, the Court **GRANTS** this portion of Defendants' Motion and excludes Mr. Atherton's proffered opinions on Defendants' alleged conduct as they do not assist the trier of fact.[10]

---

[10] In addition, Mr. Atherton may not testify that other Smith State inmates reported experiences of excessive force while being escorted in restraints to medical, because this testimony is also unhelpful to the trier of

**B.      Mr. Atherton's General Testimony on Use of Force Standards**

Defendants argue that Mr. Atherton should also be excluded from opining generally on permissible use of force standards in correctional settings because these opinions address matters not at issue. (Doc. 242-1, p. 10.) Defendants do not dispute that officers are not permitted to strike compliant, restrained inmates in the head with objects or attack them on their way to medical, and thus they argue testimony in this regard is unnecessary and would not be helpful to the jury (Id. at pp. 10–11.) In Response, Plaintiffs contend that Mr. Atherton's testimony "is fundamental for explaining the force permitted in quelling a prison disturbance once an inmate has been subdued" and "will assist the jury in understanding the level of force permissible under the circumstances of this case." (Doc. 287, pp. 8, 9.) Although Defendants may not dispute the wrongfulness of attacking complaint inmates, the Court finds that Mr. Atherton's testimony on general use of force standards in prisons will assist the trier of fact in this case.[11]

Rather simply, jury members are not well acquainted with what sort of force is necessary and common for corrections officers to use when quelling prison disturbances. Nor are they familiar with the sort of force that is permissible to use, under prevailing standards, in bringing non-compliant inmates under control or in further restraining already handcuffed inmates. These matters of prison management are "beyond the understanding and experience of the average lay citizen." Rouco, 765 F.2d at 995. Appropriate responses by officers to different types of prison

---

fact. It essentially parrots what these inmates testified to in their depositions. (See Doc. 242-3, pp. 16, 27.) Mr. Atherton does add that his review of these depositions revealed "enough of a trend and consistency" to make them credible, but credibility determinations on witness testimony is for the jury to decide. If Plaintiffs wish to proffer such evidence, they may do so by presenting this testimony directly, without the imprimatur of an expert witness.

[11]   Defendants essentially concede this point: "Had Mr. Atherton limited his opinions to solely these issues—the theory that the use of force beyond the point of restraint is generally improper—they would likely be admissible, but his opinions go far beyond this to comment on whether the Handheld Video shows such force being used, which invades the provinces of the jury." (Doc. 242-1, p. 11 n.4.)

disturbances and differing degrees of inmate non-compliance are issues distinct to prison administration, not common knowledge; thus, testimony in this regard will assist the trier of fact. And while Defendants may not dispute that, as a general matter, attacking a compliant inmate with a hammer or flashlight is impermissible, Mr. Atherton's expert testimony will assist the trier of fact in understanding the context of how force is typically used by corrections officers in prisons. For example, a juror may hear conflicting testimony and see video relevant to whether Defendant Catanzariti struck restrained inmates with objects or his fists, yet still not understand whether, and if so when, either level of force is excessive under prevailing standards. By proffering expert opinion testimony on permissible standards for the use of force in prisons, Mr. Atherton's considerable experience and expertise in this arena will undoubtedly assist the trier of fact in determining whether "excessive force" was used in this case.

In this respect, Mr. Atherton may offer expert testimony. See United States v. Myers, 972 F.2d 1566, 1577–78 (11th Cir. 1992) (holding admissible use of force opinion testimony because it was "properly framed . . . in accordance with prevailing police standards"); Samples, 916 F.2d at 1550–52 (holding admissible the use-of-force expert's opinion on whether hypothetical conduct, based on the facts of the case, met "prevailing standards in the field of law enforcement," and finding the hypotheticals admissible partly due to the expert first testifying on "the industry standards for judging the appropriate use of force"); Hopkins, 2014 WL 5488403, at *5 (admitting expert opinions on whether the defendants' conduct was "consistent with reasonable, typical police practices and procedures," but excluding opinion on whether the defendants used excessive force); Feliciano v. City of Miami Beach, 844 F. Supp. 2d 1258, 1265 (S.D. Fla. 2012) (finding expert testimony concerning the use of force would assist the trier of fact in understanding a fact at issue); Doby, 2006 WL 3518611, at *5 (admitting, with proper foundation, "general [expert] testimony

regarding relevant prison management techniques and practices" as well as "appropriate hypotheticals based on the evidence adduced at trial," but excluding opinion testimony on the propriety of the defendant's use of force and whether it was punitive); see also Cacciola v. McFall, 561 F. App'x 535, 537–38 (7th Cir. 2014) (finding that experts may permissibly explain proper uses of force as well as provide testimony on "proper police practices[] and the factors relevant to [] hypothetical uses of force" (citations omitted)).

Therefore, Mr. Atherton may offer expert opinion testimony as to general standards on the use of force in prisons, including permissible responses to restrain non-compliant inmates, proper methods for quelling prison disturbances, and the extent to which force may be used on restrained inmates in a given situation. Further, Mr. Atherton may opine on the factors relevant to hypothetical uses of force, and he may be asked appropriate hypotheticals based on the evidence adduced at trial. Accordingly, the Court **DENIES** this portion of Defendants' Motion and will permit Mr. Atherton to provide general expert testimony on the industry standards for the use of force in prisons. To be clear, however, Mr. Atherton may not testify on what he believes actually occurred during the subject prison disturbance per his review of the handheld video, including any opinions as to which witnesses should be believed.

## III.   Whether Mr. Atherton's Testimony on the Cause of Plaintiff Stevenson's Head Injuries is Admissible

Both in his Report and at his deposition, Mr. Atherton opined as to the cause of Plaintiff Stevenson's head injuries, stating that his wounds were consistent with blows to the face from an object. (Doc. 242-2, p. 9; doc. 242-3, pp. 12, 15.) Mr. Atherton has no formal medical training, is admittedly not a medical expert, and relies on medical services to provide injury assessment information when he reviews use-of-force incidents. (Doc. 242-3, p. 7, 15; see also doc. 259-4,

pp. 13–39.) However, once that injury information has been provided, Mr. Atherton forms his own opinion on how a use-of-force injury occurred. (Doc. 242-3, p. 15.)

At his deposition, Mr. Atherton clarified that, based on his corrections experience and review of relevant medical reports and other evidence, the severity of Plaintiff Stevenson's wounds would only occur if "something specific is being done to achieve that end." (Doc. 242-3, p. 15; see also id. at p. 29.) Plaintiff Stevenson's head injuries included a broken jaw and a broken skull portion around his eye. (Id. at p. 15.) Mr. Atherton added that, in his review of hundreds of use-of-force incidents involving inmate fistfights, he had "never seen injuries that severe, ever." (Id.) Mr. Atherton is "very confident" in his conclusion that Plaintiff Stevenson's head injuries were caused by deliberate blows to the head with an object. (Id.)

Defendants argue Mr. Atherton is not qualified to opine on the cause of injuries and should be precluded from offering this testimony, (doc. 242-1, pp. 12–14), but Plaintiffs contend Mr. Atherton is not offering medical expertise, rather he is describing the factual foundation for his opinion about the severity of Stevenson's injuries, (doc. 287, pp. 12–13). The Court finds that Mr. Atherton may not opine on what caused Plaintiff Stevenson's head injuries, regardless of whether medical expertise is required. To the extent Mr. Atherton's proposed causation opinion could be deemed medical in nature, it is not admissible because Mr. Atherton lacks the necessary qualifications and did not employ acceptable, scientific methodology in reaching this opinion. To the extent that Mr. Atherton's opinion on the cause of Plaintiff Stevenson's head injuries is not medical in nature, it does not assist the trier of fact as the jury is capable of reviewing the same evidence and making a lay conclusion on the injuries' cause just as Mr. Atherton has done.

Furthermore, Plaintiffs make no independent qualification, reliability, or helpfulness arguments in favor of admitting Mr. Atherton's testimony on the cause of Plaintiff Stevenson's

injuries. (See Doc. 287, pp. 12–13 (characterizing this testimony as a "description" of the facts Mr. Atherton relied on for what he believes occurred).) This argument misses the mark. In order for Mr. Atherton to offer an opinion on what occurred during the disturbance, such as on the cause of Plaintiff Stevenson's injuries, Plaintiffs must establish that individual opinion's admissibility. See Daubert, 509 U.S. at 592 & n.10. They have failed to meet that burden here. Merely stating that a use-of-force expert reviewed "witness statements, testimony, and video evidence," (doc. 287, p. 12), does not adequately support an injury causation opinion under Daubert.

Accordingly, for these reasons, the Court **GRANTS** this portion of Defendants' Motion and excludes any testimony from Mr. Atherton regarding the cause of Plaintiff Stevenson's injuries.

## CONCLUSION

Based on the foregoing, the Court **GRANTS in part** and **DENIES in part** Defendants' Joint Motion to Exclude Expert Testimony. (Doc. 242.) As detailed above, Mr. Atherton may offer testimony on acceptable use of force standards and practices in correctional settings and he may respond to appropriately posed hypotheticals, but he may not opine on what he believes the handheld video evidence shows or on the ultimate issue of whether Defendants used excessive force or had intent to harm Plaintiffs. Except as explicitly set forth herein, Plaintiffs shall not be permitted to introduce or rely upon Mr. Atherton's expert testimony and opinions.

**SO ORDERED**, this 14th day of May, 2019.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA