# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### STATESBORO DIVISION

| | |
|---|---|
| MIGUEL JACKSON; and KELVIN STEVENSON, | |
| Plaintiffs, | CIVIL ACTION NO.: 6:12-cv-113 |
| v. | |
| JOSEPH CATANZARITI, et al., | |
| Defendants. | |

## O R D E R

Before the Court are Defendants Joshua Eason, Derius Attical, and Sherry Ritchie's Motions for Summary Judgment as to all claims brought against them in this action. (Docs. 233, 237, 244.) This case arises out of a December 31, 2010 disturbance at Smith State Prison in Glennville, Georgia, where Plaintiffs allege that Defendants, corrections officers, either subjected them to excessive force or failed to intervene on their behalf, or both, in violation of their constitutional rights. (Doc. 24.) Against Defendants Eason, Attical, and Ritchie, Plaintiffs bring Eighth Amendment excessive force and failure to intervene claims pursuant to 42 U.S.C. § 1983, regarding alleged unlawful force inflicted upon them in the prison dorm, during their escort to the infirmary, and while they were in the infirmary. (Id.) In their Motions for Summary Judgment, Defendants Eason, Attical, and Ritchie argue that the undisputed evidence shows they neither used excessive force against Plaintiffs nor were in a position to intervene in other officers' use of force during the events in question. (Docs. 233, 237, 244; see also docs. 233-1, 238, 244-1.) They also contend that qualified immunity bars Plaintiffs' claims against them. (Id.) Plaintiffs filed

Responses in Opposition, (docs. 277, 278, 282), to which Defendants Eason, Attical, and Ritchie filed Replies, (docs. 293, 294, 295).

For the reasons set forth below, the Court **GRANTS in part** and **DENIES in part** Defendants Eason and Attical's Motions for Summary Judgment, (docs. 233, 237), but **GRANTS in full** Defendant Ritchie's Motion for Summary Judgment, (doc. 244). Specifically, the Court:

- **GRANTS** Defendant Eason's Motion as to: both Plaintiffs' in-dorm failure to intervene and excessive force claims; Plaintiff Stevenson's escort excessive force claim; and both Plaintiffs' claims regarding failure to intervene and excessive force in the prison's infirmary. As such, the Court **DISMISSES with prejudice** these claims against Defendant Eason as well as Plaintiffs' supervisory liability claims against him.

- **DENIES** Defendant Eason's Motion as to: the portion of his Motion predicated on Plaintiffs' alleged failure to exhaust and state a claim; and both Plaintiffs' escort failure to intervene claims and as to Plaintiff Jackson's escort excessive force claim. As such, these claims remain pending before the Court.

- **GRANTS** Defendant Attical's Motion as to: Plaintiff Jackson's in-dorm failure to intervene and excessive force claims; Plaintiff Stevenson's escort excessive force claim; and both Plaintiffs' claims regarding failure to intervene and excessive force in the prison's infirmary. As such, the Court **DISMISSES with prejudice** these claims against Defendant Attical.

- **DENIES** Defendant Attical's Motion as to: Plaintiff Stevenson's in-dorm failure to intervene and excessive force claims; Plaintiff Jackson's escort failure to intervene and excessive force claims; and Plaintiff Stevenson's escort failure to intervene claim. As such, these claims remain pending before the Court.

- **GRANTS** Defendant Ritchie's Motion as to all failure to intervene and excessive force claims alleged against her by Plaintiffs. As such, the Court **DISMISSES with prejudice** all of Plaintiffs' claims against her and **DIRECTS** the Clerk of Court to **TERMINATE** her as a Defendant upon the docket and record of this case.

In light of this disposition, the Court **ORDERS** all remaining parties to file one joint updated status report within **twenty-one (21) days** of the date of this Order.[1] The parties shall address the status of this case and whether the parties are prepared to proceed to trial. The parties' report must also address the status of those Defendants who were not subject to this Order or the companion Order filed contemporaneously herewith, (doc. 313). As previously indicated, (docs. 174, 231), the parties have discussed voluntarily dismissing, pursuant to Federal Rule of Civil Procedure 41(a), the following yet to be dismissed Defendants: Carolyn Carrol, Kim Hardee, Jeffery Mullis, and Joseph White. However, in their Stipulation of Dismissal, (doc. 232), the parties declined to dismiss these Defendants, and they remain in this case. The parties must update the Court on the status of these defendants and their relevancy to this case. Furthermore, Plaintiffs have failed to file the requisite proof of service as to Defendants Brandon Cearnel, Christopher Henderson, Candice Hill, John Jones, Justin Swope, and Gene Tootle. Pursuant to Federal Rule of Civil Procedure 4(m), the Court **ORDERS** Plaintiffs to show cause, within **twenty-one (21) days** of the date of this Order, as to why these Defendants should not be dismissed from this action for lack of timely service. Additionally, Plaintiffs must explain these Defendants' continued relevancy to this case and what actionable claims, if any, remain against them. Alternatively, Plaintiffs may move to dismiss these Defendants rather than showing cause regarding Plaintiffs failure to properly comply with Federal Rule of Civil Procedure 4(m).

---

[1] This is a reiteration of the direction that the Court issued in its Order on other Defendants' summary judgment motions filed contemporaneously with this Order, (doc. 313). In other words, the parties should only file one joint status report in response to the two Orders.

# BACKGROUND

## I.  Procedural History

Plaintiffs, formerly inmates at Smith State Prison ("Smith State") in Glennville, Georgia, brought this 42 U.S.C. § 1983 action on December 10, 2012, alleging that Defendants violated their constitutional right to be free from excessive force while they were incarcerated at Smith State.  (Doc. 1.)  Plaintiffs filed their First Amended Complaint on January 25, 2013, specifically claiming that, during a prison disturbance occurring the night of December 31, 2010, Defendants used excessive force against them, failed to intervene in other officers' use of excessive force against them, or both.  (Doc. 24, pp. 5–17.)  Plaintiffs set forth these claims under two general counts: Count One against all Defendants for violations of the Eighth and Fourteenth Amendments; and Count Two against Defendant Eason and two other Defendants for Supervisory Liability.  (Id. at pp. 17–21.)  After Plaintiffs filed their First Amended Complaint, the Court stayed this civil action while criminal proceedings against Plaintiffs, stemming from the December 31, 2010 incident at Smith State, ran their course.  (Doc. 81.)

Over three years later, following the end of criminal proceedings against Plaintiffs, the Court lifted the previously imposed stay.  (Doc. 118.)  A lengthy, disputed, and heavily litigated discovery period ensued.  (See, e.g., Docs. 168, 175, 177, 196, 202, 221, 222, 224–26, 228.)  After multiple extensions and the resolution of several disputes, discovery in this case finally closed on December 15, 2017, with motions for summary judgment due on February 5, 2018.  (Docs. 221, 228.)  Pursuant to this deadline, Defendants Eason, Attical, and Ritchie ("Defendants") filed the present Motions for Summary Judgment.[2]  (Docs. 233, 237, 244.)

---

[2]  Throughout the remainder of this Order the Court collectively refers to Defendants Joshua Eason, Derius Attical, and Sherry Ritchie as "Defendants."  The Court notes, however, that other Defendants in this matter—Jarrod Bennett, Nathaniel Milton, Melvin Wells, Andrew McFarlane, Gordon Pittman, and Gary Mitchell—have also moved for summary judgment as to Plaintiffs' excessive force and failure to intervene

## II. Factual Background

The Court begins this Background section by setting forth the general, undisputed facts of the case relevant to the disposition of Defendants' Motions for Summary Judgment. Subsequently, the Court delves into the facts, both undisputed and disputed, particular to each Defendant's Motion presently before the Court.

At the time of the subject events, Plaintiffs were inmates in the custody of the Georgia Department of Corrections ("GDC") and assigned to the D-2 dorm at Smith State.[3] (Doc. 282-1, p. 1.) On the night of December 31, 2010, corrections officers in charge of D-2 instituted a lockdown to search for contraband and released the inmates to dinner. (Doc. 278-1, p. 1.) While searching cell D-234, located on the second story of the dorm and assigned to Plaintiff Jackson, Defendant Joseph Catanzariti uncovered a substance resembling marijuana hidden in a pillow. (Doc. 277-1, p. 2.) Defendant Catanzariti continued his search and located cellphones hidden behind a heater vent; he then requested a screwdriver, hammer, and channel locks so that he could open the vent and seize the contraband. (Id.)

Defendant Catanzariti and the other officers had not yet finished conducting their contraband search when inmates returned to D-2 from dinner.[4] (Doc. 278-1, p. 2.) Inmates were

---

claims against them. (Doc. 240.) Still other Defendants in this matter—Joseph Catanzariti, Sheldon Deloach, Michael Deloach, Caleb Harrison, and Timothy Simmons—have declined to move for summary judgement. The Court addresses the Motion for Summary Judgment at Docket Number 240 by separate order, filed concurrently herewith.

[3] The D-2 dormitory has two levels of prison cells that run along the edges of a roughly v-shaped common area; the second story is accessible from the common area by two sets of stairs, which lead to a railed-off, open walkway, or range, that runs in front of the second-story cells. (Doc. 278-1, p. 1; see also doc. 273-1 (floor plan of D-2); doc. 273-2, pp. 10–14, 41–45 (photographs of D-2).)

[4] Around the time the inmates returned from dinner, a corrections officer began recording with a handheld video camera outside the area where the contraband search occurred. (Doc. 278-1, p. 2.) This video captured some, but not all, of the events in question. (See Doc. 282-1, pp. 7–12.) In addition, three stationary security cameras located in D-2 captured footage of parts of the incident. (Id. at pp. 7–8.) Plaintiffs and Defendants manually filed copies of this video footage with the Court. (See Docs. 241, 286.)

moving freely about the dorm on the top and bottom ranges as Defendant Catanzariti searched cell D-234. (Doc. 277-1, p. 2.) Before the disturbance began, multiple inmates dressed in heavy clothing and boots were congregating outside of D-234, which caused officers concern that an incident was imminent and prompted a call for assistance. (Id. at pp. 2–4; doc. 282-1, pp. 2–3.) Defendants Ritchie and Bennett were present with Defendant Catanzariti at that time, and over ten additional officers eventually arrived on the top range. (Doc. 277-1, p. 4.) In total, approximately ninety-six inmates who resided in D-2 were in various parts of the dorm at this time. (Doc. 282-1, p. 2.) At some point after inmates returned from dinner, Defendants Catanzariti and Andrew McFarlane ordered the inmates to "lockdown" by going into their cells and closing the door. (Doc. 291, pp. 7–8.) Some inmates, however, refused to lockdown. (Id.)

After the lockdown was ordered and additional officers had arrived on the scene, (id.), Defendant Catanzariti finished searching D-234 and exited onto the walkway carrying tools and contraband seized from the cell, (doc. 277-1, pp. 3–4; doc. 278-1, p. 2). Plaintiffs went upstairs to ask Defendant Catanzariti about the lockdown. (Doc. 291, p. 8.) As Defendant Catanzariti walked on the second-story range outside of cell D-234, Plaintiff Jackson, who resided in the searched cell, confronted Catanzariti and told him to "give me that stuff." (Doc. 282-1, p. 3.) The two exchanged words, and Plaintiff Jackson then, according to him, "playfully swiped" at Catanzariti,

---

The video from the handheld camera features audio of the events, but the surveillance videos do not. (Id.) For ease of reference, the Court cites to the manually filed videos at Docket Number 241 and refers to them, based on their source and file name, as follows: handheld video footage ("HHV"); dorm security footage from camera seven ("CAM 7"); dorm security footage from camera eight ("CAM 8"); and dorm security footage from camera nine ("CAM 9"). As indicated by the parties, the surveillance camera video, which is stamped in military time, reflects a time approximately fifty-three minutes and thirty-three seconds *earlier* than the time reflected on the handheld video, which is stamped in standard time. (Doc. 233-2, p. 82; doc. 282-1, p. 19.) The Court has reviewed the footage from each of these sources and relies upon it in conjunction with deposition testimony and other evidence of record. When relying on particular video footage, the Court will cite to the exact time as indicated by the video's timestamp. In addition, where appropriate, the Court will convert the timestamps of each video type so as to provide evidence from both the surveillance and handheld videos of the same point in time.

causing Catanzariti to turn away to protect the tools and contraband he held in his hands. (Id. at pp. 3–4; doc. 278-1, pp. 2–3.) Defendant Catanzariti then struck Plaintiff Jackson in response.[5] (Doc. 277-1, pp. 6, 16.) Immediately following this altercation, the disturbance erupted with several inmates and officers fighting in a skirmish close by on the upper level range. (Doc. 277-1, pp. 4–6; see also doc. 278-1, p. 3; doc. 282-1, p. 4.)

During the disturbance, both Plaintiffs were involved in separate physical altercations with officers on the upper range. (Doc. 282-1, p. 2.) Defendant Ritchie called for backup and more officers arrived on the scene. (See Doc. 291, pp. 12–14.) After Plaintiff Stevenson was handcuffed and restrained in a prone position on the ground by two officers, Defendant Catanzariti struck Stevenson multiple times toward his head area.[6] (Doc. 291, pp. 21–22; HHV at 11:02:47–11:02:52PM.) Elsewhere in the dorm, inmates were in their cells or assumed prone positions on the ground as officers worked to regain control of the situation. (CAM 7 at 22:04:30–22:09:45.) In order to quell the disturbance, officers deployed pepper spray and were able to quickly subdue the inmates. (Doc. 278-1, p. 3; doc. 282-1, p. 25.) Starting from when the commotion began until the time at which corrections officers on the scene had largely quelled the situation, approximately two minutes passed. (See HHV at 11:00:00–11:03:45PM; CAM 9 at 22:07:20–22:09:30.)

However, soon after officers regained control of the situation, Defendant Catanzariti became involved in another physical altercation with Plaintiff Jackson. (Doc. 282-1, pp. 26–28;

---

[5] Although what is recounted above is undisputed as described, Plaintiffs and Defendants vigorously dispute anything more specific about what occurred between Plaintiff Jackson and Defendant Catanzariti outside of D-234 before the disturbance began. (See, e.g., Doc. 277-1, pp. 3–6; doc. 278-1, pp. 2–3; doc. 278-1, pp. 5–6; doc. 282-1, pp. 3–4.)

[6] The parties agree that Defendant Catanzariti struck Plaintiff Stevenson, but they dispute the number of times Stevenson was struck, whether Catanzariti used a hammer or some other object to strike Stevenson, and the extent to which, if at all, Stevenson was resisting at that time. (See, e.g., Doc. 291, pp. 21–22; doc. 282-1, pp. 14–15; doc. 277-1, pp. 8–9.)

HHV 11:04:00–11:07:43PM.)  In this instance, Defendant Catanzariti made an arm movement toward Plaintiff Jackson's head with an object in his hand—while Jackson was handcuffed, held, and surrounded by other officers—that caused Jackson to collapse to the ground.[7]  (Doc. 291, pp. 124–29; HHV at 11:07:25–11:07:40PM.)  Officers, including Defendant Eason, then escorted a bloodied Plaintiff Jackson down the stairs from the upper range and out of the D-2 dormitory. (Doc. 282-1, pp. 29–32, 36; HHV at 11:07:40–11:08:03PM.)  Less than one minute prior to this escort, Defendant Harrison and another officer escorted a bloodied Plaintiff Stevenson down the same stairs and out of D-2, toward the infirmary.  (Doc. 268, pp. 7, 11–12, 25–27; HHV at 11:06:51–11:06:59PM; CAM8 at 22:13:30–22:13:40.)

Once out of the dormitory, Plaintiffs were taken to the prison infirmary for treatment. (Doc. 278-1, p. 9.)  Plaintiffs allege that, after being steered through D-2's sally port and brought outside, multiples officers repeatedly beat them during the rest of their escort to the infirmary and while they were held there.[8]  (Id.; doc. 282-1, pp. 36–39.)  Plaintiffs' medical conditions required that they be taken to the hospital that night for evaluation and treatment, but they did not stay overnight and later returned to Smith State's medical unit.  (Doc. 291, pp. 22–23, 63–64; see doc. 233-2, pp. 84–94 (Plaintiffs' medical records).)

Plaintiff Stevenson suffered extensive injuries to his head area, including a fractured right eye orbital socket (upper and lower), a broken jaw, damage to a vertebra in his neck, severe facial

---

[7]  Similar to the disturbance altercation between Plaintiff Stevenson and Defendant Catanzariti, the parties agree that Defendant Catanzariti motioned his arm toward Plaintiff Jackson while holding an object, but they dispute whether that movement made contact and whether Catanzariti held a flashlight, metal detector wand, or some other object in his hand when motioning toward Jackson.  (See, e.g., Doc. 282-1, pp. 26–28; doc. 291, pp. 124–29.)

[8]  The sally port is a gateway between D-2 and a fenced-in walkway outside, which has a secured vestibule between the outside walkway and the dorm.  (See Doc. 273-1; doc. 273-2, pp. 1, 42, 55–58, 62.)  From the secured vestibule, one can enter the D-2 control room, the bottom floor of the dorm itself, or exit to the outdoor walkway.  (Id.)

damage on the right side of his face, nerve damage in his shoulder and neck, lost teeth, headaches, and PTSD. (Id. at pp. 22, 60; see also doc. 259-2, pp. 52–54 (photographs of Plaintiff Stevenson's injuries); doc. 233-2, pp. 89–94 (Plaintiff Stevenson's medical records.)) Plaintiff Jackson's injuries were not as significant, but per his testimony, he suffered a broken nose, facial lacerations, a knocked-out tooth, knee complications, a ruptured ear drum, headaches, and PTSD. (Doc. 291, p. 145; see also doc. 282-2, pp. 10–11 (photographs of Plaintiff Jackson's knee injury); doc. 281, pp. 46–48 (photographs of Plaintiff Jackson's head injuries); doc. 233-2, pp. 84–88 (Plaintiff Jackson's medical records).) The medical evidence of record shows that both Plaintiffs' main injuries were to their head areas. (See Doc. 282-1, pp. 34, 41.)

With this general overview in mind, the Court now turns to detailing what the evidence shows Defendants did, or did not do, in relation to the prison disturbance incident and Plaintiffs' ensuing excessive force and failure to intervene claims. The Court begins each section by outlining the specific claims Plaintiffs maintain against each Defendant at summary judgment, based on their stipulations to the evidence of record. To parallel Plaintiffs' alleged claims, the Court will recount what the evidence shows as to these Defendants' conduct in the D-2 dorm, during the escort to the prison's infirmary, and in the infirmary. As will be seen, the parties dispute much of the evidence in this regard.

### A.    Defendant Joshua Eason

Against Defendant Eason, Plaintiffs are pursuing claims for his alleged: (1) failure to intervene in Plaintiffs' dorm altercations with officers, (2) failure to intervene in the events which took place during Plaintiffs' escort outside of D-2, and (3) excessive force during Plaintiff Jackson's escort outside. (See Doc. 282-1, pp. 4–9, 20–23, 27–32, 35–40.)

### (1) Events in the D-2 Dormitory

Prior to the start of the disturbance, Defendant Eason entered D-2 carrying a large pepper-spray canister and walked half-way up the stairs nearest where inmates were gathering before walking back downstairs. (Doc. 282-1, p. 11; CAM 8 at 22:06:16–22:07:21.) When the skirmish between officers and inmates began seconds later, Defendant Eason stood on the bottom range of D-2, just below the area of the top range where the disturbance unfolded. (Doc. 282-1, p. 11.) Almost immediately, he darted toward the action and discharged a torrent of pepper spray upward, at the skirmishing group of officers and inmates, for approximately thirteen seconds. (Id.; CAM 9 at 22:07:22–22:07:37.) He then went upstairs to assist Officer Henderson in handcuffing an inmate who was to the left of the top of the stairs, but the parties dispute which inmate Defendant Eason assisted with, and the evidence on this point is unclear. (Doc. 282-1, p. 12; CAM 8 at 22:07:50–22:07:57; CAM 9 at 22:07:43–22:07:52.)

Defendant Eason testified that, although he did not recall going upstairs at this time, he believed the video evidence showed him assisting with handcuffing Plaintiff Jackson. (Doc. 270, pp. 24–25.) Officer Henderson testified that he was not sure whether Defendant Eason assisted in handcuffing either Plaintiff Stevenson or Jackson and that he was also not sure whether he himself ever cuffed either Plaintiff, but Henderson acknowledged that his witness statement indicated he handcuffed Plaintiff Jackson. (Doc. 266, pp. 4–6, 15, 25–26, 28.) Surveillance camera footage depicts Defendant Eason going upstairs and bending down to assist with an inmate located at the top of the stairs to the left, in the location where Plaintiff Jackson alleges Defendant Catanzariti struck him. (CAM 8 at 22:07:50–22:09:07; CAM 9 at 22:07:43–22:09:02; HHV at 11:07:27–11:07:32PM; doc. 282-1, pp. 25–27; see also doc. 259-2, p. 5 (Plaintiff Stevenson's Declaration

identifying himself in the skirmish located further down to the left of the upper range from where Plaintiff Jackson alleges Defendant Catanzariti struck him).)

After assisting for approximately one minute, Defendant Eason headed back down the stairs and toward the control booth, away from the top-range skirmishes.  (Doc. 282-1, pp. 12–13; CAM 8 at 22:09:00–22:09:18; CAM 9 at 22:09:02–22:09:08.)  At this juncture, Defendant Eason appears to have left the scene as he was no longer visible on the surveillance camera video.  (Id.) While Defendant Eason was away from the action, Defendant Catanzariti struck Plaintiff Stevenson several times toward the head area.  (HHV at 11:02:47–11:02:52PM; doc. 282-1, pp. 14–15; see also doc. 233-2, p. 82 ("Summary of Video Evidence" chart submitted by Defendant Eason noting that Eason left the upper range fifteen seconds before the strikes seen on the HHV).) Sixteen seconds later, Defendant Eason returned to the bottom range and walked back up the same flight of stairs toward where Plaintiffs were restrained.  (Doc. 282-1, pp. 13–14; CAM 8 at 22:09:35–22:10:00; CAM 9 at 22:09:38–22:09:56.)  The parties dispute, however, whether this was the only time that Defendant Catanzariti struck Plaintiff Stevenson and also where Defendant Eason was during all of Catanzariti's alleged strikes.  (Doc. 282-1, pp. 14–23.)

At his deposition, Plaintiff Stevenson testified Defendant Catanzariti struck him ten to fifteen times with a hammer, while he was lying handcuffed on the floor of the upper range, causing him to momentarily lose consciousness.  (Doc. 240-3, pp. 10–11, 14, 23–24.)  It is undisputed that part of this alleged beating is shown on the handheld video—from 11:02:47PM to 11:02:52PM—and that during this portion Defendant Eason was not on the upper range. (Doc. 282-1, pp. 12–17.)  However, Plaintiff Stevenson contends that evidence supports his claim that force was being used against him while Defendant Eason was still on the upper range, before he headed back downstairs, and that the handheld video fails to show when the hammer beating

incident began. (Doc. 282-1, pp. 13–22.) Defendant Eason maintains that the handheld video captured the entirety of the time period during which force was used against Plaintiff Stevenson in D-2, and that he was downstairs during this time period. (Id.) He also denies ever seeing Catanzariti using force on an inmate that night, (doc. 270, p. 11).

Plaintiff Stevenson points to the following evidence to show Defendant Eason was still on the upper range during part of the alleged hammer beating incident: Officer Hill testified she saw Defendant Eason on the upper range, near an inmate Catanzariti struck, but she was not sure whether she observed this before or after the events captured on the handheld held video. (Doc. 267, pp. 12, 25–26.) Officer Hill testified to seeing Defendant Eason walk from the vicinity of Catanzariti and the inmate who was lying on the ground at the 11:03:47PM mark, (id. at p. 26), which is after Catanzariti is shown (on the handheld video) striking Plaintiff Stevenson. Defendant Attical testified to seeing Defendant Eason with Catanzariti and other officers prior to these strikes, sometime following the 11:01:52PM mark of the handheld video, but his testimony is unclear as to precisely when or where he saw Defendant Eason with Catanzariti. (Doc. 214, p. 21; see also doc. 291, p. 88.) Officer Davis placed Defendant Eason on the upper range, walking leftward toward a group of officers less than a minute before the strikes captured on the handheld video occurred, but he was not clear which officers Defendant Eason walked toward. (Doc. 212, pp. 22–23.) Inmate Satterfield testified that he believed he saw Defendant Eason restraining Plaintiff Stevenson during the subject hammer attack. (Doc. 262, pp. 15, 25, 28–29.) He also explained that the at-issue portion of handheld video does *not* show the time during which he witnessed Defendant Catanzariti strike Plaintiff Stevenson with a hammer. (Id. at pp. 16–18 (indicating that HHV sequence 11:02:47–11:02:50PM occurred after what he witnessed).) Lastly, in the period when Defendant Eason was undisputedly on the upper range after the disturbance broke out—from

22:07:50 to 22:09:00 on surveillance cameras eight and nine—Officer Harvey can be heard on the handheld video shouting, "that a damn hammer."[9] (HHV at 11:01:46–11:01:50PM; doc. 213, pp. 13–14.) Officer Harvey testified that she recalled seeing someone holding a hammer on the upper range at this time but was not sure who. (Doc. 213, pp. 13–14.)

Sixteen seconds after Defendant Catanzariti struck Plaintiff Stevenson multiple times, as shown on the handheld video, Defendant Eason reappeared on the bottom range of D-2 and went up the same flight of stairs he had previously traversed. (Doc. 282-1, pp. 13–14; CAM 8 at 22:09:35–22:10:00; CAM 9 at 22:09:38–22:09:56.) While on the upper range at this time, Defendant Eason assisted officers, including Defendant Catanzariti, with arresting and escorting Plaintiff Jackson out of the dormitory.[10] (Doc. 282-1, pp. 26–27, 35–36; doc. 270, pp. 11, 20–23.) Prior to escorting him outside of D-2, Defendant Eason held a handcuffed Jackson up by the back of his shirt, against a wall, while surrounded by other officers. (HHV at 11:07:27–11:07:32PM; doc. 282-1, pp. 26–28.)

As Defendant Eason held Plaintiff Jackson, Defendant Catanzariti positioned himself between Jackson and another inmate, and then made a single arm movement with an object toward Jackson's head. (Id.) Defendant Catanzariti motioned his arm and the object at Plaintiff Jackson underneath the arms of Defendant Eason, who did not react. (Id.) Plaintiff Jackson, with

---

[9] This time period, as shown on surveillance cameras eight and nine, corresponds to 11:01:23–11:02:33PM on the handheld video, which is also when Defendant Catanzariti was on the upper range after having used a hammer during the contraband search. (See Doc. 233-2, p. 82.)

[10] Before Defendant Eason is shown on the handheld video assisting with Plaintiff Jackson, he can be seen on the upper range carrying a baton and walking away from the area where Defendant Catanzariti and Plaintiff Stevenson's altercation took place and then down the stairs again. (HHV at 11:03:47–11:04:02PM; doc. 282-1, pp. 29–30; see also CAM 8 at 22:10:18–22:10:39; CAM 9 at 22:10:14–22:10:30.) Defendant Eason paced around the bottom area of D-2, baton in hand, until he went back upstairs to the upper range less than a minute later. (CAM 9 at 22:10:35–22:11:20; see also doc. 270, pp. 25–26.)

Defendant Eason still holding the back of his shirt near his arm, then stumbled backward and fell to his knees. (HHV at 11:07:32–11:07:36PM; doc. 282-1, p. 28.) Thereafter, Defendant Eason and another officer lifted Plaintiff Jackson up and escorted him down the stairs and toward the exit of the dormitory, holding him by the back of his shirt. (HHV at 11:07:36–11:07:49PM, 11:07:57–11:08:04PM; CAM 8 at 22:14:08–22:14:29; doc. 282-1, pp. 30–32.) Defendant Catanzariti and other officers followed closely behind, escorting another inmate toward D-2's exit. (CAM 8 at 22:14:11–22:14:30; HHV at 11:08:03PM; doc. 291, pp. 151, 153–55.)

Although this incident is captured on the handheld video, the parties dispute whether Defendant Catanzariti contacted Plaintiff Jackson's person and whether he held a flashlight, metal detector, or some other object. Additionally, they dispute whether Plaintiff Jackson resisted in some way and whether he intentionally fell to his knees. (Doc. 282-1, pp. 26–28.) The handheld video is not absolutely conclusive on these issues and the relevant testimony is conflicting. (See HHV at 11:07:27–11:07:36PM; doc. 282-1, pp. 26–30.)

### (2)   Escort Outside of the D-2 Dormitory

Plaintiff Jackson testified that, while outside D-2 and while being escorted to the prison's infirmary, six to seven officers beat him in the knees and legs with objects, and kicked and hit him all over his body. (Doc. 282-1, pp. 33–34; doc. 240-4, pp. 15–16, 18, 33.) Defendant Eason did not escort Plaintiff Jackson all the way to the infirmary, but he did take Jackson outside of D-2. (Doc. 282-1, pp. 35–36; doc. 270, p. 11.) Once outside, Defendant Eason worked to clear his eyes and lungs of pepper spray, and while doing so, other officers took Plaintiff Jackson to the infirmary. (Id.) According to Plaintiff Jackson, he was assaulted by officers once he was outside of D-2 and he suffered additional abuse along the way and in the infirmary itself. (Doc. 282-1, p. 36; doc. 240-4, pp. 15–16, 18, 33.) Three inmates testified to witnessing these assaults against

Plaintiff Jackson outside of D-2 and on the way to the infirmary. (Doc. 191, pp. 7–8; doc. 192, pp. 9–10, 19–20; doc. 263, pp. 24–25.) Defendant Eason disputes this account of the events outside of D-2 and denies using excessive force against Plaintiff Jackson while outside the dorm. (Doc. 282-1, pp. 5–7; see doc. 270, p. 11.)

Plaintiff Stevenson also testified to being beaten during his escort to the prison's infirmary. (Doc. 282-1, pp. 36–37.) Specifically, according to Stevenson, after he was taken outside to the front of D-2, Defendant Catanzariti and other officers attacked him with the butt end of a pepperball gun, kicked him, and punched him using handcuffs as brass knuckles. (Doc. 240-3, pp. 11–12.) While this attack against Plaintiff Stevenson occurred, other officers allegedly watched without intervening. (Id. at p. 14.) One of the inmates who saw the attack against Plaintiff Jackson outside of D-2 also testified that he saw officers attack Plaintiff Stevenson in this same area. (Doc. 263, pp. 12–13.) Other inmates described seeing officers beating handcuffed inmates outside of the dorm. (See Doc. 282-1, pp. 38–39.) Defendant Eason, however, disputes being outside of D-2 when these alleged events took place. (Doc. 282-1, p. 37.) Nonetheless, it is undisputed that Plaintiff Stevenson was escorted out of the dorm approximately one minute before Defendant Eason took Plaintiff Jackson outside. (Id. at p. 40; doc. 291, p. 149; see also CAM 8 at 22:13:21–22:13:40 (Stevenson being escorted toward D-2's sally port), 22:14:08–22:14:29 (Jackson being escorted toward D-2's sally port).) Both Plaintiffs were injured and bleeding prior to being taken out of D-2, and the medical evidence of record indicates severe injuries to their head and facial areas but not elsewhere. (Doc. 282-1, pp. 32–33, 34, 41.)

## B. Defendant Derius Attical

Against Defendant Attical, Plaintiffs assert claims regarding his alleged: (1) failure to intervene in Plaintiff Stevenson's dorm altercations with officers, (2) use of excessive force against

Plaintiffs in the dorm, (3) failure to intervene in the events which took place during Plaintiffs' escort from the dorm, and (4) use of excessive force during Plaintiffs' escort from the dorm. (See Doc. 278, pp. 1–2, 14–22; see also doc. 278-1, pp. 4–11.)

### (1) Events in the D-2 Dormitory

Prior to the start of the disturbance, when officers were searching for contraband in D-2, Defendant Attical, seen on video wearing a wool cap, was walking around on the bottom range as inmates milled about. (HHV at 10:57:04–10:58:01PM; doc. 214, p. 11.) Defendant Attical circled the bottom range, checking cell doors, before disappearing from the view of any camera. (CAM 9 at 22:03:40–22:04:47; doc. 293, p. 6.) The disturbance broke out two minutes and thirty-six seconds later, with Defendant Attical's precise whereabouts unknown. (Doc. 238, pp. 4–5; doc. 293, p. 6; HHV at 11:00:57PM.) Shortly after it began, however, Defendant Attical was struck with pepper spray in his eyes as he subdued an inmate on the upper level of the dorm. (Doc. 214, p. 22.) Defendant Attical testified that an officer came to assist him with handcuffing the inmate and then walked him to the control booth so he could wash his eyes out. (Id.) It is unclear precisely when this occurred.[11] (Doc. 278-1, pp. 3–4.)

Almost three minutes after the disturbance began, and approximately fifty seconds after Catanzariti is shown striking Plaintiff Stevenson, Defendant Attical can be seen on the upper range approaching the area where Catanzariti and other officers were still involved with Stevenson. (HHV at 11:03:37–11:03:40PM; doc. 238, p. 5.) Defendant Attical is shown approaching this area

---

[11] Catanzariti claims he was the officer who assisted Defendant Attical with handcuffing the inmate while Attical was blinded by pepper spray. (Doc. 274, pp. 30, 52.) Catanzariti testified as follows: "[Attical] said he couldn't get [the inmate] handcuffed, he couldn't see. So I told him I could see. . . . We got [the inmate] handcuffed, got him up. Walked downstairs. I met up with another officer downstairs. Attical went in the control room to wash his face off because he had pepper spray in his eyes. I walked [the inmate] to medical . . . and c[a]me back." (Id. at p. 30.) According to Catanzariti, this event took place *after* his altercation with Plaintiff Stevenson. (Id. at p. 52.)

from the far side of D-2, away from where Plaintiffs' altercations occurred. (Id.) But the handheld video quickly cuts away before he reaches the group, (HHV at 11:03:40PM), and neither party points to any other video evidence of record showing Defendant Attical's whereabouts during the time period surrounding the disturbance and Plaintiffs' in-dorm use of force claims, (see docs. 238, 278, 278-1, 293).

However, Plaintiffs assert that several eyewitnesses have placed Defendant Attical near the area where Catanzariti attacked Stevenson during this time period. (Doc. 278-1, pp. 5–8.) For example, Plaintiffs point to the testimony of Defendant Caleb Harrison who testified that Attical was with him on the upper range when the disturbance began and when Harrison tackled Plaintiff Stevenson. (Doc. 268, pp. 5, 19.) In addition, Officer Hill stated that she believed she saw Defendant Attical on the upper range standing near where Catanzariti was engaged with an inmate, but she could not be sure based on her memory. (Doc. 267, pp. 12, 41.) Several inmates—Briscoe, Satterfield, Neely, and Thomas—also testified that Defendant Attical was involved in Plaintiff Stevenson's altercation with Catanzariti in some fashion, including using force against and restraining Stevenson. (See Doc. 278-1, pp. 5–6.) Defendant Attical disputes the weight of this eyewitness testimony and contends that, for various reasons, it fails to show he was ever in a position to intervene on Plaintiff Stevenson's behalf or to use excessive force against him while inside D-2.[12] (Doc. 293, pp. 4–10.)

### (2)    Escort Outside of the D-2 Dormitory

After the disturbance, both Plaintiffs were escorted to the Smith State infirmary to receive treatment. (Doc. 278-1, p. 9.) As has been noted, Plaintiffs allege that officers beat them while

---

[12] With respect to Plaintiff Jackson, it is undisputed that Defendant Attical was not in a position to intervene when Catanzariti struck at him with an object, (doc. 278-1, pp. 7–8); however, Plaintiffs baldly assert that inmate Shawn Thomas identified Attical as an officer who used excess force against Jackson, (id. at p. 6).

they were escorted from the dormitory. (Id.) Defendant Attical did not escort either Plaintiff from D-2, but the surveillance camera shows him quickly following Defendants Eason and Catanzariti as they escorted Jackson and another inmate outside. (CAM 8 at 22:14:30–22:14:33; doc. 278, p. 19.) However, per the evidence submitted by the parties, no witness specifically identified Defendant Attical as an individual who used force against Plaintiffs while they were being escorted to the infirmary. (Doc. 238, p. 9; see docs. 278, 278-1.) The surveillance video only shows Defendant Attical running in the direction of an off-camera exit, and no witnesses placed him outside of D-2 at this time. (Doc. 293, pp. 12–13.)

### C.     Defendant Sherry Ritchie

Against Defendant Ritchie, Plaintiffs are pursuing a single claim: failure to intervene on Plaintiff Stevenson's behalf during his dorm altercation with officers. (See Doc. 277-1, pp. 7–10, 13, 15–16; see also doc. 277, pp. 1–2.)

Prior to the disturbance, Defendant Ritchie stood in the doorway of D-234 to prevent inmates from entering the cell while Catanzariti searched for contraband. (Doc. 277-1, p. 2.) After completing his search, Catanzariti walked out of the cell carrying tools and seized contraband whereupon he encountered Plaintiff Jackson, a resident of D-234. (Id. at pp. 3–4.) An altercation over the contraband ensued between Catanzariti and Plaintiff Jackson, causing Defendant Ritchie to radio for officer backup. (Id. at pp. 4–6.) Catanzariti struck Plaintiff Jackson, and thereafter the disturbance in D-2 broke out. (Id.)

Defendant Ritchie claims to have only witnessed this single, initial strike by Catanzariti against Jackson, but Plaintiffs contend that Ritchie also observed Catanzariti striking a compliant, handcuffed Plaintiff Stevenson after the inciting incident. (Id. at pp. 8–10.) Plaintiff Stevenson observed Defendant Ritchie on the upper range while Catanzariti beat him, but he also described

how "she had backed away" as the strikes occurred. (Doc. 240-3, p. 11.) On the handheld video, Defendant Ritchie can be seen walking toward and then standing next to Catanzariti as he struck Plaintiff Stevenson, who was lying prone on the ground and restrained by officers. (HHV at 11:02:48–11:02:53PM; doc. 214, pp. 17–18; doc. 213, pp. 15, 19.) She appears to then walk away from the group of officers surrounding Plaintiff Stevenson. (HHV at 11:03:14PM; doc. 260, pp. 8–9.) Approximately thirty-seconds later, Defendant Ritchie was still on the upper range looking toward the group of officers surrounding Plaintiff Stevenson, but by this time, she had moved slightly further down the range in the direction of the stairs. (HHV at 11:03:47PM; doc. 260, pp. 6, 9.) Defendant Ritchie remained on the upper range until she descended the stairs and left the dorm almost two and a half minutes later. (HHV at 11:06:04PM; CAM 8 at 22:12:27–22:12:58; doc. 260, p. 7.)

As a matter of background, Defendant Ritchie notes she is 5'2" in height. (Doc. 277-1, p. 13.) In the Fall of 2010, she had surgery to repair meniscus tears and remove arthritic build up in both knees and was out of work for a period of time. (Id.) Defendant Ritchie returned to work that October, but she was still recovering as of December 31, 2010, the night in question. (Id.)

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in the light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)). However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Fed. R. Civ. P. 56(c)). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (emphasis and citation omitted).

## DISCUSSION

Plaintiffs' excessive force and failure to intervene claims, as presented on Defendants' Motions for Summary Judgment, require analysis of the Eighth Amendment's proscription against cruel and unusual punishment.

That proscription governs the amount of force that prison officials are entitled to use against inmates. <u>Campbell v. Sikes</u>, 169 F.3d 1353, 1374 (11th Cir. 1999). An excessive force claim has two requisite parts: an objective and a subjective component. <u>Sims v. Mashburn</u>, 25 F.3d 980, 983 (11th Cir. 1994). To satisfy the objective component, the inmate must show that the prison official's conduct was "sufficiently serious." <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994) (quoting <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991)). The subjective component requires a showing that the official acted with a "sufficiently culpable state of mind." <u>Sims</u>, 25 F.3d at 983 (citing <u>Hudson v. McMillan</u>, 503 U.S. 1, 8 (1992)). "The core judicial inquiry . . . is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 37, 39 (2010) (citation and internal quotations omitted) (holding that there is no "significant" or "non-*de minimis*" threshold injury requirement).

In order to determine whether the official used force maliciously and sadistically to cause harm or in good faith to restore order, courts consider the following factors: (1) the need for the exercise of force; (2) the relationship between the need for force and the amount of force applied; (3) the extent of injury inflicted on the inmate; (4) the extent of the threat to the safety of staff and other inmates; (5) and any efforts taken to temper the severity of a forceful response. <u>Fennell v. Gilstrap</u>, 559 F.3d 1212, 1217 (11th Cir. 2009)). These factors are viewed from the correctional officer's point of view based on the facts known at the relevant time, and courts are to "give a wide range of deference to prison officials acting to preserve discipline and security." <u>Id.</u> Deference,

however, "is not absolute and does not insulate from review actions taken in bad faith or for no legitimate purpose." Id. (citing Ort v. White, 813 F.2d 318, 322 (11th Cir. 1987)). "Once a prisoner has stopped resisting there is no longer a need for force, so the use of force thereafter is" unconstitutionally excessive. Danley v. Allen, 540 F.3d 1298, 1309 (11th Cir. 2008).

The Eighth Amendment also "imposes a duty on prison officials to take reasonable measures to guarantee the safety of the inmates." Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099–1100 (11th Cir. 2014) (quoting Farmer, 511 U.S. at 832). Pursuant to this duty, "an officer can be liable for failing to intervene when another officer uses excessive force." Priester v. City of Riviera Beach, 208 F.3d 919, 924 (11th Cir. 2000) ("If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable[.]" (alteration in original) (quoting Ensley v. Soper, 142 F.3d 1402, 1407–08 (11th Cir. 1998))); see also Skrtich v. Thornton, 280 F.3d 1295, 1301 (11th Cir. 2002). "Even if an officer personally did not use excessive force, an officer who is present at the scene can be alternatively liable for failing to take 'reasonable steps to protect the victim of another officer's use of excessive force.'" Johnson v. White, 725 F. App'x 868, 878 (11th Cir. 2018) (per curiam) (quoting Hadley v. Gutierrez, 526 F.3d 1324, 1330–31 (11th Cir. 2008)).

"This liability, however, only arises when the officer is in a position to intervene and fails to do so." Priester, 208 F.3d at 924. A successful claim requires "facts showing the necessity or real opportunity for the defendant-officers to intervene in a fellow officer's unlawful conduct." Keating v. City of Miami, 598 F.3d 753, 764 (11th Cir. 2010). When events occur so quickly that the officer cannot intervene in the use of excessive force, he or she is not liable for another's constitutional violation. Fils v. City of Aventura, 647 F.3d 1272, 1290 n.21 (11th Cir. 2011) (citing

Brown v. City of Huntsville, 608 F.3d 724, 740 n.25 (11th Cir. 2010)).  Moreover, if there is no

underlying use of excessive force, there is no obligation to intervene.  Crenshaw v. Lister, 556

F.3d 1283, 1294 (11th Cir. 2009).

## I.    Defendant Eason's Motion for Summary Judgment (Doc. 233)

At summary judgment, Plaintiffs maintain the following claims against Defendant Eason:

(1) failure to intervene in both Plaintiffs' dorm altercations with officers, (2) failure to intervene

in the events that took place during both Plaintiffs' escorts outside of D-2, and (3) use of excessive

force against Plaintiff Jackson during his escort outside.[13]  (See Doc. 282-1, pp. 4–9, 20–23, 27–

32, 35–40; see also doc. 282, pp. 14–19.)  Defendant Eason seeks summary judgment as to all

claims brought against him by Plaintiffs.[14]  (Doc. 233.)

---

[13] In their Amended Complaint, Plaintiffs allege a "Supervisory Liability" count against Defendant Eason. (Doc. 24, pp. 19–20.)  In responding to Defendant Eason's Motion for Summary Judgment, however, Plaintiffs do not press this claim as an independent basis of liability for Eason.  (See Doc. 282.)  To the extent Plaintiffs seek to hold Defendant Eason independently liable based solely on his supervisory capacity, such claim fails as a matter of law because *respondeat superior* liability is not available in Section 1983 cases.  Bryant v. Jones, 575 F.3d 1281, 1299 (11th Cir. 2009); Braddy v. Fla. Dep't of Labor & Emp't Sec., 133 F.3d 797, 801 (11th Cir. 1998).  A supervisor may be liable only through personal participation in the alleged constitutional violation or when there is a causal connection between the supervisor's conduct and the alleged violations.  Braddy, 133 F.2d at 802; see also Barr v. Gee, 437 F. App'x 865, 875 (11th Cir. 2011) (per curiam) (setting forth the avenues to state a viable claim against a supervisory defendant).  Here, Plaintiffs have alleged, and presented evidence of, Defendant Eason's direct involvement (or nonfeasance) in their excessive force and failure to intervene claims brought against him.  Plaintiffs' supervisory allegations are redundant of these claims.  (See Doc. 24, pp. 19–20.)  Thus, rather than seeking to hold Defendant Eason liable based on his supervisory status, Plaintiffs have asserted direct claims against him. See Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986) ("If a police officer, *whether supervisory or not*, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983." (emphasis added)); Frederick v. Silva, No. 18-80483, 2018 U.S. Dist. LEXIS 138940, at *38–41 (S.D. Fla. Aug. 15, 2018) (discussing supervisory liability in the context of failure to intervene and excessive force claims).  As such, the Court **GRANTS** Defendant Eason's Motion for Summary Judgment as to the supervisory liability claim against him, (doc. 233), and **DISMISSES** that claim with regard to Defendant Eason.

[14] As noted, in their First Amended Complaint, Plaintiffs set forth their excessive force and failure to intervene allegations and claims generally against all Defendants in this action.  (See Doc. 24, pp. 5–19.)  Following discovery, however, Plaintiffs have indicated the undisputed facts show that Defendant Eason did not use excessive force in D-2 against either Plaintiff, did not use excessive force against Plaintiff Stevenson during his infirmary escort, and did not commit any alleged constitutional violations against either Plaintiff in the infirmary.  (See Doc. 282-1, pp. 4–5, 35–46; see also doc. 282, pp. 14–19.)  Because

## A.	The Parties' Arguments

As to Plaintiff Stevenson's failure to intervene claims against him, Defendant Eason argues not only that there is insufficient evidence to support those claims, but also that the undisputed evidence actually proves he was not in a position to intervene during the events that took place in the D-2 dorm or in the events that took place when Stevenson was taken outside of the dorm and was being escorted to the infirmary.  (Doc. 233-1, pp. 14–18, 22–24.)

As to Plaintiff Jackson's in-dorm failure to intervene claim, Defendant Eason argues that it fails because Jackson neglected to exhaust his prison administrative remedies as to the claim. Eason also argues there is no evidence supporting Jackson's in-dorm failure to intervene claim, and furthermore, that the video evidence insulates Eason from liability on this claim because it shows there was insufficient time for him to intervene.  (Id. at pp. 19–21.)  On Plaintiff Jackson's claims regarding the infirmary escort, Defendant Eason argues there is no evidence of his involvement in or knowledge of the events that took place outside of D-2, nor is there any evidence of injury consistent with Jackson's escort allegations, so both the excessive force and failure to intervene claims in this regard fail.  (Id. at pp. 22–24.)  Lastly, Defendant Eason asserts qualified immunity with respect to all claims.  (Id. at pp. 24–25.)

In response, Plaintiffs contend the evidence shows Defendant Eason had the opportunity to intervene in Defendant Catanzariti's attacks on them in the dorm.  (Doc. 282, pp. 2–3.) Additionally, Plaintiffs aver that evidence "places Eason at the scene outside when multiple officers continued to brutalize nonresistant Jackson and Stevenson."  (Id.)  Defendant Eason's contention that he was not in a position to intervene in Stevenson's dorm altercation, Plaintiff

the parties agree Defendant Eason did not act unlawfully in these situations, the Court **GRANTS** his Motion for Summary Judgment as to these excessive force and failure to intervene claims, (doc. 233), and **DISMISSES** those claims with regard to Defendant Eason.  Fed. R. Civ. P. 56(a).

Stevenson further argues, "rests largely on an elaborate but materially inaccurate interpretation of the video evidence." (Id. at pp. 15–16.) As for Plaintiff Jackson, he argues Defendant Eason should have intervened in the force used against him in the dorm because he had "already observed [Catanzariti's] wrath on Stevenson moments earlier." (Id.) In sum, Plaintiffs contend that a rational jury could find Defendant Eason knew what was happening to both of them in the dorm and outside, that he participated, and that he disregarded opportunities during which he could have reasonably intervened. (Id. at pp. 17–19.) Lastly, Plaintiffs argue that, because "precedent clearly establishe[s] that government officials may not use gratuitous force against a prisoner who has been already subdued," Defendant Eason is not entitled to qualified immunity. (Id. at pp. 20–22.)

In reply, Defendant Eason contends Plaintiff Stevenson's deposition testimony, in combination with the video evidence, shows he could not have intervened in the dorm altercation between Stevenson and Catanzariti because he was not in the area at that time. (Doc. 294, pp. 6–7, 15–20.) Defendant Eason also emphasizes that, as a matter of law, he cannot be held liable for not intervening in Catanzariti's single strike against Plaintiff Jackson on the upper range of D-2 (while he was restrained and about to be taken downstairs in the dorm). (Id. at pp. 8–10.) As for the events which took place outside of D-2, Defendant Eason argues there is no credible evidence that Plaintiffs were attacked in the manner asserted and, further, that their claims are belied by the medical evidence of record. (Doc. 294, pp. 2–6, 11–15, 20.) Thus, Defendant Eason concludes, Plaintiffs cannot successfully maintain their claims against him regarding the events outside D-2. (Id.)

### B. Failure to Intervene During Plaintiffs' Dorm Altercations

On a failure to intervene claim, the "plaintiff has the burden to demonstrate that the defendant was in a position to intervene but failed to do so." Ledlow v. Givens, 500 F. App'x 910,

914 (11th Cir. 2012) (per curiam) (citing Hadley, 526 F.3d at 1330–31).  To meet this burden, the

plaintiff must adduce "facts showing the necessity or real opportunity for the defendant-officers to

intervene in a fellow officer's unlawful conduct."  Keating, 598 F.3d at 764.

### (1)    Plaintiff Stevenson

To show Defendant Eason was in a position to intervene in Catanzariti's attack on him

while he was handcuffed and prone, Plaintiff Stevenson points to several pieces of evidence that

indicate Eason was near, if not  directly involved in, this event: Officers Hill and Attical's

testimony that Defendant Eason was around, or walking away from, the area where Catanzariti

repeatedly struck Stevenson; Officer Davis's testimony that Defendant Eason was walking toward

the area where Catanzariti repeatedly struck Stevenson prior to what is shown on the handheld

video; inmate Satterfield's testimony that he witnessed Defendant Eason restraining Stevenson

during the subject attack and that the handheld video does not show that attack that he observed;

and Officer Harvey's testimony, along with her handheld video remark, that someone had a

hammer when Defendant Eason was on the upper range.

Against this evidence, Defendant Eason argues that the surveillance videos undisputedly

show he was on the lower range when Catanzariti repeatedly struck Stevenson as shown on the

handheld video and that, per Eason's characterization of Stevenson's own testimony, this single

sequence of strikes is the only in-dorm use of force against him at issue in this case.  Moreover,

Eason argues that, prior to the handheld video sequence, he assisted with handcuffing Plaintiff

Jackson and was thus not near any possible use of force against Plaintiff Stevenson.

In reviewing the evidence adduced by the parties, the Court finds that undisputed evidence

shows Defendant Eason was not in a position to intervene in the strikes Catanzariti made against

Plaintiff Stevenson.  Plaintiffs admit that Defendant Eason was downstairs at the time Catanzariti

is shown on the handheld video striking Plaintiff Stevenson. (Doc. 282-1, pp. 12–17.) Instead, Plaintiffs contend the handheld video does not capture all of Catanzariti's use of force against Stevenson and that Defendant Eason was in a position to intervene in additional force not captured by the handheld video. (Id.; doc. 282, pp. 15–16.)

Plaintiff Stevenson's best evidence in attempting to create a genuine dispute on this point is testimony by inmate Satterfield.[15] At his deposition, Mr. Satterfield testified that he witnessed Defendant Eason holding down Stevenson while Catanzariti hit him with a hammer and that the handheld video depicts an incident that occurred after what he witnessed. (Doc. 262, pp. 15–18.) However, Mr. Satterfield later qualified this testimony, stating that he was not sure who all was around Stevenson at the time he described and that he could only positively identify Catanzariti and an Officer Green. (Id. at pp. 25, 28–29.) More importantly, during the time leading up to the handheld video sequence, the surveillance video shows Defendant Eason going up the stairs and assisting with Plaintiff Jackson, away from where Plaintiff Stevenson was on the upper ramp. (CAM 8 at 22:07:43–22:07:52; CAM 9 22:07:46–22:09:01; see also doc. 270, p. 25; doc. 259-2, p. 5.) Because the video evidence contradicts Mr. Satterfield's admittedly uncertain testimony about Defendant Eason's whereabouts and actions, the Court finds it insufficient to create a genuine factual dispute. See Scott, 550 U.S. at 378–81 (instructing courts to view the facts as depicted by authentic video evidence when it clearly discredits contrary testimony); Morton v. Kirkwood, 707 F.3d 1276, 1284 (11th Cir. 2013) ("[W]here an accurate video recording completely and clearly contradicts a party's testimony, that testimony becomes incredible.").

---

[15] To be sure, Plaintiff Stevenson also avers that Catanzariti's strikes against him captured by handheld video are not the only strikes Catanzariti made. (Doc. 259-2, p. 4.) Although Plaintiff Stevenson identified several officers who were around him at this time, he did not identify Defendant Eason. (Id. at pp. 3–4.)

A close study of the surveillance video definitively shows that Defendant Eason remained in this separate location on the upper ramp, assisting with Plaintiff Jackson, until he returned downstairs fifteen seconds before the attack shown on the handheld video:

- Defendant Eason reaches the top of the stairs.  (CAM 8 at 22:07:54.)
- After pausing at the top of the stairs and looking to his right, he steps to the left on the upper ramp and bends down, taking a knee on the ground immediately to the left of the stairs.  (Id. at 22:07:54–22:07:58.)
- He remains in this position for fifty-five seconds until standing up.  (Id. at 22:07:58–22:08:53.)
- After standing up, he briefly looks down at Plaintiff Jackson and around at other officers in the immediate vicinity.  (Id. at 22:08:53–22:08:59.)
- Defendant Eason then steps to the right and makes his way back down the stairs to the bottom level.  (Id. at 22:08:59–22:09:10.)
- Finally, he walks right, toward the exit of the dorm and out of screenshot.  (Id. at 22:09:10–22:09:18.)

When asked during his deposition to review video footage from surveillance camera nine, Plaintiff Stevenson identified himself during this time period in a location further down the upper ramp, much to the left of where Defendant Eason was assisting with Plaintiff Jackson near the top of the stairs.  (Doc. 259-2, p. 5; see CAM 9 at 22:07:41–22:08:51.)  Thus, even assuming Catanzariti also struck Plaintiff Stevenson earlier than what is shown on the handheld video, Defendant Eason was not in a position to intervene in that use of force.

Furthermore, Plaintiff Stevenson presents no competent testimony that tends to disprove that Defendant Eason assisted with Plaintiff Jackson at this time, much less does he present evidence that would place Eason in a position to intervene in Catanzariti's use of force against Stevenson in D-2.  In addition to inmate Satterfield's discredited "identification" of Defendant Eason as an officer who restrained Stevenson while Catanzariti repeatedly struck him, Plaintiffs argue other eyewitness testimony places Eason near Stevenson, but that testimony is either blatantly contradicted by the record or not probative of whether Eason was actually in a position to intervene on Stevenson's behalf during the time in question.  For example, Plaintiffs cite Officer

Henderson's testimony that Defendant Eason assisted with handcuffing Stevenson, (doc. 266, pp. 5, 14), however Henderson later clarified his testimony, stating he was altogether unsure and that Defendant Eason may have assisted with Jackson's handcuffing, (id. at pp. 6, 25, 28). Moreover, Officer Henderson's testimony is contradicted by the video evidence and the contemporaneous incident report he made, which indicates that Defendant Eason assisted him with Plaintiff Jackson, (id. at p. 6). While Officer Henderson stated Defendant Eason was part of the group of officers shown at 11:02:53PM on the handheld video, (id. at p. 15), it is undisputed that Defendant Eason was not on the upper range at this point in time, (doc. 282-1, pp. 12–13).[16]

Plaintiffs cite other deposition testimony in an attempt to show that Defendant Eason was in a position to intervene in Catanzariti's strikes against Stevenson, but this testimony also fails to create a genuine factual dispute. (See, e.g., Doc. 282-1, pp. 21–22.) For instance, inmates Briscoe and Cratic identified Defendant Eason on the upper range at 11:07:28PM on the handheld video, (see doc. 291, pp. 89–91), however this specific portion of video shows events that occurred quite some time *after* Catanzariti's strikes against Plaintiff Stevenson. Similarly, while Officers Hill and Attical testified to seeing Defendant Eason on the upper range, neither officer identified him near Catanzariti during the time in question. (See id. at pp. 87–88, 104–05.) Lastly, although Officer Harvey testified to seeing and remarking about someone with a hammer on the upper range around the 11:01:48PM mark on the handheld video, (doc. 213, pp. 13–14), this timestamp corresponds to when Defendant Eason was assisting with Plaintiff Jackson on the upper range, to left of the stairs (22:08:15 on surveillance camera eight). From this location, while busy attending

---

[16] This handheld video timestamp corresponds to 22:09:20 on the surveillance cameras. At 22:09:16 on surveillance camera eight, Defendant Eason is shown walking on the bottom level toward the exit of D-2 and eventually offscreen. (CAM 8 at 22:09:10–22:09:19.) He does not return until approximately sixteen seconds later. (CAM 8 at 22:09:35.) Thus, the video evidence establishes that Defendant Eason could not have been in the group of officers shown on the upper ramp at 11:02:53PM on the handheld video, as Henderson mistakenly recalled at his deposition.

to Plaintiff Jackson on the ground, Defendant Eason could have hardly been aware of what was taking place in the huddled group of officers several yards down the upper ramp, much less could he have been in a position to intervene.

Therefore, despite Plaintiffs' attempts, there is no genuine dispute about Defendant Eason's whereabouts during Catanzariti's strikes against Stevenson on the upper range of D-2. In the face of some unclear testimony of record, the video evidence definitively shows that Defendant Eason was not in a position to intervene in this attack. In other words, drawing all reasonable inferences in his favor, Plaintiff Stevenson fails to produce enough evidence for a jury to find that Defendant Eason was in a position to intervene while Catanzariti struck him on D-2's upper range. Accordingly, the Court **GRANTS** Defendant Eason summary judgment as to Plaintiff Stevenson's failure to intervene claim regarding Catanzariti's actions against Stevenson in the D-2 dorm.

### (2) Plaintiff Jackson

Plaintiff Jackson's in-dorm failure to intervene claim concerns Defendant Eason's inaction when Catanzariti made a single strike at Jackson on the upper range, near the top of the stairs, while Eason was holding Jackson (who was handcuffed) prior to escorting him down the stairs to head to the infirmary. As to this failure to intervene claim, there is no genuine dispute of material fact. (Doc. 294, pp. 9–10.)

Defendant Eason admits he was holding Plaintiff Jackson when Catanzariti made the striking motion at Jackson with an object in hand. (Id.; see also HHV at 11:07:28–11:07:34PM.) Although the parties dispute whether Catanzariti actually made contact with Plaintiff Jackson with this single jab, Defendant Eason argues that, even if contact was made, he cannot be held liable as a matter of law for failing to prevent a single strike.[17] (Doc. 294, pp. 9–10.) Plaintiffs contend

---

[17] Defendant Eason also contends Plaintiff Jackson did not properly exhaust this claim because, within his inmate grievance, he failed to make a specific allegation concerning his restraint in D-2. (Doc. 233-1,

Defendant Eason should have known to intervene prior to the strike because he had "already observed [Catanzariti's] wrath on Stevenson moments earlier." (Doc. 282, p. 16.)

For a failure to intervene claim to survive summary judgment, the plaintiff must show that the defendant-officer was in a position to intervene in another officer's excessive force and had time to do so. See Riley v. Newton, 94 F.3d 632, 635 (11th Cir. 1996). Absent some indication another officer is about to use excessive force, there is no duty to intervene in an unexpected, rapid use of force, because there is no reasonable opportunity for intervention. Id. Thus, when events occur so quickly that the defendant-officer cannot intervene, he or she is not liable for the other's constitutional violation. Fils, 647 F.3d at 1290 n.21; see also Hadley, 526 F.3d at 1331 (no duty to intervene where the other officer gratuitously punched the plaintiff once in the stomach when no evidence existed from which a reasonable jury could find that the defendant-officer could have anticipated and then stopped the other officer from delivering the single punch); Baltimore v. City of Albany, 183 F. App'x 891, 896–97 (11th Cir. 2006) (per curiam) (single surprise blow with

---

pp. 19–20.) In reviewing Plaintiff Jackson's grievance, (doc. 233-2, p. 83), however, the Court finds that this claim was properly exhausted. "A grievance is sufficient when it complies with the prison's grievance procedures and provides notice of a problem such that prison officials have an opportunity to address it internally." Slaughter v. Bryson, No. 5:15-CV-90, 2018 WL 1400976, at *9 (S.D. Ga. Mar. 20, 2018) (citations omitted) (citing Jones v. Bock, 549 U.S. 199, 204, 218 (2007); Toenniges v. Ga. Dep't of Corr., 600 F. App'x 645, 649 (11th Cir. 2015) (per curaim)). Here, Plaintiff Jackson's grievance complained of "8th Amendment" violations occurring on "12/31/10," (doc. 233-2, p. 83), which Jackson described the following way: "After regaining control of a disturbance *in D-2 dorm* . . . while handcuffed and subdued with mace, Sgt. Joseph Catanza[riti] and escort off[icers] repeatedly beat me in the head, face, and body with a hammer and blackjack *all the way to the medical door*. Inside medical waiting room officers continued to punch and kick me . . . ." (Id. (emphases added) (ellipses in original).) Contrary to Defendant Eason's argument, these allegations fairly apprised Smith State officials of Plaintiff Jackson's claims that officers used excessive force against him while escorting him from D-2 to medical; his grievance is not so limited as to exclude the possibility that "all the way to the medical door" encompassed actions taken against him from the moment of restraint in D-2. Furthermore, a failure to intervene claim is "closely linked" to an excessive force claim. Hall v. McGhee, No. 17-12008, 2019 WL 1057404, at *2 (11th Cir. Mar. 6, 2019) (citation omitted). As such, the Court finds Plaintiff Jackson exhausted his in-dorm failure to intervene claim against Defendant Eason when he grieved about Eighth Amendment violations and excessive force occurring against him during his escort from D-2.

flashlight by fellow officer does not allow for time to intervene); Riley, 94 F.3d at 635 (single, unexpected gunshot by fellow officer does not allow for time to intervene).

Plaintiff Jackson's claim that Defendant Eason failed to intervene on his behalf in the D-2 dorm concerns a single strike by Defendant Catanzariti. As shown on the handheld video, this strike occurred in a quick fashion and without any prior physical indication from Catanzariti that he was about to strike at Jackson's head with the object in his hand. (HHV at 11:07:28–11:07:34PM.) Plaintiffs attempt to show Defendant Eason, who held Jackson from behind, should have known to intervene in this strike because he was there when Catanzariti struck Stevenson several minutes prior. (Doc. 282, pp. 16, 18.) However, as explained above, the video evidence and undisputed facts establish that, during this time, Defendant Eason was either preoccupied with handcuffing Plaintiff Jackson or was not on the upper ramp at all.[18] See Jackson v. Sauls, 206 F.3d 1156, 1174 (11th Cir. 2000) (the plaintiff must produce evidence showing the defendant-

---

[18] It is true that Defendant Eason is seen walking away from the area where officers were gathered around Plaintiff Stevenson approximately one minute *after* that incident, (HHV at 11:03:47–11:04:04PM (corresponding to CAMS 8 and 9 at 22:10:14–22:10:31); see also doc. 282-1, pp. 29–30; doc. 291, pp. 94–95), and a reasonable inference from this evidence is that Eason observed Catanzariti kneeling by a bloodied, restrained Stevenson during the approximately fifteen seconds he was in that area before heading back downstairs, (CAM 8 at 22:09:55–22:10:39; HHV at 11:04:17PM; doc. 291, pp. 95–96). However, given that Defendant Eason was preoccupied with Plaintiff Jackson or possibly not even on the upper ramp during the time in which Catanzariti struck Stevenson, Eason's brief observation of an injured Stevenson would not give him reason to believe that Catanzariti had used excessive force against Stevenson, and thus might do so to another inmate more than three minutes later. Because Defendant Eason was not in a position to see Catanzariti's strikes against Stevenson, he would have no basis to conclude that possible hammer strikes or other excessive force by Catanzariti occasioned Stevenson's injuries. See Carr v. Tatangelo, 338 F.3d 1259, 1273 n.27 (11th Cir. 2003) (no opportunity to intervene where the defendant-officer "could not see the rapidly escalating" situation between the plaintiff and fellow officer and never spoke with that officer prior to use of excessive force); Ensley, 142 F.3d at 1408 (no duty to intervene where the defendant-officer did not, and could not, observe excessive force while he arrested another person). Simply witnessing Catanzariti kneeling by an injured, even bloodied Stevenson—without any indication that Catanzariti's actions occasioned those injuries—did not thereby provide any plausible warning that Catanzariti would strike at Plaintiff Jackson with an object more than three minutes later. Lacking knowledge of Catanzariti's actions against Plaintiff Stevenson, and without any other indication that Catanzariti was about to make a single, quick strike against Jackson, Defendant Eason was left without a reasonable opportunity to intervene on Jackson's behalf in this instance. In short, he had no reason to anticipate this force being used.

officer "had time to prevent" the use of force). Thus, based on the evidence presented by Plaintiffs, Defendant Eason had no indication that Catanzariti might use excessive force against Jackson almost four minutes later, and he had no reasonable opportunity to intervene in this single strike when it occurred. An unforeseen jab does not permit a moment to intervene. Accordingly, the Court **GRANTS** Defendant Eason summary judgment as to Plaintiff Jackson's failure to intervene claim regarding Catanzariti's actions against him in the D-2 dorm.

### C.      Failure to Intervene During Plaintiffs' Escort Outside of D-2

Plaintiffs' escort failure to intervene claims concern Defendant Eason's conduct once he took Plaintiff Jackson outside of D-2, after Plaintiff Stevenson had already been escorted from the dorm to the same area. It is undisputed that Defendant Eason escorted Plaintiff Jackson out of the D-2 dormitory shortly after Plaintiff Stevenson was escorted out by other officers. (See Doc. 291, pp. 141–142, 153–57.) Whether Plaintiffs were ever subjected to excessive force in Defendant Eason's presence while on their escort to the infirmary remains in dispute, however. (Id.)

Defendant Eason contends both Plaintiffs fail to adduce evidence that he was aware of, or took part in, the events which took place outside of D-2 and also fail to adduce evidence of injuries consistent with their allegations. (Doc. 233-1, pp. 22–24.) Plaintiffs argue that Defendant Eason undisputedly took Jackson outside, while carrying a baton, to the same location where Stevenson was escorted approximately one minute before, where they allege additional unwarranted force took place. (Doc. 282, p. 19.) Thus, Plaintiffs assert, there is sufficient evidence for a jury to find Defendant Eason failed to intervene on their behalf during their escort to the infirmary. (Id.) In reply, Defendant Eason contends the "absence of medical evidence demonstrating even a single injury on either Plaintiff['s] bod[y] conclusively demonstrates that" the alleged beatings outside D-2 did not occur. (Doc. 294, p. 12.) The medical evidence of record (or lack thereof)

notwithstanding, the Court finds genuine disputes of material fact preclude summary judgment as to these claims.

### (1) Plaintiff Jackson

During his deposition, Plaintiff Jackson testified that, once he was taken out of the dorm, several officers beat him for approximately two minutes all over his whole body, including his face, while he was restrained.  (Doc. 240-4, pp. 15–16, 33.)  In a declaration executed pursuant to 28 U.S.C. § 1746 after Defendants began filing motions for summary judgment, however, Jackson specifically identified Defendant Eason and Catanzariti as two of the officers who took part in the beating outside of D-2.[19]  (Doc. 281, pp. 2–4.)  In addition, several inmates testified to witnessing these events from their cell windows.  Inmate Briscoe testified that officers, including those who took Plaintiff Jackson outside the dorm, beat Jackson while he was handcuffed.  (Doc. 191, pp. 7–8, 13.)  Although he could not identify any specific officer due to darkness, Mr. Briscoe did see Plaintiff Jackson being kicked and struck with batons and fists.  (Id.)  Inmate Neely testified to hearing Plaintiff Jackson holler, and then seeing officers, whom he could not specifically identify, beat Jackson with batons while outside.  (Doc. 263, pp. 24–25.)  Inmate Cratic testified that officers kicked Plaintiff Jackson (called "John Doe 1" in Cratic's deposition) once he was escorted outside of D-2.  (Doc. 190, pp. 32, 36.)  Inmate Anderson also testified to seeing officers beat several handcuffed inmates outside of D-2 on the night in question, but he was not able to identify any particular officer or inmate.  (Doc. 265, pp. 12–13.)  Other inmates gave Georgia Bureau of Investigation ("GBI") witness statements to the same effect.  (See Doc. 259-2, pp. 2–4, 11.)

Against this robust body of eyewitness testimony, Defendant Eason argues Plaintiff Jackson's medical records conclusively establish that this event did not occur.  Although these

---

[19]  The Court discusses Plaintiff Jackson's escort excessive force claim against Defendant Eason, as well as his declaration, more fully in Section I.C, below.

records do not indicate injuries all over Jackson's body, they are not conclusive on the issue of whether officers subjected him to excessive force outside of D-2, as he and many other witnesses described. Defendant Eason relies on a mere four pages of medical evidence, (doc. 233-2, pp. 84–88), to attempt to contradict Plaintiff Jackson's account, essentially arguing that if bodily bruising is not noted on any report, then Jackson could not have been attacked outside of D-2. However, these four pages are hardly conclusive on the issue.

The first page, a GDC report, does not indicate any injuries on Plaintiff Jackson other than to his head area, but it does note "muscle soreness" without attributing that soreness to any specific location. (Id. at p. 84.) The remaining three pages, from Evans Memorial Hospital, also do not indicate any injuries to Jackson other than to his head area, but this report concerned the results of CT head and facial scans. (Id. at pp. 85–88.) Thus, it is not surprising that other bodily injuries were not indicated. Indeed, given the nature of this report, it has questionable probative value on whether Jackson suffered injury to areas of his body other than his head. It should also be noted that Plaintiff Jackson testified he was struck in the head during the events outside of D-2, an allegation consistent with this medical evidence.[20] Moreover, photographs of Plaintiff Jackson show knee abrasions that were not noted in either report, (see doc. 282-2, pp. 10–11), and he testified that he was unable to speak during his examination at the hospital, (doc. 240-4, p. 33). When viewed in the light most favorable to Plaintiffs, these four pages of medical records are not enough to discredit Plaintiff Jackson's testimony and that of several corroborating inmates.[21] See

---

[20]  Plaintiff Jackson acknowledges he also suffered injuries to his head while still inside of D-2, but he disputes that this was the only damage done to him. (Doc. 282-1, p. 32.) In support of his claim that officers further harmed him while outside of D-2 and in the presence of Defendant Eason, Plaintiff Jackson points to the testimonial and video evidence discussed in this section. (See id. at pp. 37–40.)

[21]  Defendant Eason cites a number of cases where a prisoner's claims of excessive force and failure to intervene were dismissed because of a lack of corroborating medical evidence, but this case is distinguishable from those. (See Doc. 233-1, pp. 22–24.) For example, in Vicks v. Knight, 380 F. App'x

<u>Scott</u>, 550 U.S. at 380 (instructing courts to disregard the non-moving party's account only when it is "blatantly contradicted by the record").

Defendant Eason also attempts to argue that there is a lack of evidence that he was aware of these attacks such that he could intervene. However, his own testimony places him outside of D-2 with Plaintiff Jackson during at least part of the time in question:

> A. All I remember is I know that I was on his left side taking him out. And then we met outside the sally port and I had to stop because I couldn't breathe [because of the pepper spray].
> …
> Q. Okay. Sure. At this point you transferred Jackson to another officer?
> A. I wouldn't say that. I let him go and was standing there and then I was told that he was escorted off to medical.
> Q. Did Jackson get escorted immediately or was he standing there with you while you were clearing your lungs and eyes?
> A. I turned around after about probably ten seconds and then he was gone. . . . [And] I was told he was taken off.

(Doc. 270, p. 11.) When asked, Defendant Eason could not recall who took Plaintiff Jackson or who told him Jackson was taken. (<u>Id.</u>) This testimony stands diametrically opposed to that of Jackson and other eye witnesses, creating a genuine dispute of material fact as to whether Defendant Eason failed to intervene in other officers' use of excessive force against Plaintiff Jackson outside D-2. <u>See</u> <u>Fils</u>, 647 F.3d at 1292 & n.24 (affirming denial of summary judgment in failure to intervene case where there was a "stark contrast" in the parties' versions of events);

---

847, 852 (11th Cir. 2010) (per curiam), the Eleventh Circuit Court of Appeals upheld the grant of summary judgment in part due to a lack of medical evidence showing injury to the prisoner-plaintiff. However, the medical evidence of record in that case was decidedly more comprehensive and included affidavits from practitioners who averred conducting multiple bodily examinations that showed no injury whatsoever. <u>Id.</u> at 849, 852. The court there also noted the *only* evidence in the plaintiff's favor was his own affidavit, even though he claimed there were numerous inmate eye witnesses. <u>Id.</u> at 852. Because he did not present any affidavits from these witnesses to support his claim and rebut the defendants' evidence, the court affirmed summary judgment. <u>Id.</u> Here, of course, there is medical evidence that Plaintiff Jackson suffered severe head injuries, muscle soreness, and knee abrasions, and there is ample eye-witness testimony corroborating Jackson's account. Moreover, the medical evidence relied on by Defendant Eason, unlike that presented in <u>Vicks</u>, does not confirm Plaintiff Jackson underwent a full-body examination showing no injury at all. As such, the reasoning and holding in <u>Vicks</u> actually supports the Court's finding here that genuine disputes of material fact preclude summary judgment on this claim.

see also Velazquez v. City of Hialeah, 484 F.3d 1340, 1342 (11th Cir. 2007) (finding the plaintiff's testimony that he was beaten by two unidentified defendant-officers, "coupled with their admission that they were present, permits the jury, if it believes he was beaten, to find that . . . one [officer] beat him while the other failed to intervene").

Additionally, video evidence shows Defendant Eason escorting Plaintiff Jackson toward the dorm's exit while holding a baton.  (HHV at 11:07:36–11:07:49PM, 11:07:57–11:08:04PM; CAM 8 at 22:14:08–22:14:29.)  Both Plaintiff Jackson and inmate eyewitnesses testified that Jackson was attacked by officers with batons while outside of D-2.  This and other circumstantial evidence of record, when combined with the testimony regarding Plaintiff Jackson's assault outside of D-2, provides enough evidence for a jury to find in Plaintiff Jackson's favor on this claim.  "[G]iven the record here, it is up to the jury to determine whom to believe and what actually transpired."  Skelly v. Okaloosa Cty. Bd. of Cty. Comm'rs, 415 F. App'x 153, 155 (11th Cir. 2011) (per curiam) (citation omitted) (vacating grant of summary judgment in excessive force case where district court failed to properly credit the plaintiff's testimony); see also Sears v. Roberts, 922 F.3d 1199, 1206–09 (11th Cir. 2019) (vacating grant of summary judgment in excessive force and failure to intervene case where district court credited officer affidavits and prison records, including medical reports, over the plaintiff's sworn version of events and finding those sworn statements sufficient to create genuine fact issue).

Accordingly, the Court **DENIES** Defendant Eason summary judgment as to Plaintiff Jackson's failure to intervene claim regarding the force used against him after being escorted outside of D-2.

### (2)    Plaintiff Stevenson

Given the above analysis, the viability of Plaintiff Stevenson's failure to intervene claim largely hinges on whether there is evidence indicating he was still outside D-2 when Defendant Eason emerged escorting Plaintiff Jackson. As the evidence undisputedly shows, officers escorted Plaintiff Stevenson out of D-2 approximately one minute before Defendant Eason escorted Jackson outside. (Doc. 291, p. 149; doc. 282-1, p. 37; see also CAM 8 at 22:13:21–22:13:40 (showing Stevenson being escorted toward D-2's sally port), 22:14:08–22:14:29 (showing Jackson being escorted toward D-2's sally port).) As with Plaintiff Jackson's claim, Defendant Eason argues that Plaintiff Stevenson's escort failure to intervene claim fails due to the medical evidence and due to Eason's claim that he was not aware of, or involved in, the incident outside of D-2.[22] (Doc. 233, pp. 22–24; doc. 294, pp. 12, 20.)

---

[22] Alternatively, Defendant Eason seeks dismissal of Plaintiff Stevenson's escort failure to intervene claim because he "failed to allege any specific facts in his [Amended] Complaint relating to [this] alleged beating." (Doc. 233-1, p. 22.) However, finding that Plaintiffs set forth colorable claims for relief, the Court previously denied a motion to dismiss in this case (albeit filed by different Defendants). (Docs. 41, 81.) Moreover, while Plaintiffs' Amended Complaint is not the model of clarity, it does put Defendant Eason on notice of Plaintiff Stevenson's failure to intervene claim. (See Doc. 24, p. 4 ("[W]itness testimony demonstrates that Defendants beat [P]laintiffs **more** on that unrecorded, escorted trip [to medical]." (emphasis in original)); pp. 7–8 ("Sergeant Joshua Eason incited, directed, and ratified the unconstitutional beating of both Mr. Stevenson and Mr. Jackson, and failed to take reasonable steps to protect Mr. Jackson and Mr. Stevenson from cruel and unusual punishment (excessive force) inflicted by other Defendants."); p. 12 ("On December 31, 2010, Smith State Prison officials performed a 'shake down' of the dormitory that housed Mr. Jackson and Mr. Stevenson."); p. 14 ("Defendants violated their own standard operating procedures by failing to record themselves escorting Mr. Jackson and Mr. Stevenson to medical."); p. 18 ("Furthermore, all Defendants failed to take reasonable steps to immediately stop other Defendants from beating Mr. Jackson and Mr. Stevenson, evidenced by the facts incorporated to support this Count and by video evidence and witness testimony."); p. 20 ("[Defendant] Eason had the authority, by virtue of [his] position, to stop other Defendants . . . from beating [Plaintiffs] while they were non-resisting and compliant. Nevertheless . . . Eason failed to use [his] authority to stop the unconstitutional beating that took place in [his] presence.").) These allegations collectively give Defendant Eason "fair notice" of what Plaintiffs claims are and the grounds upon which they rest. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007). Lastly, the Eleventh Circuit case that Defendant Eason cites in requesting dismissal, Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1313 (11th Cir. 2004) (per curiam), concerns the improvidence of attempting to add new, never before alleged *claims* by way of summary judgment response, which is not the case here. Although discovery revealed new, previously unalleged facts regarding the contours of Plaintiff Stevenson's failure to intervene claim, his legal claims in this action—excessive force and failure to intervene—did not change. Accordingly, since the Amended Complaint put Defendant Eason on notice

At his deposition, Plaintiff Stevenson testified that, once outside D-2, an officer immediately struck him with the blunt end of a pepperball gun and other officers punched him in the head and face, using handcuffs as brass knuckles, and kicked him. (Doc. 240-3, pp. 11–12.) Per Plaintiff Stevenson's testimony, he was then dragged to the north security gate area and held against the fence, where Catanzariti appeared and punched him. (Id. at p. 12.) Stevenson says he twice lost consciousness during these attacks and that "nobody even tried to intervene; it was just like they didn't care." (Id. at p. 14.) After this, officers escorted him the rest of the way to the infirmary.[23] (Id. at pp. 12–13.)

With the benefit of a photographic lineup of officers on duty that night, which he was not provided at his deposition, Plaintiff Stevenson identified, by way of a sworn declaration, four officers who took part in the attacks outside of the D-2 dormitory: Catanzariti (Bates 8228), Jones (Bates 8233), Simmons (Bates 8298), and Harrison (Bates 8191). (Doc. 259-2, pp. 2–6; doc. 291, pp. 2, 122, 141, 143, 160.) In addition, Inmate Neely testified that he observed the escorting officers bang Stevenson's head against the sally port door and then he heard Stevenson "screaming" and "hollering" as he was outside "going up the sidewalk to medical." (Doc. 263, pp. 12–13.) However, Plaintiff Jackson, who was escorted outside by Defendant Eason one minute *after* Stevenson, testified that he "wasn't aware of any inmates around [him]" and that he never saw Stevenson during his escort. (Doc. 240-2, p. 18.) This testimony calls into question whether Plaintiff Stevenson was still immediately outside of D-2 when Defendant Eason emerged with

---

of the nature of the constitutional claims alleged against him, including information concerning his escort to medical, the Court will not dismiss Plaintiff Stevenson's escort failure to intervene claim outright.

[23] Plaintiff Stevenson noted the attacks outside of D-2 and then toward the north security gate area occurred pretty fast, but he could not say how long exactly. (Id. at p. 24.)

Jackson and thus whether Defendant Eason was ever in a position to intervene in these attacks against Stevenson.

Plaintiff Stevenson testified he was hit with the pepperball gun by Officer Simmons when he came out of the dormitory exit door. (Doc. 240-3, pp. 11–12; doc. 259-2, p. 4.) At this time, Defendant Eason was still inside D-2 with Plaintiff Jackson, as was Catanzariti. Approximately one minute later, Defendant Eason and an officer escorted Plaintiff Jackson outside of D-2, followed by Catanzariti and another officer escorting an inmate.[24] (CAM 8 at 22:14:08–22:14:30.) Plaintiff Stevenson testified, however, that he did not see Catanzariti outside until officers had taken him further away from D-2's exit, near the north gate security area. And, per the undisputed facts, Defendant Eason never went to this area.[25] Moreover, Plaintiff Stevenson never identified Defendant Eason as one of the officers involved in the actions against him outside, and Plaintiff Jackson testified to never seeing Stevenson while he was outside D-2 with Defendant Eason or when he was then escorted the rest of the way to the Smith State infirmary.

Based on these facts and allegations, there is no evidence that Defendant Eason was in Plaintiff Stevenson's vicinity when he was struck just outside of D-2, nor is there any evidence that Eason was in Stevenson's vicinity when Stevenson was later struck by Catanzariti and others near the north security gate. However, the duty to intervene in the use of excessive force does not only apply to instances where an officer is close enough to physically stop the use of force. Even officers who are simply aware of excessive force being used can have a duty "to do *something*." Bailey v. City of Miami Beach, 476 F. App'x 193, 197 (11th Cir. 2012) (per curiam) (emphasis in

---

[24] Defendant Catanzariti's testimony confirms that, at this time, he escorted an inmate from the top range, downstairs, and out the door to medical, but he denied knowing Plaintiff Jackson was being escorted out of the dorm in front of him. (See Doc. 274, pp. 47–48.)

[25] It is undisputed that, during this sequence of events, Defendant Eason did not venture past the area outside of D-2's exit and did not make an escort to the infirmary. (See Doc. 282-1, p. 35.)

original).  For example, officers who are in the presence of excessive force, but not in a position to physically intervene, could verbally demand that the use of force be halted or could call for help. Id.; see also Priester, 208 F.3d at 925, 927 (defendant-officer was in voice contact with fellow officer and could have ordered the attack to stop, even though he was not in a position to physically intervene).  Total nonfeasance in the face of excessive force—or a failure to take any reasonable steps to protect the victim of that force—is grounds for liability under Section 1983.  Fundiller v. Cooper City, 777 F.2d 1436, 1442 (11th Cir. 1985); see also Priester, 208 F.3d at 927 (concluding that an officer who observes excessive force with "the time and ability to intervene, but [does] nothing," violates clearly established law).

Here, Plaintiffs have presented enough evidence, when viewed in the light most favorable to them, for a jury to find that Defendant Eason failed to intervene on Plaintiff Stevenson's behalf outside of D-2 to stop Catanzariti.  Specifically, Plaintiffs have presented testimony and evidence showing that, over a span of less than five minutes, Defendant Eason observed Catanzariti kneeling beside a bloodied Stevenson in D-2, witnessed Catanzariti strike at Jackson with an object while restraining him in D-2, and witnessed (and allegedly participated in) Catanzariti's additional attack on Jackson just after Jackson exited D-2.  These facts, viewed in Plaintiffs' favor, show the "necessity" and "real opportunity" for Defendant Eason to intervene and prevent Catanzariti from continuing to use gratuitous force against inmates, including Stevenson.  Keating, 598 F.3d at 764.

From this, a reasonable jury could infer that Defendant Eason was well aware of Catanzariti's several uses of excessive force and could find that such awareness triggered the duty for Eason to do *something* to stop Catanzariti from continuing the unlawful force against Stevenson.  See Riley, 94 F.3d at 635 (an obligation to intervene arises when the defendant-officer had "reason to expect the use of excessive force" would occur); Carr, 338 F.3d at 1273 n.27 (factors

41

relevant to whether the defendant-officer had "a reasonable opportunity to prevent" force include his or her: involvement with the officer using force, awareness of that officer's presence, and ability to see the subject situation). Yet, if Plaintiffs' testimony is believed by the jury, Defendant Eason, while in Catanzariti's presence outside D-2, did nothing to prevent Catanzariti from leaving and going after Stevenson at the north security gate area.[26] And this alleged nonfeasance occurred right after Defendant Eason would have witnessed Catanzariti twice gratuitously attack a handcuffed Jackson. In other words, Plaintiffs have produced sufficient evidence of proof on this claim, and genuine disputes of material fact remain.[27] "Even if [the testimonies presented] turn out to be exaggerations or false, they are enough to raise a genuine issue of material fact about the amount of force [Catanzariti] used and whether . . . [Defendant Eason] witnessed the incident[s] but did not attempt to intervene . . . ." Sears, 922 F.3d at 1209 (citations omitted).

---

[26] Even assuming that Defendant Eason was never actually in the north security gate area, he could have reasonably taken some steps to prevent further gratuitous uses of force by Catanzariti against handcuffed inmates, such as calling for backup, issuing a verbal command, following after him, or alerting other officers to his prior use of force. At the very least, under Plaintiffs' version of events, Defendant Eason was in voice contact with Catanzariti after observing him use excessive force against Jackson, giving him reason and the opportunity to intervene in some fashion. See Priester, 208 F.3d at 925. It appears from the evidence and testimony that, even from just outside the sally port exit, Defendant Eason remained in voice contact with, as well as ear and eyeshot of, Defendant Catanzariti as he went down the secured walkway and approached Plaintiff Stevenson at the security gate. (See Doc. 268, pp. 11–12, 33–35; doc. 268-3; doc. 240-3, p. 12.) Moreover, the testimony of record establishes that inmates inside the dorm could hear the beatings taking place outside; thus, a reasonable inference can be made that Defendant Eason heard this occur too. Yet, taking Plaintiffs' account as true as the Court must, Eason still did nothing to quell Catanzariti.

[27] As to Defendant Eason's argument that the six-pages of medical records on Plaintiff Stevenson, (doc. 233-2, pp. 89–94), disprove his allegations that he was continually beaten once escorted out of D-2, the Court finds these records insufficient for much the same reasons already explained in this Order. Stevenson's GDC chart indicates severe injuries to his head as well as muscle soreness on his body; four of the pages concern CT head and facial scans; and a hospital report indicates some degree of trauma to his right ribs. (Id.; see also doc. 259-2, pp. 52–54 (photographs of Plaintiff Stevenson's injuries).) Thus, as with Plaintiff Jackson, Stevenson's medical records do not decisively indicate, one way or the other, whether he was struck outside of D-2 as alleged.

Accordingly, the Court **DENIES** Defendant Eason summary judgment as to Plaintiff Stevenson's failure to intervene claim regarding the force used against him by Catanzariti after being escorted outside of D-2.

### D.    Excessive Force Against Plaintiff Jackson During His Escort Outside of D-2

In addition to alleging that Defendant Eason failed to intervene on his behalf while outside of D-2, Plaintiff Jackson also averred, in his declaration, that Eason participated in the use of excessive force against him.  (Doc. 281, pp. 2–4; see also doc. 282-1, pp. 35–36.)  Defendant Eason argues this evidence is self-serving and should not be given any weight because it is contradicted by Jackson's deposition testimony.[28]  (Doc. 294, p. 14.)

At his deposition, Plaintiff Jackson stated that he could not name any of the officers involved outside of D-2 and, other than noting there were both white and black officers who took part, he could not provide any identifying information.  (Doc. 240-4, p. 16.)  However, as stated in his sworn declaration submitted in opposition to summary judgment, counsel for Defendants did not provide Plaintiff Jackson any photographs of Smith State employees to aid him in his identification.  (Doc. 281, p. 1.)  And, as Plaintiff Jackson testified at the deposition's outset, he had only been at Smith State for seven weeks prior to the disturbance and did not know a single corrections officer's name.  (Doc. 240-4, p. 9.)  After being shown a photographic lineup of officers on duty that night, Plaintiff Jackson (via his sworn declaration) identified Defendant Eason as the officer who held him at the top of the stairs and who also "physically struck [him] outside the dormitory while [he] was handcuffed."  (Doc. 281, p. 2.)  Moreover, while Plaintiff Jackson could not name the officers who assaulted him once he was outside, he did testify that the group included

---

[28]    Defendant Eason also contends Plaintiff Jackson's inmate grievance contradicts his declaration. (Doc. 294, p. 14.)  However, as explained above, *supra* note 17, Jackson's inmate grievance, which alleges that officers beat him from D-2 "all the way to the medical door," does not contradict or undermine his allegations regarding Eighth Amendment violations that occurred outside of D-2.  (Doc. 233-2, p. 83.)

"the same officers [who] escort[ed him] out." (Doc. 240-4, p. 15). It is undisputed that Defendant Eason escorted Plaintiff Jackson outside of D-2.

In light of Plaintiff Jackson's reasonable explanation for any inconsistency between his deposition testimony and later declaration, (doc. 282-1, pp. 35–36), the Court cannot say it is of no evidentiary value or decline to exclude it from consideration. See Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984) (noting that a later affidavit which contradicts earlier deposition testimony can create a genuine issue of material fact when the submitting party provides explanation for the inconsistency). These explainable discrepancies raise issues of witness credibility suitable only for a jury to decide.[29] Plaintiff Jackson's sworn declaration, when combined with eyewitness testimony, the video evidence, and Defendant Eason's admission that he was present with Jackson outside—indeed he escorted him there— present genuine issues of material fact that preclude summary judgment on this claim.[30] See King v. Reap, 269 F. App'x 857, 860 (11th Cir. 2008) (per curiam) (upholding denial of summary judgment in failure to intervene and excessive force case, because the facts as alleged by the

---

[29] See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citation omitted)). Moreover, as the Eleventh Circuit has recently held, "a non-conclusory affidavit which complies with [Federal Rule of Civil Procedure] 56 can create a genuine dispute concerning an issue of material fact, even if it is self-serving and/or uncorroborated." United States v. Stein, 881 F.3d 853, 858–59 (11th Cir. 2018). The prior rule to the contrary "ousted the jury from its historical role." Id. at 860 (Pryor, J., concurring).

[30] Given the nature of Plaintiff Jackson and Defendant Eason's fact dispute on this claim—Jackson avers Eason was involved in his being gratuitously beaten while handcuffed and restrained outside of D-2 whereas Eason avers this did not occur at all—the Court declines to engage in a full analysis of the excessive force factors, which have previously been discussed in this Order. See supra Discussion Section's preliminary paragraphs; see also Fennell, 559 F.3d at 1217 (providing excessive force factors). If a jury credits Plaintiff Jackson's testimony and evidence, then it easily follows that Defendant Eason's conduct in question was done "maliciously and sadistically to cause harm," in violation of the Eighth Amendment. Wilkins, 559 U.S. at 37.

plaintiff, when viewed in his favor, showed "the amount of force used was not reasonable" and that each defendant "had the opportunity to observe that a handcuffed, non-violent suspect was being beaten but failed to intervene"); Velazquez, 484 F.3d at 1342 (finding the plaintiff's testimony that the two defendant-officers were present, combined with their admissions that they were, sufficient for a jury to find in his favor on excessive force and failure to intervene, despite the plaintiff's inability to positively identify which officer beat him).

Accordingly, the Court **DENIES** Defendant Eason summary judgment as to Plaintiff Jackson's escort excessive force claim against him, arising from the disputed events outside D-2.

### E.    Qualified Immunity

In addition, Defendant Eason asserts that he is entitled to qualified immunity on all claims. (Doc. 233-1, pp. 24–25.)  Plaintiffs oppose.  (Doc. 282, pp. 19–22.)

#### (1)    Legal Standard

Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Lee v. Ferraro, 284 F.3d 1188, 1193–94 (11th Cir. 2002).[31]  "Qualified immunity is intended to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law."  Hoyt v. Cooks, 672 F.3d 972, 977 (11th Cir. 2012) (citation and internal quotations omitted).  However, it does not protect an official who "knew or reasonably should have known that the action he took

---

[31]  To rely upon qualified immunity, a defendant first must show that he or she acted within his or her discretionary authority.  Mobley v. Palm Beach Cty. Sheriff Dept., 783 F.3d 1347, 1352 (11th Cir. 2015). Here, there is no dispute Defendant Eason was acting within his discretionary authority.  (See Doc. 282, pp. 19–22.)  The question thus becomes whether qualified immunity bars the claims against him.

within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." Holmes v. Kucynda, 321 F.3d 1069, 1077 (11th Cir. 2003) (citations and internal quotations omitted). "Overcoming the official's qualified-immunity defense requires a plaintiff to establish both that the officer's conduct violated a constitutionally protected right and that the right was clearly established at the time of the misconduct." Alcocer v. Mills, 906 F.3d 944, 951 (11th Cir. 2018) (citation omitted). The Court has discretion in deciding which of these two prongs to address first. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

"[W]hether the law clearly established the relevant conduct as a constitutional violation at the time [the defendants] engaged in the challenged acts" turns on whether the defendants had "fair warning" that their conduct violated a constitutional right. Jones v. Fransen, 857 F.3d 843, 851 (11th Cir. 2017) (citing Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011)). In order to demonstrate "fair warning" and defeat qualified immunity, the plaintiff must "point to binding precedent that is materially similar," or show the challenged conduct violated federal law with "obvious clarity" such that "every objectively reasonable government official facing the circumstances would know that the official's conduct" was unlawful, despite the lack of materially similar case law. Id. at 852; Gaines v. Wardynski, 871 F.3d 1203, 1209 (11th Cir. 2017) (binding precedent comes from "the United States Supreme Court, the Eleventh Circuit, or the relevant State Supreme Court" (citation and alteration omitted)). When relying on the "obvious clarity" method, the plaintiff may invoke a "'broader, clearly established principle' that he asserts 'should control the novel facts [of the] situation.'" Fransen, 857 F.3d at 852 (citation omitted). Or, the plaintiff may show that defendant's conduct is "so bad that case law is not needed to establish" its unlawfulness. Id. (citation omitted). The "obvious clarity" category has been described as "narrow." Id. (citing Priester, 208 F.3d at 926–27).

At summary judgment, when assessing qualified immunity, the court "must take the facts in the light most favorable to the party asserting the injury," eliminating all issues of fact so "the court has the plaintiff's best case before it." Robinson v. Arrugueta, 415 F.3d 1252, 1257 (11th Cir. 2005). Thus, the court "determine[s] the legal issue of whether the defendant [is] entitled to qualified immunity using the version of facts most favorable to the plaintiff." Bates v. Harvey, 518 F.3d 1233, 1239 (11th Cir. 2008) (citation omitted).

### (2)  Analysis

Given the Court's finding that, based on the facts of record, Defendant Eason could not have intervened in Plaintiffs' dorm altercations with Catanzariti and other officers, *supra* Discussion Section I.B., Plaintiffs have failed to establish constitutional violations with respect to these particular failure to intervene claims. As such, Defendant Eason is entitled to qualified immunity on them.[32] See Alcocer, 906 F.3d at 951. With respect to Plaintiffs' remaining claims— those arising out of their escort outside of the D-2 dorm—Eason argues qualified immunity applies "because he committed no constitutional violation." (Doc. 233-1, p. 25.) However, the Court has already determined that genuine disputes of material fact remain as to whether Defendant Eason used excessive force against Plaintiff Jackson and whether he failed to intervene in other officers' use of force against Plaintiffs outside of D-2. Taking Plaintiffs' versions of events in the light most favorable to them, as supported by the evidence of record described above, Robinson, 415 F.3d at 1257, the Court finds that Defendant Eason is not due qualified immunity under these versions of events in light of clearly established law as of 2010.

---

[32]  Because the undisputed facts show that Defendant Eason was not in a position to intervene when Plaintiffs were subjected to excessive force in the D-2 dorm, Plaintiffs cannot show an essential element of their claim that Defendant Eason violated their Eighth Amendment right against excessive force by failing to intervene on their behalf, and thus Eason is entitled to qualified immunity on these excessive force claims. See, e.g., Butler v. Norman, 766 F. App'x 924, 929 (11th Cir. 2019) (per curiam) (evidentiary failure on essential element of constitutional claim entitles the defendant to qualified immunity)).

As explained in Discussion Section I.C., *supra*, Plaintiffs have proffered sufficient evidence, with the disputed facts resolved in their favor, to establish that Defendant Eason violated the Eight Amendment when he failed to intervene whatsoever in Catanzariti and other corrections officers' use of excessive force against both Jackson and Stevenson while they were restrained outside of D-2. Suffice it to say here, the beatings that took place against Plaintiffs when they were escorted outside of D-2, as described by them and other eyewitnesses, fall within the core of what the Eighth Amendment prohibits: "unnecessary and wanton infliction of pain" on restrained, non-resisting inmates "for the very purpose of causing harm." See Hudson, 503 U.S. at 4–6 (determining that prison guards who placed an inmate "in handcuffs and shackles" and beat him while escorting him to lockdown used excessive force in violation of the Eighth Amendment even though no serious injury occurred); Reid v. Neal, 688 F. App'x 613, 617 (11th Cir. 2017) (per curiam) (stating that corrections officers who are present at the scene and fail to "take reasonable steps to protect" prisoners from other officers' excessive use of force are liable under the Eighth Amendment for failure to intervene (citing Skrtich, 280 F.3d at 1300)).

The law of the Eleventh Circuit "prohibit[s] the unjustified use of excessive force by a prison guard against an inmate" who is restrained and "pose[s] no continuing threat." Davis v. Locke, 936 F.2d 1208, 1213 (11th Cir. 1991) (citations omitted) (threatening a handcuffed inmate with slurs and punishment and then pulling him by his ankles from a cage, causing him to fall, constitutes excessive force); see Harris v. Chapman, 97 F.3d 499, 505–06 (11th Cir. 1996) (evidence that group of officers restrained inmate with a towel and then beat and verbally harassed him, after he refused to submit to a haircut, sufficient to support jury's finding of Eighth Amendment violation); Williams v. Cash-C.O.I., 836 F.2d 1318, 1320 (11th Cir. 1988) (allegations that officers "deliberately broke [inmate's] elbow after he had ceased to resist their

48

efforts to return him to his cell" sufficient to support Eighth Amendment excessive force claim at summary judgment). In short, "[i]t is excessive force for a jailer to continue using force against a prisoner who already has been subdued." Nasseri v. City of Athens, 373 F. App'x 15, 19 (11th Cir. 2010) (per curiam) (citing Danley, 540 F.3d at 1309); see also Skrtich, 280 F.3d at 1303 ("By 1998, our precedent clearly established that government officials may not use gratuitous force against a prisoner who has been already subdued or, as in this case, incapacitated." (citations omitted)).

Here, both Plaintiffs allege that multiple corrections officers continued to attack them outside of the dorm long after the inciting disturbance was over, while they were handcuffed and not resisting, and that no one—including Defendant Eason—intervened on their behalf. More specifically, under Plaintiffs' evidence and version of the facts, Jackson's beatings outside D-2 took place directly in Defendant Eason's presence without intervention, while Stevenson's relevant beating took place partially at the hands of Catanzariti, away from Eason's direct presence, but just after Eason had witnessed several gratuitous uses of force by Catanzariti without intervention. Under the Eighth Amendment, "an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable for his nonfeasance." Skrtich, 280 F.3d at 1301 (citation omitted). Nonfeasance by an officer in the face of another officer's excessive force, when that officer is in a position to intervene, violates clearly established law. Id. at 1301 (collecting cases).[33]

---

[33] See also Velazquez, 484 F.3d at 1341–42 (rejecting award of qualified immunity because the plaintiff did not know which officer beat him and concluding that a jury is permitted to find that both defendant-officers "administered the excessive force or that one beat him while the other failed to intervene"); Ensley, 142 F.3d at 1407 (granting qualified immunity because "this is *not* a case in which an officer is alleged to have stood idly by" while "an unprovoked beating [took] place in his presence" (emphasis added)); Byrd, 783 F.2d at 1007 (holding that "if a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is

Because Plaintiffs' facts, accepted as true and viewed in their favor, see *supra* Discussion Section I.C., show that they were subjected to gratuitous force while outside D-2 and that Defendant Eason did *nothing* to intervene in this use of force despite being in a position to respond in some manner, he is not entitled to qualified immunity. Skrtich, 238 F.3d at 1305; see Priester, 208 F.3d at 927 ("Nor do we think particularized case law is necessary to overcome [the defendant's] claim of qualified immunity. That a police officer had a duty to intervene when he witnessed the use of excessive force and had the ability to intervene was clearly established in February 1994." (citations omitted)).[34] In short, Defendant Eason is not entitled to qualified immunity as his conduct, under Plaintiffs' version of events, violated this broader clearly established principle.

---

directly liable under Section 1983" and vacating summary judgment for defendant-officer who was present at alleged excessive force but did not intervene).

[34] In Priester, the Eleventh Circuit denied qualified immunity on a failure to intervene claim despite there being no factually similar case. 208 F.3d at 927. There the defendant-officer, standing on the top of a canal, observed a fellow officer order his police dog to attack a compliant suspect who was in the canal along with the other officer. Id. at 923, 925. The attack "may have lasted as long as *two minutes*," but the defendant-officer did nothing to intervene in the use of excessive force "even though he watched the entire event and was in voice contact." Id. at 925 (emphasis in original). After a trial at which the jury found the defendant-officer liable for failing to intervene, the lower court had granted the defendant-officer's motion for judgment on the pleadings, determining that the defendant-officer was entitled to qualified immunity on the failure to intervene claim. The Eleventh Circuit reversed, finding that the case was not like those where the officer who failed to intervene avoided liability "because he did not observe the [force] or have the opportunity to intervene." Id. (citations omitted). It concluded, instead, that because the "duty to intervene was clearly established" and the defendant-officer "did nothing" even though he "had the time and ability to intervene," qualified immunity was inappropriate. Id. at 927. Under these circumstances, "no reasonable officer would believe that either the amount of force used . . . or the failure to intervene was objectively reasonable." Id. at 928.

Importantly, in reversing, the Eleventh Circuit chastised the district court for "mistakenly rel[ying] upon [the *d]efendants'* version of the facts, rather [the p]laintiff's version of the facts, as it was required to do" and which "[t]he jury believed." Id. at 924, 925 (emphasis in original). Here, accepting Plaintiffs' version of the facts (which a jury will be entitled to believe), the Court concludes that no reasonable officer would find it lawful to allow another officer to twice attack a handcuffed, restrained inmate in his presence, and then allow that same officer to leave that attack to seek out another inmate further down the secured walkway, without any intervention whatsoever. This would be an "obvious" violation of the clearly established duty to intervene. See Fransen, 857 F.3d at 852.

Similarly, as explained in Discussion Section I.D., Plaintiff Jackson has proffered sufficient evidence, with the disputed facts resolved in his favor, to establish that Defendant Eason violated the Eighth Amendment when he used force against Jackson outside of D-2. "The use of force must stop when the need for it to maintain or restore discipline no longer exists." Skrtich, 238 F.3d at 1304. Thus, as set forth by the cases cited above, it is a violation of clearly established Eighth Amendment law "to use gratuitous force against a prisoner who has been already subdued." Id. at 1303. Under Plaintiff Jackson's facts, accepted as true and viewed in his favor, at the time of Defendant Eason's attack on him outside of D-2, the disturbance at Smith State had stopped, order was restored, and he had been restrained with handcuffs and was compliant while surrounded by other officers, see supra Discussion Section I.D. These allegations make out an Eighth Amendment excessive force claim. In the Eleventh Circuit, "a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution by [prior] Supreme Court decisions." Skrtich, 280 F.3d at 1301 (citation omitted). Accordingly, because Plaintiff Jackson's allegations and accompanying eyewitness testimony would allow a reasonable jury to find that Defendant Eason used force against him "maliciously and sadistically to cause harm," Defendant Eason is not entitled to qualified immunity on Jackson's escort excessive force claim.

Therefore, based on the foregoing reasons, the Court **DENIES** Defendant Eason summary judgment on the basis of qualified immunity as to Plaintiffs' failure to intervene claims arising from their escort outside of D-2 and Plaintiff Jackson's excessive force claim regarding the same.[35]

---

[35] As to this denial of qualified immunity, the Court emphasizes "that the 'facts,' as accepted at the summary judgment stage of the proceedings, may not be the 'actual' facts of the case." Priester, 208 F.3d at 925 n.3. However, based on the applicable standard and the facts assumed thereunder, Defendant Eason

However, because Defendant Eason did not violate Plaintiffs' constitutional rights when he failed to intervene in their altercations *inside* the D-2 dorm, the Court **GRANTS** Defendant Eason summary judgment on the basis of qualified immunity as to these claims.

### F. Conclusions on Defendant Eason's Motion for Summary Judgment

For the reasons and in the manner set forth above, the Court **GRANTS in part** and **DENIES in part** Defendant Eason's Motion for Summary Judgment. (Doc. 233) Accordingly, the Court **DISMISSES** Plaintiffs' failure to intervene claims against Defendant Eason concerning his inaction during the events inside D-2. In addition, the Court **DISMISSES** Plaintiffs' in-dorm excessive force claims against Defendant Eason, Plaintiff Stevenson's escort excessive force claim, Plaintiffs' constitutional claims concerning the alleged events in the infirmary, and Plaintiffs' supervisory liability claims. However, because the disputed evidence on Plaintiffs' failure to intervene claims—concerning both their escorts outside D-2—and on Plaintiff Jackson's excessive force claim concerning the same presents genuine issues of material fact that must be resolved at trial, Defendant Eason is not entitled to judgment as a matter of law. As such, these claims remain pending before the Court.

## II. Defendant Attical's Motion for Summary Judgment (Doc. 237)

At summary judgment, Plaintiffs maintain the following claims against Defendant Attical: (1) failure to intervene in Plaintiff Stevenson's altercations with officers in the dorm, (2) use of excessive force against Plaintiffs in the dorm, (3) failure to intervene in the events which took place during Plaintiffs' escort from the dorm, and (4) use of excessive force during Plaintiffs' escort from the dorm. (See Doc. 278, pp. 1–2, 14–22; see also doc. 278-1, pp. 4–11.) Defendant

---

is not entitled to qualified immunity. If appropriate, Defendant Eason may reassert qualified immunity based on the facts found at trial by the jury.

Attical seeks summary judgment as to all claims brought against him by Plaintiffs.[36]  (Docs. 237,

238.)

### A.    The Parties' Arguments

As to Plaintiffs' excessive force claims, concerning both the events inside D-2 and the

ensuing infirmary escort, Defendant Attical argues that there is no evidence showing he used any

force against Plaintiffs that night.  (Doc. 238, pp. 9–10.)  Specifically, Defendant Attical contends

the video and testimonial evidence of record indicate that he was not near either Plaintiff when the

alleged excessive force occurred.  (Id.)  Similarly, with respect to Plaintiffs' failure to intervene

claims, Defendant Attical asserts he is not liable because there is no evidence he was ever aware

of, or in a position to intervene in, the alleged excessive force events.  (Id. at pp. 10–12.)  He

further argues that he could not have intervened during the in-dorm uses of force because he was

blinded by pepper spray and engaged in restraining another inmate, and also because the force

happened so quickly.  (Id.)  Lastly, Defendant Attical asserts qualified immunity with respect to

all claims.[37]  (Id. at pp. 12–14.)

---

[36]  As noted, in their First Amended Complaint, Plaintiffs asserted their excessive force and failure to intervene allegations and claims generally against all Defendants in this action.  (See Doc. 24, pp. 5–19.) Following discovery, however, Plaintiffs have not pressed their claims against Defendant Attical regarding failure to intervene on Plaintiff Jackson's behalf in D-2 or regarding excessive force and failure to intervene during their time in the infirmary.  (See Doc. 278, pp. 1–2, 14–22; doc. 278-1, pp. 4–8, 10; see also doc. 293, p. 12 & n.5.)  Defendant Attical argues that Plaintiffs lack evidence to support these claims.  (Doc. 237; doc. 238, pp. 9–12) (note that he makes this same argument as to all of Plaintiffs' claims, regardless of the setting in which they allegedly occurred).)  Because Plaintiffs have failed to offer any evidentiary support for their claims that Defendant Attical failed to intervene on Jackson's behalf in the dorm or used excessive force or failed to intervene during Plaintiffs' time in the prison infirmary, the Court **GRANTS** Attical's Motion for Summary judgment as to these claims, (doc. 237).  Fed. R. Civ. P. 56(a); Moton, 631 F.3d at 1341.

[37]  In addition, Defendant Attical argues that, because he believes Plaintiffs have "no evidence in this case to support [their] claims," he is entitled to attorney's fees and costs under 42 U.S.C. § 1988 and 28 U.S.C. § 1920, should he be granted summary judgment.  (Doc. 238, pp. 14–15.)  Given that the Court has denied Defendant Attical's summary judgment motion in part, it declines to award him fees and costs at this stage of the litigation.

In response, Plaintiffs contend that eyewitness testimony establishes Defendant Attical was a "central cast member in the brutal hammer beating of nonresistant [Plaintiff] Stevenson." (Doc. 278, p. 1.)  They point to several witnesses who testified that Defendant Attical either participated in or was in the vicinity of Catanzariti's attack on Stevenson, and they contend that Attical's pepper spray explanation is contradicted by the record.  (Id. at pp. 16–22.)  Additionally, as to their excessive force and failure to intervene claims arising out of the infirmary escort, Plaintiffs assert the video evidence "places Attical at the scene outside when multiple officers continued to brutalize nonresistant Jackson and Stevenson."  (Id. at p. 2.)  This circumstantial evidence, they contend, creates an issue of fact as to whether Defendant Attical was one of the abusers outside of D-2, failed to intervene there, or both.  (Id.)  Lastly, Plaintiffs argue that Defendant Attical is not entitled to qualified immunity.  (Id. at pp. 22–25.)

In his Reply, Defendant Attical disputes Plaintiff Stevenson's presentation of the in-dorm eyewitness testimony, arguing that eyewitnesses "either cannot remember Defendant's involvement, retracted their statements about [his] involvement, or are contradicted by the eyewitnesses who discussed the video evidence." (Doc. 293, p. 3.)  Specifically, Defendant Attical argues that the testimony of Officers Hill, Harrison, and Catanzariti as well as that of Inmates Briscoe, Thomas, Satterfield, Cratic, and Neely does not support Plaintiff Stevenson's in-dorm excessive force and failure to intervene claims.  (Id. at pp. 4–10.)  Finally, as to Plaintiff Jackson's in-dorm excessive force claim and Plaintiffs' claims stemming from their escort to the infirmary, Defendant Attical argues he is entitled to summary judgment because Plaintiffs lack sufficient evidence.  (Id. at pp. 12–15.)

### B. Excessive Force Against Plaintiff Jackson in D-2

In their Response brief, Plaintiffs fail to offer any discussion of their claim that Defendant Attical used excessive force against Jackson in the dorm. (See Doc. 278.) They argue that "[g]enuine issues of material fact exist as to whether Attical failed to intervene in Catanzariti's use of force on Stevenson and as to whether Attical himself used excessive force on both Stevenson and Jackson [or failed to intervene on their behalf outside]," but Plaintiffs make no mention of Attical using force against or failing to intervene on Jackson's behalf inside D-2. (Id. at p. 14.) However, in responding to Defendant Attical's Statement of Undisputed Material Facts, Plaintiffs assert that inmate Shawn Thomas identified Attical as an officer who beat Jackson on the upper range. (Doc. 278-1, p. 6; see also doc. 293, p. 12 & n.5.) Although Plaintiffs provide no further discussion or support of this claim, the Court addresses it out of an abundance of caution.

At his deposition, Mr. Thomas initially identified Defendant Attical as "the large black officer from the third shift" who, along with other officers (one of whom wore a wool cap), kicked and beat Plaintiff Jackson on the upper range.[38] (Doc. 193, pp. 11–12.) On further examination, however, Mr. Thomas revised this identification. He stated that the large black officer from third shift was Lieutenant McFarlane (also known as "Debow"), not Defendant Attical. (Id. at p. 17; see doc. 259, p. 57; doc. 293, p. 7.) In addition, Mr. Thomas identified the young officer wearing the wool cap as someone other than Defendant Attical.[39] (Doc. 193, pp. 13, 17; see HHV at 11:02:49PM, 11:11:01PM.) Thus, when read in full, Mr. Thomas's deposition testimony provides

---

[38] It is undisputed that the individual photographed at Bates 8196 is Defendant Attical. (See Doc. 293, p. 7; doc. 259, p. 37.)

[39] Based on the Court's review of Mr. Thomas's deposition, he never positively identified the officer wearing the wool cap, (see doc. 193, pp. 11–13, 16–17), but it is clear that the person he identified in the handheld video at 11:02:49PM and 11:11:01, a black man wearing a wool cap, is not Defendant Attical. (Compare HHV 11:02:49PM, 11:11:01PM with Doc. 259, p. 37 (identifying Defendant Attical as the officer in Bates 8196); doc. 259-1, p. 31 (Bates stamped photograph of Defendant Attical).)

no evidence that Defendant Attical used excessive force against Plaintiff Jackson inside the D-2 dormitory. Furthermore, Plaintiffs do not offer any other evidentiary basis to show that Defendant Attical was one of the officers who allegedly used excessive force against Jackson on the upper range of D-2. And, as previously explained, they do not press this claim whatsoever in their summary judgment briefing. Because Plaintiffs lack any evidence showing that Defendant Attical used excessive force against Plaintiff Jackson in the D-2 dormitory, Attical is entitled to judgment as a matter of law on this claim. Fed. R. Civ. P. 56(a); Moton, 631 F.3d at 1341.

Accordingly, the Court **GRANTS** Defendant Attical summary judgment as to Plaintiff Jackson's in-dorm excessive force claim against him.

### C.   Failure to Intervene and Excessive Force Against Plaintiff Stevenson in D-2

Evaluation of Plaintiff Stevenson's in-dorm claims against Defendant Attical for excessive force and failure to intervene requires consideration of several eyewitnesses' disputed testimonies. (See Doc 278-1, pp. 4–8; doc. 293, pp. 4–10.)   The Court considers this officer and inmate testimony, as presented by the parties, in turn.

### (1)   Officer Testimony

Defendant Caleb Harrison testified that "Attical might have been there" when he tackled Plaintiff Stevenson on the upper range as the disturbance broke out, but he noted that he did not remember due to the passage of time since the incident. (Doc. 268, pp. 5–6.) Harrison added that Attical "was right beside me whenever we were locking people down [on the upper range by cells 225, 226, and 227,] and he and I both ran to assist whenever everything started off. That's the last thing I remember of him." (Id. at p. 19.) However, upon reviewing the handheld video, Harrison noted that Defendant Attical was not shown heading up the stairs with him at 10:57:04PM; instead, Attical is shown on the bottom range checking cell doors. (Id. at p. 36.) Harrison also stated that

he did not "think" Defendant Attical was around him when he and Catanzariti were attempting to handcuff Plaintiff Stevenson and Catanzariti is shown striking at Stevenson. (<u>Id.</u>)

Officer Hill initially testified that Defendant Attical was one of several officers "crowding around" Plaintiff Stevenson when Catanzariti was using force against a prone Stevenson on the upper range. (Doc. 267, p. 12.) Hill later explained that she identified Attical because he was "upstairs on the floor" but she was "not sure if it was before the incident or after." (<u>Id.</u> at pp. 25–26.) Nevertheless, Hill identified Attical on the upper range, heading toward Plaintiff Stevenson's location, at the 11:03:40PM mark on the handheld video—fifty seconds after Catanzariti is shown striking Stevenson, (<u>id.</u> at p. 26). In concluding her testimony, Hill testified that she never witnessed Defendant Attical use force that night and that she could not recall whether he was in the group of officers around Plaintiff Stevenson during the time in question. (<u>Id.</u> at p. 41.)

Defendant Catanzariti testified that he assisted Defendant Attical, who was blinded by pepper spray, with handcuffing Inmate Norman on the upper range and walking Norman downstairs. (Doc.267, p. 30.) Catanzariti clarified that this occurred after he was shown on the handheld video striking Plaintiff Stevenson. (<u>Id.</u> at p. 52.) In addition, Catanzariti indicated that he assisted Defendant Attical with Inmate Norman in an area five cells down from where Catanzariti had been involved with Plaintiff Stevenson on the upper range of D-2. (<u>Id.</u> at p. 40; <u>see</u> doc. 274-8.)

### (2) Inmate Testimony

Inmate Neely identified Defendant Attical as one of the "officer[s] that was initially there when [the disturbance] first started." (Doc. 263, p. 8.) Neely did not, however, indicate where Defendant Attical was at this time or what he was doing. (<u>See</u> <u>id.</u>) After being shown the video

evidence, Neely stated that he could not see Defendant Attical in the events depicted, including amongst the group of officers surrounding Catanzariti and Plaintiff Stevenson. (Id. at p. 23.)

Inmate Briscoe testified that Defendant Attical "was one of the officers that had [Plaintiff Stevenson] on the ground" with Catanzariti. (Doc. 191, p. 6.) While viewing the handheld video of Plaintiff Stevenson being escorted down from the upper range, Briscoe testified that Defendant Attical was on the bottom level but added, "now I seen him kick [Stevenson] in the head too." (Id. at pp. 9–10.) Prior to his deposition, Briscoe gave a statement to the GBI indicating he had gotten out of the shower as the disturbance commenced, (id. at p. 49), but at his deposition, Briscoe clarified that he was not in the shower during the subject events and could see them as he looked out from his cell door, (id. at pp. 16, 18).

Inmate Satterfield testified that he "could not say for sure," but that he believed Defendant Attical was one of the officers who was surrounding Plaintiff Stevenson as Catanzariti struck him with a hammer. (Doc. 262, p. 11.) When asked again, Satterfield stated that, "to the best of [his] knowledge," Defendant Attical was there when Plaintiff Stevenson was attacked by Catanzariti. (Id. at p. 30.)

Inmate Thomas, as discussed above, initially identified Defendant Attical as the "large black officer from the third shift" who beat and kicked Plaintiff Stevenson. (Doc. 193, p. 12.) However, the Court has already found that Thomas revised his testimony to state that Lieutenant McFarlane was this officer, not Defendant Attical, see supra Discussion Section II.A. Moreover, like with Plaintiff Jackson, inmate Thomas does not provide any additional testimony regarding Defendant Attical's alleged use of force and failure to intervene with respect to Plaintiff Stevenson during the subject disturbance. (See Doc. 193.)

**(3)**     **Analysis**

Defendant Attical urges the Court to discount the eyewitness testimony that implicates him in the attack against Plaintiff Stevenson in D-2, arguing that the cumulative effect of it, in light of the record, does not show he was involved. (Doc. 293, p. 10.) Moreover, Defendant Attical argues he could not have been involved because he was blinded by pepper spray during the time in question. (Id. at p. 11.) Plaintiff Stevenson contends, however, that the testimony creates a genuine dispute of material fact about whether Defendant Attical used excessive force against him or could have intervened in the use of force against him in D-2. (Doc. 278, pp. 20–21.) Reviewing this testimony and the video evidence, the Court agrees.

Officers Harrison and Hill both identified Defendant Attical as an officer on the upper range at some point during the disturbance. For her part, Officer Hill initially testified that Defendant Attical was one of the officers surrounding Plaintiff Stevenson when Catanzariti was using force against him, but she later concluded that she was not sure. Nonetheless, Hill never testified that she was initially wrong and that Defendant Attical was *not* one of those officers. For his part, Officer Harrison gave clear testimony that Defendant Attical was on the upper range near cells 225, 226, and 227, at the top of the stairs, when the disturbance broke out. These cells are on the same wing of the upper range where Catanzariti struck Plaintiff Stevenson, approximately five cell spaces from this location. (See Doc. 274-8.) Although Officer Harrison stated he did not think Defendant Attical was around him when he restrained Plaintiff Stevenson, he never conclusively testified to the contrary. Lastly, Officer Catanzariti's testimony places Defendant Attical on the same wing of the upper range sometime after the force in question, approximately five cells down from where Catanzariti admittedly struck Plaintiff Stevenson.[40] (See id.)

_____

[40] As a point of clarity, Officer Harrison's testimony places Defendant Attical on this wing of the D-2 upper range at the top of the stairs (the same staircase discussed throughout this Order) as the disturbance began;

As to the inmate eyewitnesses, Briscoe maintained that Defendant Attical struck Plaintiff Stevenson on the upper range and was one of the officers that had Stevenson handcuffed and on the ground as Catanzariti attacked. Inmate Satterfield testified that, as best as he could recollect, Defendant Attical was involved in the use of force against Plaintiff Stevenson on the upper range of D-2. And, although the testimony of inmates Neely and Thomas is less than probative of this issue, neither of their testimonies contradict or call into question the other eyewitnesses cited by Plaintiff Stevenson. Moreover, none of the video evidence contradicts Briscoe's accusations that Defendant Attical used force against Plaintiff Stevenson and restrained him during Catanzariti's use of force, or the other eyewitness testimony that places Defendant Attical in close vicinity to Plaintiff Stevenson on the upper range during the time in question.[41]

Lastly, although there is no dispute that Defendant Attical was sprayed with pepper spray, (doc. 278-1, pp. 3–4), Plaintiffs dispute that he was fully incapacitated and they further argue that this evidence shows Attical was on the upper range near Plaintiff Stevenson when Catanzariti used force against him, (id. at pp. 4, 8). As discussed previously, Defendant Eason deployed pepper

---

Officer Catanzariti's testimony, meanwhile, places Defendant Attical on the other end of this wing after the disturbance had ended. (See Doc. 274-8.) These two locations span a total of ten prison cells, with Catanzariti's use of force against Plaintiff Stevenson taking place roughly at the midpoint. (See id.)

[41] Defendant Attical makes the argument that, because the video evidence shows he was on the bottom range two minutes and thirty-six seconds prior to the disturbance breaking out and because he was never identified on the video footage capturing the use of force against Plaintiff Stevenson, it is established that he was not near Plaintiff Stevenson at this time and Briscoe's testimony to the contrary should be discounted. (Doc. 293, pp. 5–6.) This argument is lacking for at least three reasons: (1) Defendant Attical admits that the video evidence, particularly that recorded by the handheld camera, does not capture the whole fight, (doc. 278-1, p. 7); (2) Officer Harrison's testimony, which Defendant Attical never disclaimed, places him on the upper range, only five cells down from Plaintiff Stevenson's location, as the disturbance began, (doc. 268, p. 19); and (3) based on the last known pre-disturbance location of Defendant Attical, as established by the surveillance camera footage, (CAM 8 at 22:03:40–22:03:50; CAM 9 at 22:03:50– 22:04:47; doc. 268, pp. 35–36), Attical had two minutes and thirty-six seconds to go up either flight of stairs in D-2 and traverse over to Plaintiff Stevenson's location, which is ample time to do so. Indeed, the surveillance video appears to show Defendant Attical heading up the other set of stairs and making his way back around the upper range of the dormitory, toward Plaintiff Stevenson's direction. (See CAM 7 at 22:04:47–22:06:00.)

spray from the bottom of D-2 toward where officers were restraining and using force against Plaintiff Stevenson, and Officer Catanzariti assisted Defendant Attical handcuff inmate Norman on the upper range in the same immediate area where Eason aimed the pepper spray. (See CAM 9 at 22:07:26–22:07:40; doc. 274-8.) Taken together, this is sufficient evidence, when combined with other eyewitness testimony, to permit a reasonable jury to find that Defendant Attical was involved in the restraining and use of force against Plaintiff Stevenson inside D-2. Further, while Defendants Attical and Catanzariti testified that Attical was blinded by the pepper spray, Catanzariti admitted that he relied on Attical to correctly identify Norman. (Doc. 274, p. 29.) At the time Officer Hill identified Defendant Attical on the upper range, (HHV at 11:03:40PM), which is approximately three minutes after pepper spray was deployed, he appears to ambulate in a manner that is not indicative of a totally blinded and incapacitated individual.[42] And, of course, Mr. Briscoe testified to witnessing Defendant Attical play a direct role in the use of excessive force against Plaintiff Stevenson. On the whole, this evidence creates a fact dispute as to whether Defendant Attical was incapacitated by the pepper spray deployed that night such that he could not have used force or intervened.

Based on the video and testimonial evidence adduced by Plaintiffs, and making all reasonable inferences in their favor, the Court concludes a reasonable jury could find that Defendant Attical was on the upper range during the time in question and was involved in, or in close vicinity to, the use of force against Plaintiff Stevenson while he was restrained and handcuffed. Moreover, if the jury were to credit Plaintiffs' evidence on this claim—that Defendant Attical, along with other officers, restrained and kicked Plaintiff Stevenson in the head—it would

---

[42] Furthermore, just over four minutes later, Defendant Attical can be seen walking, and then running, toward D-2's sally port exit on the surveillance camera video in a manner inconsistent with someone allegedly blinded by pepper spray. (CAM 8 at 22:14:27–22:14:33.) At the very least, this evidence creates a fact dispute as to whether Defendant Attical was incapacitated by the deployment of pepper spray.

undoubtedly constitute excessive force in violation of the Eighth Amendment. See Piazza v. Jefferson County, 923 F.3d 947, 953 (11th Cir. 2019) ("When jailers continue to use substantial force against a prisoner who has clearly stopped resisting—whether because he has decided to become compliant, he has been subdued, or he is otherwise incapacitated—that use of force is excessive." (alteration and emphasis omitted) (quoting Danley, 540 F.3d 1298, 1309 (11th Cir. 2008)). Likewise, if the jury believes Plaintiff Stevenson was beaten while restrained, the evidence submitted permits it to also find that Defendant Attical—who allegedly held Stevenson down—failed to intervene while Catanzariti struck him with a hammer, despite being in a position to do so. Velazquez, 484 F.3d at 1340.

Accordingly, the Court **DENIES** Defendant Attical summary judgment as to Plaintiff Stevenson's in-dorm excessive force and failure to intervene claims against him.

### D. Failure to Intervene and Excessive Force Against Plaintiffs During Their Escort Outside of D-2

Plaintiffs' escort excessive force and failure to intervene claims against Defendant Attical arise out of the same factual background as those alleged against Defendant Eason. As previously described, Plaintiff Stevenson was escorted out by officers, followed by Plaintiff Jackson, Defendant Eason, Catanzariti, and other officers approximately one minute later. (CAM 8 at 22:13:21–22:13:40 (Stevenson being escorted toward D-2's sally port), 22:14:08–22:14:29 (Jackson being escorted toward D-2's sally port by Defendant Eason and followed by Catanzariti and other officers).) One of those other officers was Defendant Attical. The surveillance camera video shows Defendant Attical walking behind Catanzariti, an inmate, and another officer (who are themselves following Defendant Eason and Plaintiff Jackson), and as that group goes off screen, Attical takes off running after them. (CAM 8 at 22:14:27–22:14:32.)

Defendant Attical contends this circumstantial evidence is insufficient to create an actual question of material fact on these claims, because it cannot reasonably support the inference that he then exited and participated in, or permitted, the alleged use of excessive force against Plaintiffs outside D-2. (Doc. 293, pp. 12–13.) According to Defendant Attical, the "justifiable inference[] which can be drawn from [this] video evidence . . . is merely that [he] was moving in the direction of the exit while he was *inside* the D-2 dorm." (Id. at p. 13 (emphasis in original).) This, however, is not an inference. The video straightforwardly shows, without need for inferential supposition, Defendant Attical quickly moving toward the sally port exit while still inside D-2. (CAM 8 at 22:14:27–22:14:32.) From Defendant Attical's last shown position on this surveillance video, the entrance to the sally port is mere steps away. (See CAM 8 at 22:14:32; doc. 273-1.) A justifiable inference to be made from this direct evidence is that Defendant Attical continued on the short distance to the exterior of D-2, joining Defendants Catanzariti and Eason and Plaintiff Jackson in the area outside the sally port exit.[43]

Standing alone, this evidence would not reasonably support a further inference that Defendant Attical used force against Plaintiff Jackson or against Plaintiff Stevenson outside D-2, or that he failed to intervene in other officers' use of force. Plaintiffs, however, also testified that they were beaten by multiple officers outside. (See, e.g., Doc. 259, pp. 77–78.) Moreover, several inmates corroborated Plaintiffs' accounts, testifying that they witnessed and heard multiple officers beating Plaintiffs while they were restrained and handcuffed outside of D-2, see *supra* Discussion Sections I.C. and I.D. Given this testimony and the video evidence of Defendant

---

[43] At his deposition, Defendant Attical mentioned that he "stepped outside" after washing his eyes out but did not elaborate. (Doc. 214, p. 25.) Although this testimony, which lacks any precise temporal designation, is not dispositive of whether Attical continued on outside at this time, it does establish that Attical was outside D-2 at some point after the disturbance occurred. Defendant Attical's admission in this regard adds credence to Plaintiffs' argued-for inference.

Attical running toward the sally port, there is more than a "mere 'scintilla' of evidence supporting" Plaintiff Jackson's claims that Defendant Attical participated in the use of gratuitous force against him,[44] or failed to intervene,[45] outside of D-2 as Jackson was being escorted to the Smith State infirmary.  Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).

As for Plaintiff Stevenson, however, the Court has already determined that, per the undisputed evidence, he was no longer in the area directly outside the sally port exit when Plaintiff Jackson and officers emerged, see supra Discussion Section I.C(2).  By this time, Plaintiff Stevenson had already been escorted further down the covered walkway outside D-2.  Id.  As such, for Plaintiff Stevenson to maintain his escort excessive force claim, there must be evidence showing Defendant Attical participated in the attacks against him that occurred at the north security gate area where Catanzariti allegedly again used gratuitous force, (doc. 240-3, p. 12). However, by Plaintiff Stevenson's own testimony, the officers who attacked him once he was outside D-2 were all white.  (Id.)  When asked to provide a description, Plaintiff Stevenson replied, "[T]he only thing I can tell you was [that there were] several white [male] officers out there that jumped me."  (Id.)  Defendant Attical is black.  Therefore, Defendant Attical could not have been one of the officers that used excessive force against Plaintiff Stevenson as he was being escorted outside to the infirmary.

Nevertheless, applying the Court's analysis of Plaintiff Stevenson's escort failure to intervene claim against Defendant Eason, see supra Discussion Section I.C(2), to the same claim

---

[44]  Notably, when asked to describe the officers who attacked him once he was taken outside the dorm, Plaintiff Jackson testified that there were both black and white officers at fault.  (Doc. 240-4, p. 16.) Defendant Attical is one of the black officers who was on duty that night.

[45]  Based on the video and testimony discussed herein, a jury could find that Defendant Attical followed Plaintiff Jackson outside where officers began beating Jackson, thus putting Attical in a position to intervene in that force.

here against Defendant Attical, the Court finds that Stevenson has produced enough evidence to also show that Defendant Attical was in a position to intervene to prevent Catanzariti from using excessive force against him at the north security gate area.[46]  Like Defendant Eason, the evidence would permit a determination that Defendant Attical knew of Catanzariti's gratuitous use of force and could have done something to prevent him from attacking Plaintiff Stevenson further down the fenced walkway to the infirmary.  In fact, if Plaintiffs' evidence is believed by a jury, Defendant Attical would have been a witness to Catanzariti's excessive use of force against Plaintiff Stevenson on the upper range of D-2 (or perhaps even a participant in the use of force himself) approximately five minutes prior to when he followed Catanzariti outside.  Once outside, Defendant Attical would have been a witness to Catanzariti's excessive use of force against Plaintiff Jackson.  By this point, Defendant Attical would have clear "reason to expect the use of excessive force" by Catanzariti would continue.  Riley, 94 F.3d at 635.  Thus, viewed in the light most favorable to Plaintiffs, the evidence shows Defendant Attical had an obligation to do something at this juncture to prevent Catanzariti from continuing to use gratuitous force against inmates and was in a position to do so, yet did nothing.[47]  In other words, Plaintiffs have adduced sufficient evidence for a jury to find that Defendant Attical was in a position to intervene and

---

[46]  Should Plaintiffs' testimonial evidence and interpretation of the surveillance video be believed by the jury, then Defendants Attical and Eason would have been in the exact same location together just outside the sally port door and would have necessarily witnessed, or participated in, the same events.  Notably, the testimony of Plaintiffs and their witnesses, as compared to that provided by Defendants Attical and Eason, regarding what occurred outside of D-2 is irreconcilable.  Where there are two competing accounts of what occurred, it is for a jury to decide which is credible.  See Fils, 647 F.3d at 1292 n.24.

[47]  This evidence would permit a reasonable jury to find that, while witnessing Catanzariti strike Plaintiff Jackson in his immediate vicinity, Defendant Attical could have called for backup, issued a verbal command, or physically intervened to prevent him from leaving the area outside D-2 and continuing to use gratuitous force.  Moreover, even if the facts indicate that Defendant Attical was never directly in the north security gate area—where Stevenson alleges Catanzariti struck him outside—it stands to reason that he could have heard Catanzariti's use of force against Stevenson, because inmates inside D-2 testified to hearing officers strike Plaintiffs as they were being escorted outside.

prevent the alleged use of force by Catanzariti against Plaintiff Stevenson during his infirmary escort.

Accordingly, the Court **DENIES** Defendant Attical summary judgment as to Plaintiff Jackson's escort excessive force and failure to intervene claims and as to Plaintiff Stevenson's escort failure to intervene claim. However, the Court **GRANTS** Defendant Attical summary judgment as to Plaintiff Stevenson's escort excessive force claim alleged against him.

### E. Qualified Immunity

In addition, Defendant Attical asserts that he is entitled to qualified immunity on all claims. (Doc. 238, pp. 12–14.) Plaintiffs oppose. (Doc. 278, pp. 22–25.)

#### (1) Legal Standard

As set forth above, qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818; see also Lee, 284 F.3d at 1193–94.[48] To overcome the qualified-immunity defense, a plaintiff must "establish both that the officer's conduct violated a constitutionally protected right and that the right was clearly established at the time of the misconduct." Alcocer, 906 F.3d at 951. "[W]hether the law clearly established the relevant conduct as a constitutional violation at the time [the defendants] engaged in the challenged acts," turns on whether the defendants had "fair warning" that their conduct violated a constitutional right. Fransen, 857 F.3d 843, 851 (11th Cir. 2017) (citation omitted).

---

[48] To rely upon qualified immunity, a defendant first must show that he or she acted within his or her discretionary authority. Mobley, 783 F.3d at 1352. Here, there is no dispute Defendant Attical was acting within his discretionary authority. (See Doc. 278, pp. 22–25.) The question thus becomes whether qualified immunity bars the claims against him.

In order to demonstrate "fair warning" and defeat qualified immunity, the plaintiff must "point to binding precedent that is materially similar," or show the challenged conduct violated federal law with "obvious clarity" such that "every objectively reasonable government official facing the circumstances would know that the official's conduct" was unlawful, despite the lack of materially similar case law. Id. at 852; Gaines, 871 F.3d at 1209 (binding precedent comes from "the United States Supreme Court, the Eleventh Circuit, or the relevant State Supreme Court" (citation and alteration omitted)). When relying on the "obvious clarity" method, the plaintiff may invoke a "'broader, clearly established principle' that he asserts 'should control the novel facts [of the] situation.'" Fransen, 857 F.3d at 852 (citation omitted). Or, the plaintiff may show that defendant's conduct is "so bad that case law is not needed to establish" its unlawfulness. Id. (citation omitted). The "obvious clarity" category has been described as "narrow." Id. (citing Priester, 208 F.3d at 926–27).

At summary judgment, when assessing qualified immunity, the court "must take the facts in the light most favorable to the party asserting the injury," eliminating all issues of fact so "the court has the plaintiff's best case before it." Robinson, 415 F.3d at 1257. Thus, the court "determine[s] the legal issue of whether the defendant [is] entitled to qualified immunity using the version of facts most favorable to the plaintiff." Bates, 518 F.3d at 1239 (citation omitted).

### (2) Analysis

Given the Court's finding that, based on the facts of record, Defendant Attical did not use excessive force against Plaintiff Jackson in the dorm, *supra* Discussion Section II.B., and did not use excessive force against Plaintiff Stevenson during his escort outside of the dorm, *supra* Discussion Section II.D., Plaintiffs have failed to establish constitutional violations with respect

to these claims.  As such, Defendant Attical is entitled to qualified immunity on them.[49]  <u>See</u>

<u>Alcocer</u>, 906 F.3d at 951.  With respect to Plaintiffs' claims where the Court has identified material

fact disputes precluding summary judgment—excessive force against and failure to intervene to

protect Plaintiff Stevenson in the dorm; excessive force against Plaintiff Jackson outside; and

failure to intervene to protect both Plaintiffs outside during their infirmary escort—Defendant

Attical repeats his contention that there is insufficient evidence against him.  (Doc. 238, p. 14.)

However, the Court has already determined that Plaintiffs have adduced enough evidence to

preclude summary judgment on these claims.  Thus, taking Plaintiffs' versions of events in the

light most favorable to them, as supported by the evidence of record described above, <u>Robinson</u>,

415 F.3d at 1257, the Court finds that Defendant Attical is not due qualified immunity under these

versions of events in light of clearly established law as of 2010.

      As explained in Discussion Section II.C., Plaintiffs proffered sufficient evidence, with the

disputed facts resolved in their favor, to establish that Defendant Attical violated the Eighth

Amendment when he, along with other officers, kicked a non-resistant, restrained Plaintiff

Stevenson and also held him down as other officers battered him.  Once an inmate has been

restrained and become complaint, further use of serious force is unconstitutionally excessive.  "The

basic legal principle is that once the necessity for the application of force ceases, any further use

of harmful force can be a violation of the Eighth and Fourteenth Amendments."  <u>Williams v.</u>

<u>Burton</u>, 943 F.2d 1572, 1576 (11th Cir. 1991).  It bears repeating here, "[w]hen jailers continue to

use substantial force against a prisoner who has clearly stopped resisting—whether because he has

---

[49]  Because the evidence, construed in Plaintiffs' favor, would not allow a jury to find that Defendant Attical used excessive force against Plaintiff Jackson in the dorm or against Plaintiff Stevenson during his escort outside the dorm to the infirmary, Plaintiffs cannot establish constitutional violations on these claims.  Thus, Defendant Attical is entitled to qualified immunity as to them.  <u>See, e.g.</u>, <u>Butler</u>, 766 F. App'x at 929 (evidentiary failure on essential element of constitutional claim entitles the defendant to qualified immunity)).

decided to become compliant, he has been subdued, or he is otherwise incapacitated—that use of force is excessive." Danley, 540 F.3d at 1298. Kicking a subdued inmate in the head constitutes an unnecessary and wanton infliction of pain that violates the Eighth Amendment, and thus, Defendant Attical is not able to invoke the qualified immunity defense on this excessive force claim. See Skrtich, 280 F.3d at 1301 (citation omitted).

Moreover, as has been made evident throughout this Order, the Eleventh Circuit has long adhered to the broad and clearly established principle that "an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable for his nonfeasance."[50] Skrtich, 280 F.3d at 1302. Even if Plaintiff Stevenson fails to convince a jury that Defendant Attical actually used excessive force against him in the dorm, he still could convince a jury, under his failure to intervene theory, that Defendant Attical held Plaintiff Stevenson down as Catanzariti and other officers used gratuitous force on him, rather than intervening once the force became excessive. On this version of events, Defendant Attical is not entitled to qualified immunity on Plaintiff Stevenson's in-dorm failure to intervene claim.

Similarly, as explained in Discussion Section II.D., Plaintiffs have adduced enough evidence for a jury to find that Defendant Attical used excessive force against Plaintiff Jackson or failed to intervene in his fellow officers' alleged use of force against Jackson, or both, as he was

---

[50] See also Velazquez, 484 F.3d at 1341–42 (rejecting award of qualified immunity based on the plaintiff's not knowing which officer beat him and concluding that a jury is permitted to find that both defendant-officers "administered the excessive force or that one beat him while the other failed to intervene"); Ensley, 142 F.3d at 1407 (granting qualified immunity because "this is *not* a case in which an officer is alleged to have stood idly by" while "an unprovoked beating [took] place in his presence"(emphasis added)); Byrd, 783 F.2d at 1007 (holding that "if a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983" and vacating summary judgment for defendant-officer who was present at alleged excessive force but did not intervene).

escorted through the sally port and outside of D-2. Continuing to strike a subdued Plaintiff Jackson as he was being escorted outside D-2 and to the infirmary would amount to a violation of clearly established Eighth Amendment law. E.g., Davis, 936 F.2d at 1213. Furthermore, on Plaintiffs' best case, a jury could find that Defendant Attical failed to intervene as Catanzariti used force against Jackson outside and that his failure to do so also constituted a failure to protect Plaintiff Stevenson, because Catanzariti then went down the fenced-in walkway and attacked Stevenson at the north gate security area. Having seen Catanzariti strike Stevenson inside the dorm and Jackson outside the dorm, any reasonable officer in Defendant Attical's position would have known he had a duty to intervene to prevent further excessive force by Catanzariti.[51] That an officer was obligated to intervene to stop the use of excessive when he observed it and had the ability to do so was clearly established in December 2010. E.g., Skrtich, 280 F.3d at 1302; Priester, 208 F.3d at 927. On Plaintiffs' version of the facts, Defendant Attical violated this clearly established principle.

Therefore, based on the foregoing reasons, the Court **DENIES** Defendant Attical summary judgment on the basis of qualified immunity as to Plaintiff Stevenson's in-dorm failure to intervene and excessive force claims and on Plaintiff Jackson's escort failure to intervene and excessive force claims. In addition, the Court **DENIES** Defendant Attical qualified immunity as to Plaintiff Stevenson escort failure to intervene claim.[52] However, because the evidence shows Defendant

---

[51] In addition, the testimonial evidence viewed in the light most favorable to Plaintiff Stevenson shows that Defendant Attical could have heard Catanzariti's strikes against Stevenson and remained in range of voice contact, such that he could have verbally intervened to attempt to prevent or end the use of excessive force.

[52] As to these denials of qualified immunity, the Court again emphasizes "that the 'facts,' as accepted at the summary judgment stage of the proceedings, may not be the 'actual' facts of the case." Priester, 208 F.3d at 925 n.3. However, based on the applicable standard and the facts assumed thereunder, Defendant Attical is not entitled to qualified immunity. If appropriate, Defendant Attical may reassert qualified immunity based on the facts found at trial by the jury.

Attical did not use excessive force against Plaintiff Stevenson during his escort or against Plaintiff Jackson inside the dorm, the Court **GRANTS** Defendant Eason summary judgment on the basis of qualified immunity as to these claims.

### F. Conclusions on Defendant Attical's Motion for Summary Judgment

For the reasons and in the manner set forth above, the Court **GRANTS in part** and **DENIES in part** Defendant Attical's Motion for Summary Judgment. (Doc. 237.) Accordingly, the Court **DISMISSES** Plaintiff Jackson's in-dorm excessive force claim and Plaintiff Stevenson's escort excessive force claim against Defendant Attical. In addition, the Court **DISMISSES** Plaintiff Jackson's in-dorm failure to intervene claim and both Plaintiffs' constitutional claims concerning the alleged events in the infirmary. However, because there are genuine issues of material fact on Plaintiff Stevenson's in-dorm failure to intervene and excessive force claims as well as on his escort failure to intervene claim, and because there are genuine issues of material fact on Plaintiff Jackson's escort failure to intervene and excessive force claims, Defendant Attical is not entitled to judgment as a matter of law on those particular claims. As such, these claims shall remain pending before the Court.

## III. Defendant Ritchie's Motion for Summary Judgment (Doc. 244)

At summary judgment, Plaintiffs maintain a single claim against Defendant Ritchie: failure to intervene on Plaintiff Stevenson's behalf during his dorm altercation with officers. (See Doc. 277-1, pp. 7–10, 13, 15–16; see also doc. 277, pp. 1–2.) Defendant Ritchie seeks summary judgment as to all claims brought against her by Plaintiffs.[53] (Doc. 244.)

---

[53] As noted, in their First Amended Complaint, Plaintiffs set forth their excessive force and failure to intervene allegations and claims generally against all Defendants in this action. (See Doc. 24, pp. 5–19.) Following discovery, however, Plaintiffs have indicated the undisputed facts show that Defendant Ritchie did not use excessive force or fail to intervene in the use of excessive force when they were escorted to the infirmary or when they were held there. (See Doc. 277-1, pp. 7–10, 13, 15–16; doc. 277, pp. 1–2; see also doc. 295, pp. 1–3.) In addition, Plaintiffs have stipulated that Defendant Ritchie never used excessive force

## A.    The Parties' Arguments

As to Plaintiff Stevenson's in-dorm failure to intervene claim, Defendant Ritchie argues the duty to intervene never arose because the evidence shows she did not observe any use of force against Stevenson, by Catanzariti or any other officer.  (Doc. 244-1, pp. 9–10.)  She denies that there is any "evidence to demonstrate that [she] could have observed or actually did observe any excessive use of force."  (Id. at p. 10.)  While Defendant Ritchie acknowledges that the handheld video footage shows a female officer standing among the crowd of officers surrounding Stevenson while he was on the ground and being repeatedly struck by Catanzariti, she disputes whether the female officer in question has been proven to be her; she further argues that, even if it is her, the video footage does not establish that she witnessed a use of excessive force.  (Id. at pp. 10–12.)  Any possible vantage point, Ritchie contends, was obstructed by other officers and, moreover, Catanzariti's strikes occurred too quickly for the approaching female correctional officer to have been able to observe them.  (Id. at pp. 12–13.)

Alternatively, even if this female officer in the handheld video footage was her, Defendant Ritchie contends she would have been physically incapable of intervening in the quick strikes shown on the handheld video.  (Id. at pp. 13–14.)  Because there were larger male officers around Plaintiff Stevenson and because she was recovering from bilateral knee surgery, Defendant Ritchie asserts that "it would have been extraordinarily difficult—if not impossible—for [her] to intervene on Stevenson's behalf."  (Id. at p. 14.)  Additionally, Defendant Ritchie argues that she cannot be liable for failure to intervene as "she did not sit idly by when the riot broke out; rather, she promptly radioed for assistance in very dangerous circumstances."  (Id. at p. 15.)  She contends more action

against Plaintiff Jackson or Plaintiff Stevenson, nor was she ever in a position to intervene in the force other officers used against Plaintiff Jackson.  (Id.)  Because the parties agree Defendant Ritchie did not act unlawfully in these situations, the Court **GRANTS** her Motion for Summary Judgment as to these excessive force and failure to intervene claims, (doc. 244).  Fed. R. Civ. P. 56(a).

would have subjected her to danger and was not constitutionally required.  (Id. at pp. 16–17.) Lastly, Defendant Ritchie asserts qualified immunity with respect to this claim.  (Id. at pp. 23–24.)

In response, Plaintiffs argue that the law did not require Defendant Ritchie "to be Wonder Woman that day," only that she take some reasonable step to intervene, such as yelling for officers to stop beating Plaintiff Stevenson.  (Doc. 277, p. 2.)  As such, based on the handheld video evidence and accompanying testimony, Plaintiffs argue that "[g]enuine issues of material fact exist as to whether [Defendant] Ritchie failed to intervene in Catanzariti's use of force on Stevenson." (Id. at p. 13; see also doc. 259, pp. 53–56.)  Furthermore, because the inmates had been subdued when Catanzariti "continued to unleash on" a restrained Stevenson, Plaintiffs dispute that the situation was too dangerous for Defendant Ritchie to do anything to protect Stevenson.  (Doc. 277, p. 19.)  Plaintiffs contend she could have verbally intervened in some fashion.  (Id.)  Lastly, Plaintiffs assert that Defendant Eason is not entitled to qualified immunity.  (Id. at pp. 20–22.)

Defendant Ritchie replied, arguing that Plaintiffs failed to produce evidence showing she observed Catanzariti striking Stevenson.  (Doc. 295, pp. 3, 6–9.)  Moreover, Defendant Ritchie asserts that "[e]ven assuming [she] observed that the incident had turned from the use of justified force to regain control to excessive force, the evidence establishes that the incident complained of was unexpected, sudden, and short in duration such that Ritchie did not have sufficient time to give a voice command to prevent the alleged excessive use of force."  (Id. at p. 3.)  Based on the brief sequence of events, she avers that it would have been unreasonable for her to have been legally obligated to verbally intervene.  (Id. at pp. 9–11.)  Defendant Ritchie thus concludes that no issues of material fact remain and she is entitled to judgment as a matter of law.  (Id. at p. 4.)

### B.  Failure to Intervene During Plaintiff Stevenson's Dorm Altercation

To reiterate, on a failure to intervene claim, the "plaintiff has the burden to demonstrate that the defendant was in a position to intervene but failed to do so." Ledlow, 500 F. App'x at 914 (citing Hadley, 526 F.3d at 1330–31).  To meet this burden, the plaintiff must adduce "facts showing the necessity or real opportunity for the defendant-officers to intervene in a fellow officer's unlawful conduct." Keating, 598 F.3d at 764.  Part of this showing requires the plaintiff to provide evidence that the defendant-officer could observe the use of excessive force.  See Riley, 94 F.3d 635; see also Militello v. Sheriff of Broward Sheriff's Office, 684 F. App'x 809, 813 (11th Cir. 2017) (per curiam) (An officer who "was unable to observe a fellow officer's use of [excessive] force" was not in a position to intervene.)

Defendant Ritchie essentially argues that she could not observe Plaintiff Stevenson being attacked by Catanzariti, and even if she could have, his strikes occurred too quickly for her to intervene based on her location on the upper ramp.  A close viewing of the video evidence shows that a reasonable jury could find Defendant Ritchie observed the subject use of force, despite her protestations to the contrary.[54]  Even so, whether she was in a position to intervene, or had an opportunity to do so, is the ultimate issue.  The handheld video depicts the following:

- Defendant Ritchie is four cell doors down from where Catanzariti and officers are surrounding Plaintiff Stevenson on the ground, holding the railing as she bends down with her back to Stevenson's location.  (HHV at 11:02:33PM.)
- The handheld camera quickly flashes by this same area; Defendant Ritchie is now walking and looking toward Plaintiff Stevenson's location.  (Id. at 11:02:45PM.)

---

[54] Although Defendant Ritchie equivocated as to whether the female correctional officer, on the upper range during the time in question with hair styled in a bun, was actually her, (doc. 260, p. 9), two Smith State correctional officers identified this individual as Ritchie, (doc. 214, pp. 17–18; doc. 213, pp. 15, 19). Moreover, Defendant Ritchie testified to being on the upper range when the incident began, (HHV at 11:00:57PM), and also to being there approximately three minutes later, (Id. at 11:03:47PM).  (Doc. 260, pp. 7, 9, 14.)  Given this evidence, a jury could easily find that Ritchie was the female officer identified on the handheld video, and the Court's analysis herein presumes as much.

- The camera pans back and shows her continuing to walk the short distance to where officers are surrounding Stevenson and using force against him. As she steps away, Catanzariti quickly delivers several hard blows to Stevenson. (<u>Id.</u> at 11:02:47PM–11:02:49PM.)
- Defendant Ritchie joins the group of surrounding officers and bends down toward Plaintiff Stevenson as Catanzariti finishes his last strike. (<u>Id.</u> at 11:02:49PM–11:02:53PM.)
- Defendant Ritchie then disappears from view amongst this group of officers surrounding Plaintiff Stevenson. (<u>Id.</u> at 11:02:54PM–11:03:02PM.)
- Approximately twenty seconds later, she leaves the group and walks back toward where she was before. (<u>Id.</u> at 11:03:09PM–11:03:14PM.)
- In this location, Defendant Ritchie holds a handcuffed inmate against the wall. (<u>Id.</u> at 11:03:47PM–11:04:03PM.) Two minutes later, from this same location, she walks down the stairs and leaves the dorm. (<u>Id.</u> at 11:06:04PM; <u>see also</u> CAM 8 at 22:12:27–11:12:58.)

Based on this video evidence, the earliest possible point at which Defendant Ritchie could have seen officers using force against Plaintiff Stevenson while he was on the ground and not resisting would be at the 11:02:45PM mark, when she began walking toward Stevenson. Before this time, Defendant Ritchie faced away from Plaintiff Stevenson as she assisted officers with an inmate four cell doors down. (HHV at 11:02:33PM.) What is more, Plaintiff Stevenson testified that, once the altercation between he and Catanzariti began, Defendant Ritchie left where they were located: "After [Catanzariti and me] talked, [Ritchie] went opposite because when the officer sprayed, she went that way. She went opposite of where [Catanzariti] was. And when the officer sprayed the spray, that's the last time I saw her." (Doc. 240-3, p. 31.) This testimony and the handheld video together establish that Defendant Ritchie was not around Plaintiff Stevenson and Catanzariti, and thus did not observe excessive force until she turned and began walking back toward them at the 11:02:45PM mark.

From this point forward, however, at most only *eight* seconds elapsed between when Defendant Ritchie could have possibly seen Catanzariti use force on a restrained and non-resisting Plaintiff Stevenson and when he ceased using such force. For liability to attach, there must have

been "time to intervene" in the use of force, otherwise it cannot be said that the non-intervening officer was ever in a position to intervene. Marantes v. Miami-Dade County, 649 F. App'x 665, 672 (11th Cir. 2016) (per curiam) (citations omitted). In Defendant Ritchie's case, eight seconds was not nearly enough time for her to ascertain that Plaintiff Stevenson was no longer resisting and had been restrained as Catanzariti delivered several quick strikes to his head area. Even assuming that she could see the situation, which was at least partly obstructed by other officers, she did not have enough time to issue a verbal command to protect Plaintiff Stevenson before Catanzariti's rapid strikes ended. The duration of time between when Defendant Ritchie could have possibly realized Catanzariti was using force on a compliant, handcuffed Plaintiff Stevenson and when he stopped using that force was, at most, only a few seconds. Once Defendant Ritchie arrived at Catanzariti's location, he had stopped striking Plaintiff Stevenson, and the video shows that she bent down toward Stevenson amongst this group of surrounding officers.[55]

Eleventh Circuit precedent makes clear that such a short interval of time is insufficient for an officer to reasonably intervene in the use of excessive force. See, e.g., Johnson, 725 F. App'x at 878 (finding no constitutional violation on a failure to intervene claim where "the whole incident lasted only a few seconds"); Marantes, 649 F. App'x at 672 (affirming dismissal of failure to intervene claim where officer kicked plaintiff four times in rapid succession without warning, leaving insufficient time for any of the other officers to issue a verbal command or physically prevent the kicking); Riley, 94 F.3d at 635 ("The three blows were struck in such rapid succession

---

[55] Thus, it cannot be said that Defendant Ritchie "stood idly by" while Catanzariti struck Plaintiff Stevenson as she approached their location. Ensley, 142 F.3d at 1407. Furthermore, Plaintiffs have presented no evidence that Catanzariti continued striking Plaintiff Stevenson in the dorm after what is shown on the handheld video sequence, which is the point when Defendant Ritchie bent down over Stevenson and was positioned to intervene in any continued force. (See Doc. 277, pp. 14–19; doc. 277-1; doc. 259, pp. 53–56; see also doc. 282-1 pp. 16–17 (arguing that evidence shows the hammer beating incident occurred before Catanzariti's strikes captured by the handheld video)).

that [the defendant] had no realistic opportunity to attempt to prevent them. This was not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator." (quoting O'Neill v. Krzeminski, 839 F.2d 9, 11–12 (2d. Cir. 1988)); see also Crane v. Fort, No. 5:15-CV-345-CAR-CHW, 2016 WL 8678447, at *10 (M.D. Ga. Nov. 4, 2016) ("The most significant shots, to [the plaintiff's] face, occurred only at the end of [a thirty second] period. [Thus], the other officers were not in a position to intervene once it arguabl[y] became apparent that the use of force had escalated beyond necessity."), *report and recommendation adopted by* 2017 WL 132846 (M.D. Ga. Jan. 13, 2017).

Therefore, based on the undisputed evidence of record with all reasonable inferences drawn in Plaintiffs' favor, the Court finds that Defendant Ritchie's failure to verbally intervene on Plaintiff Stevenson's behalf was not constitutionally unlawful. Plaintiffs have failed to adduce evidence from which a reasonable jury could conclude that she had sufficient time to intervene and protect Plaintiff Stevenson. Accordingly, the Court **GRANTS** Defendant Ritchie summary judgment as to Plaintiff Stevenson's in-dorm failure to intervene claim alleged against her. Additionally, because the undisputed facts show that Defendant Ritchie was not in position to intervene when Plaintiff Stevenson was subjected to excessive force by Catanzariti in the D-2 dorm, Plaintiffs cannot show an essential element of their failure to intervene claim against her; thus, the Court **GRANTS** Defendant Ritchie qualified immunity on this claim.[56]

---

[56] See, e.g., Butler, 766 F. App'x at 929 (evidentiary failure on essential element of constitutional claim entitles the defendant to qualified immunity)).

## CONCLUSION

In light of the foregoing, the Court **GRANTS in part** and **DENIES in part** Defendants Eason and Attical's Motions for Summary Judgment, (docs. 233, 237), but **GRANTS** Defendant Ritchie's Motion for Summary Judgment as to all claims alleged against her, (doc. 244). As a result, the Court:

- **DISMISSES with prejudice** Plaintiffs' failure to intervene and excessive force claims against Defendant Ritchie and **DIRECTS** the Clerk of Court to **TERMINATE** Ritchie as a Defendant upon the docket and record of this case.

- **DISMISSES with prejudice** the following claims against Defendant Eason: Plaintiffs' in-dorm failure to intervene and excessive force claims; both Plaintiffs' claims regarding failure to intervene and excessive force in the infirmary; both Plaintiffs' supervisory liability claims; and Plaintiff Stevenson's escort failure to intervene claim.

- **DISMISSES with prejudice** the following claims against Defendant Attical: Plaintiff Jackson's in-dorm failure to intervene and excessive force claims; Plaintiff Stevenson's escort excessive force claim; and both Plaintiffs' claims regarding failure to intervene and excessive force in the infirmary.

However, as explained above, the following Eighth Amendment claims against Defendant Eason remain pending: both Plaintiffs' escort failure to intervene claims and Plaintiff Jackson's escort excessive force claim. And the following Eighth Amendment claims against Defendant Attical remain pending: Plaintiff Stevenson's in-dorm failure to intervene and excessive force claims; Plaintiff Jackson's escort failure to intervene and excessive force claims; and Plaintiff Stevenson's escort failure to intervene claim.

In light of the foregoing disposition, the Court **ORDERS** the remaining parties to file one updated joint status report within **twenty-one (21) days** of the date of this Order regarding the status of this case and whether the parties are prepared to proceed to trial. The parties' status report must also address the status of those Defendants who were not subject to this Order or the companion Order filed contemporaneously herewith, (doc. 313). As previously indicated, (docs. 174, 231), the parties have discussed voluntarily dismissing, pursuant to Federal Rule of Civil Procedure 41(a), the following yet to be dismissed Defendants: Carolyn Carrol, Kim Hardee, Jeffery Mullis, and Joseph White. However, in their Stipulation of Dismissal, (doc. 232), the parties declined to dismiss these Defendants and they remain in this case. The parties must update the Court on the status of these defendants and their relevancy to this case. Furthermore, Plaintiffs have failed to file the requisite proof of service as to Defendants Brandon Cearnel, Christopher Henderson, Candice Hill, John Jones, Justin Swope, and Gene Tootle. Pursuant to Federal Rule of Civil Procedure 4(m), the Court **ORDERS** Plaintiffs to show cause, within **twenty-one (21) days** of the date of this Order, as to why these Defendants should not be dismissed from this action for lack of timely service. In so doing, Plaintiffs must explain these Defendants' continued relevancy to this case and what actionable claims, if any, remain against them. Alternatively, Plaintiffs may move to dismiss these Defendants rather than showing cause regarding their failure to properly comply with Federal Rule of Civil Procedure 4(m).

**SO ORDERED**, this 2nd day of October, 2019.

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA