# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## STATESBORO DIVISION

MIGUEL JACKSON; and KELVIN
STEVENSON,

           Plaintiffs,

    v.

JOSEPH CATANZARITI, et al.,

           Defendants.

CIVIL ACTION NO.: 6:12-cv-113

## <u>O R D E R</u>

Before the Court is Defendants Andrew McFarlane, Nathaniel Milton, Melvin Wells, Jarrod Bennett, Gordon Pittman, and Gary Mitchell's Motion for Summary Judgment. (Doc. 240.) This case arises out of a December 31, 2010 disturbance at Smith State Prison in Glennville, Georgia, where Plaintiffs allege that Defendants, corrections officers, either subjected them to excessive force or failed to intervene on their behalf, or both, in violation of their constitutional rights. (Doc. 24.) Against Defendants McFarlane, Milton, Wells, Bennett, Pittman, and Mitchell, Plaintiffs bring Eighth Amendment excessive force and failure to intervene claims pursuant to 42 U.S.C. § 1983. (<u>Id.</u>) Plaintiffs allege these Defendants participated or failed to intervene in the unlawful use of force against them in their prison dorm, during their escort outside the dorm to the infirmary, and while they were in the infirmary. (<u>Id.</u>)

In their Motion for Summary Judgment Brief, Defendants McFarlane, Milton, Wells, Bennett, Pittman, and Mitchell argue that the undisputed evidence shows they neither used excessive force against Plaintiffs nor were they in a position to intervene in other officers' use of force during the events in question. (Doc. 240-2.) They also contend that qualified immunity bars

Plaintiffs' claims against them, and Defendant McFarlane asserts that the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(e), applies to limit the extent to which Plaintiff Jackson may recover monetary damages against him. (<u>Id.</u>) Plaintiffs filed a Response in Opposition, arguing that genuine disputes of material fact preclude summary judgment, (doc. 283), to which Defendants filed a Reply, (doc. 290).

For the reasons set forth below, the Court **GRANTS in part** and **DENIES in part** Defendants McFarlane, Milton, Wells, Bennett, Pittman, and Mitchell's Motion for Summary Judgment. (Doc. 240; <u>see also</u> doc. 240-2.) Specifically, the Court:

- **GRANTS** Defendant McFarlane summary judgment as to all failure to intervene and excessive force claims alleged against him by Plaintiffs as well as to Plaintiffs' supervisory liability claim. As such, the Court **DISMISSES with prejudice** all claims brought against Defendant McFarlane in this action and **DIRECTS** the Clerk of Court to **TERMINATE** him as a Defendant upon the docket and record of this case.

- **GRANTS** Defendant Wells summary judgment as to all failure to intervene and excessive force claims alleged against him. As such, the Court **DISMISSES with prejudice** all claims brought against Defendant Wells in this action and **DIRECTS** the Clerk of Court to **TERMINATE** him as a Defendant upon the docket and record of this case.

- **GRANTS** Defendant Milton summary judgment as to all failure to intervene and excessive force claims alleged against him by Plaintiffs. As such, the Court **DISMISSES with prejudice** all claims brought against Defendant Milton in this action and **DIRECTS** the Clerk of Court to **TERMINATE** him as a Defendant upon the docket and record of this case.

- **GRANTS** Defendant Mitchell summary judgment as to all failure to intervene and excessive force claims alleged against him by Plaintiffs. As such, the Court **DISMISSES with prejudice** all claims brought against Defendant Milton in this action and **DIRECTS** the Clerk of Court to **TERMINATE** him as a Defendant upon the docket and record of this case.

- **DENIES** Defendant Pittman summary judgment as to both Plaintiffs' escort failure to intervene and excessive force claims alleged against him, but **GRANTS** Pittman summary judgment as to both Plaintiffs' in-dorm failure to intervene and excessive force claims and their claims regarding failure to intervene and excessive force in the prison's infirmary. As such, the Court

> **DISMISSES with prejudice** these claims; however, Plaintiffs' failure to intervene and excessive force claims against Defendant Pittman that arise from their escort outside of D-2 to the infirmary shall remain pending before the Court.

- **DENIES** Defendant Bennett summary judgment as to Plaintiff Stevenson's in-dorm failure to intervene claim, but **GRANTS** Bennett summary judgment as to Plaintiff Stevenson's in-dorm excessive force claim, Plaintiff Jackson's in-dorm excessive force and failure to intervene claims, and both Plaintiffs' claims regarding excessive force and failure to intervene during their escort outside of D-2 and during their time in the prison's infirmary. As such, the Court **DISMISSES with prejudice** these claims; however Plaintiff Stevenson's in-dorm failure to intervene claim against Defendant Bennett shall remain pending before the Court.

Accordingly, some of Plaintiffs' Eighth Amendment failure to intervene and excessive force claims against Defendants Pittman and Bennett remain pending for the reasons explained more fully below.

In light of this disposition, the Court **ORDERS** the remaining parties to file one updated joint status report within **twenty-one (21) days** of the date of this Order.[1] The parties shall address the status of this case and whether the parties are prepared to proceed to trial. The parties' report must also address the status of those Defendants who were not subject to this Order or the companion Order filed contemporaneously herewith, (doc. 312). As previously indicated, (docs. 174, 231), the parties have discussed voluntarily dismissing, pursuant to Federal Rule of Civil Procedure 41(a), the following yet to be dismissed Defendants: Carolyn Carrol, Kim Hardee, Jeffery Mullis, and Joseph White. However, in their Stipulation of Dismissal, (doc. 232), the parties declined to dismiss these Defendants and they remain in this case. The parties must update the Court on the status of these defendants and their relevancy to this case. Furthermore, Plaintiffs have failed to file the requisite proof of service as to Defendants Brandon Cearnel, Christopher

---

[1] This is a reiteration of the direction that the Court issued in its Order on other Defendants' summary judgment motions filed contemporaneously with this Order, (doc. 312). In other words, the parties should only file one joint status report in response to the two Orders.

Henderson, Candice Hill, John Jones, Justin Swope, and Gene Tootle. Pursuant to Federal Rule of Civil Procedure 4(m), the Court **ORDERS** Plaintiffs to show cause, within **twenty-one (21) days** of the date of this Order, as to why these Defendants should not be dismissed from this action for lack of timely service. In so doing, Plaintiffs must explain these Defendants' continued relevancy to this case and what actionable claims, if any, remain against them. Alternatively, Plaintiffs may move to dismiss these Defendants rather than showing cause regarding their failure to properly comply with Federal Rule of Civil Procedure 4(m).

## BACKGROUND

### I.     Procedural History

Plaintiffs, formerly inmates at Smith State Prison ("Smith State") in Glennville, Georgia, brought this 42 U.S.C. § 1983 action on December 10, 2012, alleging that Defendants violated their constitutional right to be free from excessive force while they were incarcerated at Smith State. (Doc. 1.) Plaintiffs filed their First Amended Complaint on January 25, 2013, specifically claiming that, during a prison disturbance occurring the night of December 31, 2010, Defendants used excessive force against them, failed to intervene in other officers' use of excessive force against them, or both. (Doc. 24, pp. 5–17.) Plaintiffs set forth these claims under two general counts: Count One against all Defendants for violations of the Eighth and Fourteenth Amendments, and Count Two against Defendant McFarlane, and two other Defendants, for Supervisory Liability. (Id. at pp. 17–21.) After Plaintiffs filed their First Amended Complaint, the Court stayed the proceedings in this case while criminal proceedings against Plaintiffs, stemming from the December 31, 2010 incident at Smith State, ran their course. (Doc. 81.)

Over three years later, following the end of criminal proceedings against Plaintiffs, the Court lifted the previously imposed stay. (Doc. 118.) A lengthy, disputed, and heavily litigated

discovery period ensued. (See, e.g., Docs. 168, 175, 177, 196, 202, 221, 222, 224–26, 228.) After multiple extensions and the resolution of several disputes, discovery in this case finally closed on December 15, 2017, with motions for summary judgment due on February 5, 2018. (Docs. 221, 228.) Pursuant to this deadline, Defendants McFarlane, Milton, Wells, Bennett, Pittman, and Mitchell ("Defendants") jointly filed the present Motion for Summary Judgment.[2] (Docs. 240, 240-2.)

## II.    Factual Background

The Court begins this Background section by setting forth the general, undisputed facts of the case relevant to the disposition of Defendants' Motion for Summary Judgment. Subsequently, the Court delves into the facts, both undisputed and disputed, particular to each Defendant.

At the time of the subject events, Plaintiffs were inmates in the custody of the Georgia Department of Corrections ("GDC") and assigned to the D-2 dorm at Smith State.[3] (Doc. 282-1, p. 1.) On the night of December 31, 2010, corrections officers in charge of D-2 instituted a lockdown to search for contraband and released the inmates to dinner. (Doc. 278-1, p. 1.) While searching cell D-234, located on the second story of the dorm and assigned to Plaintiff Jackson, Defendant Joseph Catanzariti uncovered a substance resembling marijuana hidden in a pillow.

---

[2] Throughout the remainder of this Order the Court collectively refers to the moving Defendants—Andrew McFarlane, Nathaniel Milton, Melvin Wells, Jarrod Bennett, Gordon Pittman, and Gary Mitchell—as "Defendants." The Court notes, however, that other Defendants in this matter—Derius Attical, Joshua Eason, and Sherry Ritchie—have also moved for summary judgment as to Plaintiffs' excessive force and failure to intervene claims against them. (Docs. 233, 238, 244.) Still other Defendants who have appeared in this matter—Joseph Catanzariti, Sheldon Deloach, Michael Deloach, Caleb Harrison, and Timothy Simmons—have declined to move for summary judgement. As to those Defendants moving for summary judgment at Docket Numbers 233, 238, and 244, the Court addresses their Motions by separate Order, filed concurrently herewith.

[3] The D-2 dormitory has two levels of prison cells that run along the edges of a roughly v-shaped common area; the second story is accessible from the common area by two sets of stairs, which lead to a railed-off, open walkway, or range, that runs in front of the second-story cells. (Doc. 278-1, p. 1; see also doc. 273-1 (floor plan of D-2); doc. 273-2, pp. 10–14, 41–45 (photographs of D-2).)

(Doc. 277-1, p. 2.)  Defendant Catanzariti continued his search and located cellphones hidden behind a heater vent; he then requested that Defendant Bennett retrieve a screwdriver, hammer, and channel locks from so that he could open the vent and seize the contraband.  (Id.)

Defendant Catanzariti and the other officers had not yet finished conducting their contraband search when inmates returned to D-2 from dinner.[4]  (Doc. 278-1, p. 2.)  Inmates were moving freely about the dorm on the top and bottom ranges as Defendant Catanzariti searched cell D-234.  (Doc. 277-1, p. 2.)  Before the disturbance began, multiple inmates dressed in heavy clothing and boots congregated outside of D-234, which caused officers concern that an incident was imminent and prompted a call for assistance.  (Id. at pp. 2–4; doc. 282-1, pp. 2–3.)  Defendants Bennett and Ritchie were present with Defendant Catanzariti at that time, and over ten additional officers eventually arrived on the top range.  (Doc. 277-1, p. 4.)  In total, approximately ninety-six inmates who reside in D-2 were in various parts of the dorm at this time.  (Doc. 282-1, p. 2.)  At some point after inmates returned from dinner, Defendants McFarlane and Catanzariti ordered the inmates to "lockdown" by going into their cells and closing the door.  (Doc. 291, pp. 7–8.)  Some inmates, however, refused to lockdown.  (Id.)

---

[4]  Around the time the inmates returned from dinner, a corrections officer began recording with a handheld video camera outside the area where the contraband search occurred.  (Doc. 278-1, p. 2.)  This video captured some, but not all, of the events in question.  (See Doc. 282-1, pp. 7–12.)  In addition, three stationary security cameras located in D-2 captured footage of parts of the incident.  (Id. at pp. 7–8.)  Plaintiffs and Defendants manually filed copies of this video footage with the Court.  (See Docs. 241, 286.)  The video from the handheld camera features audio of the events, but the surveillance videos do not.  (Id.)  For ease of reference, the Court cites to the manually filed videos docketed at entry 241 and refers to them, based on their source and file name, as follows: handheld video footage ("HHV"); dorm security footage from camera seven ("CAM 7"); dorm security footage from camera eight ("CAM 8"); and dorm security footage from camera nine ("CAM 9").  As indicated by the parties, the surveillance camera video, which is stamped in military time, reflects a time approximately fifty-three minutes and thirty-three seconds *earlier* than the time reflected on the handheld video, which is stamped in standard time.  (Doc. 233-2, p. 82; doc. 282-1, p. 19.)  The Court has reviewed the footage from each of these sources and relies upon it in conjunction with deposition testimony and other evidence of record.  When relying on particular video footage, the Court will cite to the exact time as indicated by the video's timestamp.  In addition, where appropriate, the Court will convert the timestamps of each video type so as to provide evidence from both the surveillance and handheld videos of the same point in time.

After the lockdown was ordered and the additional officers had arrived on scene, (id.), Defendant Catanzariti finished searching D-234 and exited onto the walkway carrying tools and contraband seized from the cell, (doc. 277-1, pp. 3–4; doc. 278-1, p. 2).  Plaintiffs went upstairs to ask Defendant Catanzariti about the lockdown.  (Doc. 291, p. 8.)  As Defendant Catanzariti walked on the second-story range outside of cell D-234, Plaintiff Jackson, who resided in the searched cell, confronted Catanzariti and told him to "give me that stuff."  (Doc. 282-1, p. 3.)  The two exchanged words, and Plaintiff Jackson then, according to him, "playfully swiped" at Catanzariti, causing Catanzariti to turn away to protect the tools and contraband he held in his hands.  (Id. at pp. 3–4; doc. 278-1, pp. 2–3.)  Defendant Catanzariti then struck Plaintiff Jackson in response.[5] (Doc. 277-1, pp. 6, 16.)  Immediately following this altercation, the disturbance erupted with several inmates and officers fighting in a skirmish close by on the upper level range.  (Doc. 277-1, pp. 4–6; see also doc. 278-1, p. 3; doc. 282-1, p. 4.)

During the disturbance, both Plaintiffs were involved in separate physical altercations with officers on the upper range.  (Doc. 282-1, p. 2.)  Defendant Ritchie called for backup and more officers arrived on the scene.  (See Doc. 291, pp. 12–14.)  After Plaintiff Stevenson was handcuffed and restrained in a prone position on the ground by two officers, Defendant Catanzariti struck Stevenson multiple times toward his head area.[6]  (Doc. 291, pp. 21–22; HHV at 11:02:47–11:02:52PM.)  Elsewhere in the dorm, inmates were in their cells or assumed prone positions on

---

[5]  Although what is recounted above is undisputed as described, the parties vigorously dispute anything more specific about what occurred between Plaintiff Jackson and Defendant Catanzariti outside of D-234 before the disturbance began.  (See, e.g., Doc. 277-1, pp. 3–6; doc. 278-1, pp. 2–3; doc. 278-1, pp. 5–6; doc. 282-1, pp. 3–4.)

[6]  The parties agree that Defendant Catanzariti struck Plaintiff Stevenson, but they dispute the number of times Stevenson was struck, whether Catanzariti used a hammer or some other object to strike Stevenson, and the extent to which, if at all, Stevenson was resisting at this time.  (See, e.g., Doc. 291, pp. 21–22, doc. 282-1, pp. 14–15; doc. 277-1, pp. 8–9.)

the ground as officers worked to regain control of the situation. (CAM 7 at 22:04:30–22:09:45.) In order to quell the disturbance, officers deployed pepper spray and were able to quickly subdue the inmates. (Doc. 278-1, p. 3; doc. 282-1, p. 25.) Starting from when the commotion began until the time at which corrections officers on the scene had largely quelled the situation, approximately two minutes passed. (See HHV at 11:00:00–11:03:45PM; CAM 9 at 22:07:20–22:09:30.)

However, soon after officers regained control of the situation, Defendant Catanzariti became involved in another physical altercation with Plaintiff Jackson. (Doc. 282-1, pp. 26–28; HHV 11:04:00–11:07:43PM.) In this instance, Defendant Catanzariti made an arm movement toward Plaintiff Jackson's head with an object in his hand—while Jackson was handcuffed, held, and surrounded by other officers—that caused Jackson to collapse to the ground.[7] (Doc. 291, pp. 124–29; HHV at 11:07:25–11:07:40PM.) Officers then escorted a bloodied Plaintiff Jackson down the stairs from the upper range and out of the D-2 dormitory. (Doc. 282-1, pp. 29–32, 36; HHV at 11:07:40–11:08:03PM; CAM 8 at 22:14:10–22:14:32.) Less than one minute prior to this escort, Defendant Harrison and another officer escorted a bloodied Plaintiff Stevenson down the same stairs and out of D-2, toward the infirmary. (Doc. 268, pp. 7, 11–12, 25–27; HHV at 11:06:51–11:06:59PM; CAM8 at 22:13:18–22:13:40.)

Once out of the dormitory, Plaintiffs were taken to the prison infirmary for treatment. (Doc. 278-1, p. 9.) Plaintiffs allege that, after being steered through D-2's sally port and brought outside, multiples officers repeatedly beat them during the rest of their escort to the infirmary and

---

[7] Similar to the disturbance altercation between Plaintiff Stevenson and Defendant Catanzariti, the parties agree that Defendant Catanzariti motioned his arm toward Plaintiff Jackson while holding an object, but they dispute whether that movement made contact and whether Catanzariti held a flashlight, metal detector wand, or some other object in his hand when motioning toward Jackson. (See, e.g., Doc. 282-1, pp. 26–28; doc. 291, pp. 124–29.)

while they were held there.[8]  (Id.; doc. 282-1, pp. 36–39.)  Plaintiffs' medical conditions required that they be taken to the hospital that night for evaluation and treatment, but they did not stay overnight and later returned to Smith State's medical unit.  (Doc. 291, pp. 22–23, 63–64; see doc. 233-2, pp. 84–94 (Plaintiffs' medical records).)

Plaintiff Stevenson suffered extensive injuries to his head area, including a fractured right eye orbital socket (upper and lower), a broken jaw, damage to a vertebra in his neck, severe facial damage on the right side of his face, nerve damage in his shoulder and neck, lost teeth, headaches, and PTSD.  (Id. at pp. 22, 60; see also doc. 259-2, pp. 52–54 (photographs of Plaintiff Stevenson's injuries); doc. 233-2, pp. 89–94 (Plaintiff Stevenson's medical records.))  Plaintiff Jackson's injuries were not as significant, but per his testimony, he suffered a broken nose, facial lacerations, a knocked-out tooth, knee complications, a ruptured ear drum, headaches, and PTSD.  (Doc. 291, p. 145; see also doc. 282-2, pp. 10–11 (photographs of Plaintiff Jackson's knee injury); doc. 281, pp. 46–48 (photographs of Plaintiff Jackson's head injuries); doc. 233-2, pp. 84–88 (Plaintiff Jackson's medical records).)  The medical evidence of record shows that both Plaintiffs' main injuries were to their head areas.  (See Doc. 282-1, pp. 34, 41.)

With this general overview in mind, the Court now turns to detailing what the evidence shows Defendants did, or did not do, in relation to the prison disturbance incident and Plaintiffs' ensuing excessive force and failure to intervene claims.  The Court begins each section by outlining the specific claims Plaintiffs maintain against each Defendant at summary judgment, based on their stipulations to the evidence of record.  To parallel Plaintiffs' alleged claims, the Court will recount what the evidence shows as to these Defendants' conduct in the D-2 dorm, during the

---

[8]  The sally port is a gateway between D-2 and a fenced-in walkway outside, which has a secured vestibule between the outside walkway and the dorm.  (See Doc. 273-1; doc. 273-2, pp. 1, 42, 55–58, 62.)  From the secured vestibule, one can enter the D-2 control room, the bottom floor of the dorm itself, or exit to the outdoor walkway.  (Id.)

escort to the prison's infirmary, and in the infirmary.  As will be seen, the parties dispute much of the evidence in this regard.

## A.      Defendant Andrew McFarlane

Against Defendant McFarlane, Plaintiffs are pursuing claims for his alleged: (1) failure to intervene in Plaintiff Stevenson's dorm altercation with officers, (2) use of excessive force against Plaintiff Jackson in the dorm, and (3) failure to intervene and use of excessive force during both Plaintiffs' escort outside.  (See Doc. 283-1, pp. 3–7, 10; see also doc. 283, pp. 1–2, 20–21.)

### (1)      Events in the D-2 Dormitory

Defendant McFarlane was a supervising lieutenant on the night in question.  (Doc. 283-1, p. 10; doc. 290, p. 8.)  Prior to the start of the disturbance, Defendant McFarlane arrived at D-2 to to assist in locking inmates down.  (Doc. 240-9, p. 2.)  An area of major dispute with regard to Defendant McFarlane concerns where he was at certain key points in time—specifically whether he was on the upper or lower level of D-2.  Defendant McFarlane claims that he was helping with the lockdown process on the *bottom* range, and that he looked up and witnessed Plaintiff Jackson punch Catanzariti in the face on the upper range (marking the start of the disturbance).  (Doc. 240-15, pp. 4–6.)  He claims he then went to the top of the stairs where he was physically confronted by two unnamed inmates, prompting him to strike one of them with a closed fist.  (Id. at pp. 5–6.)  From this position, Defendant McFarlane claims he could not see Catanzariti or Plaintiffs, as the ensuing chaos obstructed his view.  (Id.)  After subduing the two inmates, McFarland avers that he descended the stairs where he was once again able to see, while looking up, Catanzariti on the upper range.  (Id.)

Other officers, however, place Defendant McFarlane on the top range when the incident began.  According to Defendant Ritchie, who was assisting Catanzariti with the search of cell D-

234 when the disturbance began, Defendant McFarlane was "for certain" on the top range when the fighting broke out. (Doc. 260, p. 15.) Defendant Ritchie claims she saw McFarlane "up on the top range walking down towards" D-234 just before Catanzariti was confronted by Plaintiff Jackson. (Id. at pp. 14–15.) Additionally, Catanzariti testified that he saw Defendant McFarlane "c[o]me up" right after Plaintiff Jackson swiped at him (thereby commencing the disturbance).[9] (Doc. 274, p. 15.) What is more, Plaintiff Stevenson testified Defendant McFarlane was one of the officers who was upstairs while Catanzariti and Ritchie searched for contraband before the disturbance began.[10] (Doc. 240-3, p. 10.)

Several minutes prior to the disturbance, Defendant McFarlane identified himself on the bottom range, closing cell doors near the staircase.[11] (Doc. 240-15, p. 26; CAM 8 at 22:03:22–22:30.) Surveillance camera video subsequently shows Defendant McFarlane on the upper range

---

[9] Catanzariti subsequently testified that he saw Defendant McFarlane "coming up the stairs" while Plaintiff Jackson was initially confronting him. (Doc. 274, p. 16.) Catanzariti claims that he "yelled" to Defendant McFarlane that "it's fixing to happen," and then Plaintiff Jackson "swung at the stuff first" before swinging again and hitting Catanzariti. (Id.) Defendant McFarlane, however, testified that he witnessed this precipitating event while "standing downstairs" on the bottom range, which caused him to head "to the top of the stairs." (Doc. 240-15, p. 5.) Defendant McFarlane's testimony on this point does not indicate that Catanzariti made any verbal remarks to him just prior to Plaintiff Jackson's actions. (See id. at pp. 4–7.)

[10] In addition, Officer Candice Hill initially indicated that she remembered Defendant McFarlane being on the upper range, around Catanzariti when he struck Plaintiff Stevenson, (doc. 267, p. 12), but later testified that she was not sure when he was up there or where he was located, (id. at pp. 25–26).

[11] The individual that Defendant McFarlane identified as himself—wearing a zipped-up dark blue jacket, grey slacks, and a dark colored knit cap—remained on the bottom range, circling around to close and check cell doors, while Harrison went upstairs. (CAM 8 at 22:03:40–22:03:50; CAM 9 at 22:03:50–04:50; see also CAM 7 at 22:04:48.) Tracking this individual further reveals that, before the disturbance began, he went up the same staircase that Defendant McFarlane later identified himself atop (once the disturbance was ongoing), and he then made his way across the upper ramp toward where Catanzariti and Plaintiffs were located. (CAM 7 at 22:04:40–22:05:35; CAM 9 at 22:05:32–22:05:50; CAM 8 at 22:05:40–22:06:05). The relevant surveillance camera footage does not show this officer descending either set of stairs prior to the disturbance commencing. (See CAM 8 at 22:06:05–22:07:30; CAM 7 at 22:06:05–22:07:30.) Moreover, when reviewing this section of video, Defendant McFarlane never identified himself going up the stairs as the fighting broke out; he only identified himself as already on the upper range, by the top of the stairs. (See Doc. 240-15, p. 26.)

after the disturbance began but *before* Catanzariti is shown striking a prone Stevenson on the corresponding handheld video footage. As backup officers entered D-2, Defendant McFarlane was kneeling near an inmate on the upper range, just to the right of the staircase. (Doc. 240-15, p. 26; CAM 8 at 22:08:04–22:08:45.) He remained on the upper range, in the vicinity of this staircase, assisting with inmates until descending the stairs approximately forty-seconds later. (Doc. 240-15, p. 26; CAM 8 at 22:08:45–22:08:55.) Defendant McFarlane then began speaking with an inmate, who was lying on the ground to the left of the stairs. (Doc. 240-15, p. 26; CAM 8 at 22:08:55–22:09:25.)[12]

At some point soon after the disturbance began, Defendant McFarlane was back on the bottom range where he observed Catanzariti "trying to get some restraints on the offender upstairs," which included Catanzariti striking the unspecified inmate "[m]aybe once or twice." (Doc. 240-15, pp. 6–7.) Defendant McFarlane, however, testified that he did not see Catanzariti have any object in his hand and noted that he "looked away" to ensure other inmates were locked down. (Id. at p. 7.) Upon review of the handheld video, Defendant McFarlane agreed the strikes shown from 11:02:47PM to 11:02:52PM depict Catanzariti's actions that he witnessed from the bottom range. (Id. at p. 21.) Defendant McFarlane also qualified his earlier testimony about Catanzariti attempting to put restraints on this inmate, stating that Catanzariti "*might* have been trying to get [the inmate's] hands out to put handcuffs on him." (Id. at p. 22 (emphasis added).) As set forth above, this portion of video evidence depicts Catanzariti using force against Plaintiff Stevenson.

---

[12] As a point of reference, Catanzariti's strikes shown of the handheld video, (HHV at 11:02:47–11:02:52PM), occurred at 22:09:14–22:09:19 on the surveillance camera videos. (See Doc. 233-2.) Additionally, the fighting and subject disturbance begin at 11:00:57PM on the handheld video, which corresponds to 22:07:24 on the surveillance camera videos. (See id.)

As for Plaintiff Jackson, he alleges that Defendant McFarlane (known by Plaintiff Jackson as "Deebo") came up to him while he was standing, handcuffed on the upper ramp and scratched his eyes. (Doc. 240-4, p. 14; doc. 240-2, pp. 3, 10; <u>see also</u> 283-1, pp. 3–4.) According to Plaintiff Jackson, Defendant McFarlane "put a finger in each one of [his] eyes and scratched them." (Doc. 240-4, p. 14.) This action occurred just before Catanzariti approached a restrained, nonresistant Plaintiff Jackson and struck at his face with an object. (<u>Id.</u>; <u>see</u> HHV at 11:07:25–11:07:40PM.) Defendant McFarlane, however, denies using any force against Plaintiff Jackson. (Doc. 240-9, p. 2; doc. 240-2, pp. 9–10.)

### (2) Escort Outside of the D-2 Dormitory

After correctional officers got control of the disturbance, Defendant McFarlane exited the D-2 dormitory and "went towards medical to . . . make sure everybody was okay." (<u>Id.</u> at p. 25.) He noted that at least five minutes had passed, if not more, between the time officers escorted Plaintiffs outside of D-2 and when he went out to the infirmary to check on everyone.[13] (<u>Id.</u>) On his way there, Defendant McFarlane did not see or pass by any other officers.[14] (<u>Id.</u>) Once at the infirmary, he saw that the injured inmates were already bandaged and shackled, and he assumed that they were slated to be transported to the hospital due to their injuries. (<u>Id.</u> at pp. 25–26.) Defendant McFarlane then returned to D-2 where he provided a brief narration of the incident on the handheld video. (<u>Id.</u> at pp. 23–25; HHV 11:20:26–11:22:15PM.) Other than Defendant McFarlane's statement that he went towards medical at some point in the evening, Plaintiffs offer

---

[13] Defendant McFarlane testified that he exited through the same main entrance to D-2 as did the officers who escorted Plaintiffs out of the dorm. (Doc. 240-15, p. 25.) Approximately two minutes after Plaintiff Jackson was escorted out of the dorm, an officer can be heard on the handheld video inquiring as to Defendant McFarlane's whereabouts. (HHV at 11:09:48–11:09:49PM; doc. 263, pp. 21–22.)

[14] When asked if he saw blood on the ground, Defendant McFarlane stated that he presumed that there "had to be" blood because Plaintiff Stevenson (escorted by Harrison) "was bleeding" on his way out of the dorm, but he did not actually see any due to darkness. (Doc. 240-15, p. 25.)

no evidence tending to show that McFarlane was present during their escorts to the infirmary.  (See Doc. 283-1, p. 10.)

**B.     Defendant Melvin Wells**

Against Defendant Wells, Plaintiffs are pursuing claims regarding his alleged: (1) failure to intervene in Plaintiff Stevenson's dorm altercation with officers, and (2) failure to intervene in the excessive force used against both Plaintiffs during their escort outside.  (See Doc. 283-1, p. 11; doc. 283, pp. 2, 13, 18–20.)

Defendant Wells was also a presiding lieutenant at Smith State on the night in question.  (Doc. 240-2, p. 4.)  During the disturbance, Defendant Wells deployed pepper spray and a pepper ball gun from the first floor of D-2 in an effort to restore order.  (Id.)  He did not, however, use his status as a supervisor to intervene during any of the force used against Plaintiffs, whether in the dormitory or during their escort to the infirmary.  (Doc. 283-1, p. 11.)  Apart from noting his supervisory position, Plaintiffs offer no further factual allegations or evidence regarding their claims against Defendant Wells.  (See id.; doc. 259, p. 57; see also doc. 290, p. 8.)

**C.     Defendant Nathaniel Milton**

Against Defendant Milton, Plaintiffs are pursuing claims regarding his alleged: (1) failure to intervene in Plaintiff Stevenson's dorm altercation with officers, and (2) failure to intervene in the excessive force used against both Plaintiffs during their escort outside and to the infirmary. (See Doc. 283-1, pp. 11–14; see also doc. 283, pp. 2, 13, 18–20.)

**(1)     Milton's Involvement in the Events in the D-2 Dormitory**

Before the disturbance broke out, Defendant Milton was present in D-2 acting as "standby" while other officers conducted the contraband search.  (Doc. 283-1, p. 14.)  He stood on the bottom range and remained there once fighting between officers and inmates began.  (Id. at pp. 12, 14.)

In this position, Defendant Milton picked up several items from the floor as the disturbance was ongoing: a shank that was slid out beneath a cell door, a cell phone that fell from the upper ramp, and a hammer that also fell from the upper ramp. (Id. at p. 12; see also CAM 9 at 22:07:24–22:07:42, 22:09:12–22:09:24; doc. 290-1.) According to Defendant Milton, the hammer he retrieved—and then later handed off to correctional officer Darryl Davis—did not have any blood on it.[15] (Doc. 283-1, p. 12; CAM 8 at 22:09:23–22:09:37.)

Plaintiffs, however, point out that many witnesses testified to seeing blood around where Catanzariti and other officers used force against Plaintiff Stevenson, (id.), which is the area from which one of the objects fell approximately twenty seconds into the incident, (CAM 9 at 22:07:42; doc. 290-1). For example, inmate William Satterfield saw Plaintiff Stevenson lying face down on the upper ramp after the incident was over, his face "mangled" and blood spattered "all over the handrails [and] walls." (Doc. 262, p. 13.) Catanzariti admitted to seeing "a lot of blood" that night, (doc. 274, p. 41), and Plaintiff Stevenson was covered in blood following the disturbance, (e.g., doc. 259-2, p. 52). Nonetheless, both Defendant Milton and Davis denied seeing any blood on the hammer they handled. (Doc. 212, p. 19; doc. 240-11, p. 1.)

Defendant Milton, moreover, pointing to the video, shows that the hammer he retrieved fell from the upper ramp *before* Catanzariti struck Plaintiff Stevenson as shown on the handheld video. (See Doc. 290-1.) Even so, inmate Satterfield testified that he witnessed a hammer-beating incident that occurred *before* Catanzariti's strikes that are captured on the handheld video, (doc. 262, pp. 16–18). The object that fell from near Plaintiff Stevenson's location, which

---

[15] Because the parties, particularly Plaintiffs, present evidence and argument regarding this hammer, the Court duly includes such in its Order. However, as discussed below, whether the hammer had blood on it and the exact point in time in which it fell from the upper ramp are irrelevant to the viability of Plaintiffs' claims against Defendant Milton.

Defendant Milton retrieved, fell twenty seconds into the disturbance and before Catanzariti can be seen on the handheld video repeatedly striking Plaintiff Stevenson.  (See Doc. 290-1).

### (2)     Milton's Involvement in the Escorts Outside of the D-2 Dormitory

As to the events outside of D-2, Plaintiffs contend that Defendant Milton was one of the officers who escorted either Plaintiff Jackson or Plaintiff Stevenson from the dorm to the infirmary. (Doc. 283-1, pp. 13–14.)  Officer Christopher Henderson wrote, in his witness statement, that he and Defendant Milton escorted Plaintiff Jackson to the infirmary following the disturbance. (Doc. 266-2.)  At his deposition, however, Henderson did not have an independent recollection of escorting Plaintiff Jackson out of the dorm, and he testified that he could have possibly escorted Plaintiff Stevenson rather than Jackson; he could not be sure either way.  (Doc. 266, pp. 6, 8.) Plaintiffs did not depose Defendant Milton and offer no other evidence in this regard.  (Doc. 283-1, p. 13; see doc. 259, pp. 53, 75.)  Defendant Milton denies ever seeing an officer use force on Plaintiffs during the events in question, and his witness statements do not mention his being involved in escorting either Plaintiff to the infirmary.[16]  (Doc. 240-11.)

### D.     Defendant Gary Mitchell

Against Defendant Mitchell, Plaintiffs pursue claims regarding his alleged: (1) failure to intervene and excessive force during Plaintiff Stevenson's dorm altercation with officers, and (2) failure to intervene and excessive force during Plaintiffs' escort outside.  (See Doc. 283-1, pp. 14–17; see also doc. 283, pp. 2, 12–13, 19–20.)

---

[16]  Although neither party invokes the video evidence to ascertain whether Defendant Milton was involved in either Plaintiff's escort out of D-2, the Court has reviewed the relevant footage, at least with respect to what can been seen from inside the dorm, and it appears that the officer Defendant Milton identified as himself, (see CAM 8 at 22:09:24–22:09:30; doc. 290-1), does not escort either Plaintiff from D-2, (see CAM 8 at 22:13:18–22:14:32).  Moreover, this individual remains in the dormitory for approximately ten minutes following Plaintiffs' removal, before exiting.  (See CAMS 7, 8, 9 at 22:09:30–22:24:27.)

Defendant Mitchell was on the upper range when inmates and officers began fighting and the disturbance broke out. (Doc. 283-1, p. 14.) An unidentified inmate wearing a grey sweatshirt attacked Defendant Mitchell, punching him in the face. (Id.) To defend himself, he swung his flashlight at the inmates nearby. (Id. at pp. 14–15, 16–17.) According to Defendant Mitchell, this is the only force he used during the incident, and moreover, he never observed any officers on the upper ramp use force against a restrained, non-combative inmate. (Id. at p. 15.) After the incident, Defendant Mitchell had to be taken to the hospital for treatment of the injuries he sustained. (Id. at pp. 15, 17.)

Plaintiffs argue Defendant Mitchell's injuries resulted from a skirmish that also involved Defendant Attical, a fellow correctional officer. (Id. at pp. 15–16.) According to some eyewitnesses, Defendant Attical was involved in the altercation that resulted in Catanzariti attacking Plaintiff Stevenson while he was restrained on the ground, not resisting. (Id.) Because an eyewitness, inmate Travis Cratic, identified Defendant Mitchell as being with Defendant Attical in some instance where force was used, Plaintiffs conclude that his "presence with Attical at the same time places Mitchell at the scene when [Catanzariti] was beating Stevenson with the hammer—with the clear opportunity to intervene." (Id. at p. 16.) As discussed in the related Summary Judgment Order, which addresses Defendant Attical's Motion for Summary Judgment, the Court has determined that genuine disputes of material fact exist regarding whether Defendant Attical used excessive force against Plaintiff Stevenson or failed to intervene in the use of excessive force against him on the upper ramp of D-2. (Doc. 312.)

In pertinent part, Cratic testified that he observed Defendant Attical respond to the call for backup, at which point Attical came and helped Defendant Mitchell up from the floor. (Doc. 190, p. 9.) Defendant Mitchell had a bloody nose by this time. (Id.) Defendant Mitchell and Attical

then, according to Cratic, proceeded to use their flashlights to strike "maybe one or two inmates" who had yet to lockdown. (Id. at p. 10.) With respect to Defendant Mitchell and Plaintiffs, Cratic specifically testified that Mitchell had no interaction with Plaintiff Stevenson that night. (Id. at p. 23.) He explained that what he witnessed of Defendant Mitchell with Attical was activity "unrelated" to "the two guys in question," meaning the Plaintiffs.[17] (Id. at pp. 23–24.) Cratic further explained that this event occurred when "the conflict was pretty much over with." (Id. at p. 31.)

As to their escort claims against Defendant Mitchell, Plaintiffs offer no supporting facts or evidence. (See Doc. 283, pp. 14–17; doc. 283, pp. 13, 19–20; doc. 259, p. 53.) In his declaration, moreover, Defendant Mitchell does not indicate that he was ever involved with either Plaintiffs' escort to the prison's infirmary. (See Doc. 240-12.)

### E.     Defendant Gordon Pittman

Against Defendant Pittman, Plaintiffs are pursuing claims regarding his alleged: (1) failure to intervene in Plaintiff Stevenson's dorm altercation with officers, and (2) failure to intervene or, in the alternative, participation in the excessive force used against Plaintiffs during their escort outside of D-2. (See Doc. 283-1, pp. 17–18; see also doc. 283, pp. 2, 13, 16, 18–20.)

### (1)     Pittman's Involvement in the Events in the D-2 Dormitory

When the disturbance began, Defendant Pittman was in the K building waiting to be relieved from working. (Doc. 283-1, p. 17.) As he waited, he saw two officers running toward the D-2 dorm, so he joined them. (Id.) Upon arrival, Defendant Pittman saw officers and inmates

---

[17] Inmate Cratic's full testimony on this issue was as follows: "It's like [Defendant Mitchell] was involved in the day's events but having a direct physical altercation with the two guys in question, no. He slapped the shit out of somebody else with a flashlight eventually, him and the other officer. Asked them what they were doing out there on the range and stuff and just hit them upside the head with a flashlight." (Doc. 190, pp. 23–24.)

on the upper range, but by this point the inmates were already subdued on the ground. (Id.) According to Defendant Pittman, he neither used force on an inmate nor witnessed the use of force by other officers on any inmates. (Id.) After helping to lockdown the inmates on the upper range who had yet to return to their cells, Defendant Pittman was tasked with transporting Plaintiff Stevenson to Evans Memorial Hospital. (Id.) He did not return to Smith State after this transport. (Id.)

Plaintiffs do not dispute this general overview of Defendant Pittman's actions that night, but they assert he had the opportunity to intervene in the force used against Plaintiff Stevenson. (Id. at pp. 17–18.) When he arrived in D-2, Defendant Pittman surveyed the scene and went up the stairs to where inmates and officers, including Catanzariti and Plaintiff Stevenson, were still engaged. (Id. at p. 17; HHV at 11:02:48–11:02:50PM.) During the time in which Catanzariti delivered strikes to a prone Plaintiff Stevenson, Defendant Pittman was still coming up the stairs. (HHV at 11:02:47–11:02:52PM; CAM 8 at 22:09:14–22:09:21; see also doc. 290, p. 11.) Plaintiffs concede that he made it over to this location "after" Catanzariti struck Plaintiff Stevenson. (Doc. 283-1, p. 18; HHV at 11:02:56–11:02:58PM, 11:06:52–11:06:54PM.)

### (2) Pittman's Involvement in the Escort Outside of the D-2 Dormitory

Thereafter, Defendant Pittman, along with Defendant Harrison, escorted Plaintiff Stevenson from D-2. (HHV at 11:06:52–11:07:59; CAM 8 at 22:13:18–22:13:40; doc. 263, p. 18; doc. 192, p. 11.)[18] Plaintiffs contend that Defendant Pittman was also involved in Plaintiff Jackson's escort from the dorm, noting that inmate Clinton Briscoe identified Pittman as an officer walking out after Jackson on video. (Doc. 283-1, p. 18.) However, the surveillance camera footage that shows Defendant Pittman escorting Plaintiff Stevenson out of the dorm does not show him

---

[18] Defendant Pittman is the officer pictured at Bates 8210. (Doc. 274, p. 44; doc. 281, p. 18.)

reentering the dorm prior to Plaintiff Jackson's escort. (CAM 8 at 22:13:18–22:13:40.) Moreover, none of the individuals present in the subject video scene—which inmate Briscoe contends shows Defendant Pittman following Plaintiff Jackson's escort—appear to be Defendant Pittman.[19] (See Doc. 191, pp. 9–10; HHV at 11:07:29–11:08:05PM; CAM 8 at 22:14:10–22:14:32.) Nevertheless, Defendant Pittman was undisputedly involved with Plaintiff Stevenson's escort outside of D-2 approximately one minute before officers escorted Plaintiff Jackson out. (See CAM 8 at 22:13:18–22:13:40.)

### F.      Defendant Jarrod Bennett

Against Defendant Bennett, Plaintiffs are pursuing claims regarding his alleged: (1) failure to intervene in Plaintiff Stevenson's dorm altercation with officers, and (2) failure to intervene or, in the alternative, participation in the excessive force used against Plaintiffs during their escort outside of D-2. (See Doc. 283-1, pp. 19–20; see also doc. 283, pp. 2, 13–14, 16, 18.)

### (1)      Bennett's Involvement in the Events in the D-2 Dormitory

Defendant Bennett was in D-2 before the disturbance began, assisting Catanzariti's search for contraband on the upper ramp. (Doc. 283-1, pp. 19–20.) To help recover contraband hidden in cell D-234, Plaintiff Jackson's cell, Catanzariti sent Defendant Bennett to get a hammer and channel-lock pliers. (Id.) He went and retrieved these tools and carried them back to Catanzariti. (Id.) At this point in the progression of events, Plaintiffs' and Defendant Bennett's accounts diverge. (See id.)

---

[19] The officer going up the stairs and then taking Plaintiff Stevenson out of the dorm, identified by Plaintiffs as Defendant Pittman, is a white male of average build, with a buzz cut, and wearing a light-blue uniform shirt. (See HHV at 11:02:50PM; CAM 8 at 22:13:35.) This individual matches the appearance of Defendant Pittman. (See Doc. 281, p. 18.) None of the officers who escorted Plaintiff Jackson out of D-2 or followed after him match this description. Of the white males, two are bald, one is wearing a cap, another has sunglasses resting on top of his head, and one is wearing a blue jacket; two of the officers in the group are black males. (See HHV at 11:07:29–11:08:05PM; CAM at 8 22:14:10–22:14:45.)

In his declaration, Defendant Bennett avers that, after giving Catanzariti the requested tools, he "left D-2 and went to the south side of the prison where [he] assisted with count." (Doc. 240-14, p. 1.) Later, upon hearing the call for assistance, he returned to D-2 where he "observed officers and inmates on the second floor," and he observed Plaintiff Jackson swinging at officers. (Id.) Defendant Bennett claims that his participation was limited to "cuffing one inmate who was already on the ground" and then, afterward, transporting Plaintiff Jackson to the hospital and back to Smith State. (Id. at pp. 1–2.) He states he neither used force nor witnessed any use of force. (Id. at p. 1.)

Plaintiffs, however, contend that Defendant Bennett was on the upper ramp as the disturbance broke out. (Doc. 283-1, p. 20.) According to inmate Neely's testimony, Defendant Bennett and Defendant Ritchie went into a cell together approximately six to seven minutes before the fighting occurred.[20] (Doc. 263, p. 26.) Inmate Neely further claims that several inmates confronted them as they came out of the cell. (Id.) One of these inmates, Neely states, tried to snatch something from Defendant Ritchie, causing Defendant Mitchell to react, and the "brawl" started from there.[21] (Id.) However, earlier in his deposition, Neely had testified that Defendant Bennett arrived on scene "later on" as opposed to being there "when it first started."[22] (Id. at p. 8.) Nonetheless, Neely also indicated that, "if [he] was not mistaken," Defendant Bennett was one of

---

[20] Defendant Bennett is the officer pictured at Bates 8217. (Doc. 277, p. 44; doc. 281, p. 20.)

[21] Defendant Ritchie could not remember Defendant Bennett's specific involvement on the night in question, only that Catanzariti had someone go get tools for him. (Doc. 260, p. 8.) She further testified that Catanzariti was the person who went in the cell while she "mostly" stood outside. (Id. at p. 14.) The only other officer she recalled being involved at the start was Defendant McFarlane. (See id. at pp. 14–15.) To be sure, "there [were] more people and officers and more inmates," but Defendant Ritchie could not specifically remember any. (Id. at p. 15.)

[22] Inmate Neely gave his testimony that Defendant Bennett "was there later on" in the context of being asked to remember which officers "hit an inmate while they [were] already handcuffed or while [they] were down already." (Doc. 263, p. 8.)

the officers around the inmate being beaten with the hammer. (Id. at p. 11.) The handheld video shows Defendant Bennett on the upper ramp eighty seconds after the use of force had ceased, standing over Plaintiff Stevenson, who was handcuffed on the ground. (HHV at 11:04:04–11:04:09PM; doc. 240-15, p. 23.)

### (2)     Bennett's Involvement in the Escort Outside of the D-2 Dormitory

Plaintiffs also contend the facts show that Defendant Bennett participated in Plaintiff Stevenson's escort out of D-2, placing him at the scene when Plaintiffs were beaten outside of the dorm on the way to the infirmary. (Doc. 283-1, p. 20.) The Court has reviewed the video footage which shows the following: after remaining on the upper ramp for some time after the disturbance was over, Defendant Bennett followed Harrison and Defendant Pittman down the steps as they escorted Plaintiff Stevenson from the dorm. (HHV at 11:06:57–11:07:02; doc. 263, p. 18; doc. 267, p. 29.) However, once this group reached the bottom of the stairs, Defendant Bennett turned away as Harrison and Defendant Pittman continued to escort Plaintiff Stevenson out. (CAM 8 at 22:13:30–22:13:41.) Defendant Bennett then exited the frame in the opposite direction of the escorting officers. (Id.)

### STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in the light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)). However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Fed. R. Civ. P. 56(c)). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (emphasis and citation omitted).

## DISCUSSION

Plaintiffs' excessive force and failure to intervene claims, as presented on Defendants' Motion for Summary Judgment, require analysis of the Eighth Amendment's proscription against cruel and unusual punishment.

That proscription governs the amount of force that prison officials are entitled to use against inmates. Campbell v. Sikes, 169 F.3d 1353, 1374 (11th Cir. 1999). An excessive force claim has two requisite parts: an objective and a subjective component. Sims v. Mashburn, 25 F.3d 980, 983 (11th Cir. 1994). To satisfy the objective component, the inmate must show that the prison official's conduct was "sufficiently serious." Farmer v. Brennan, 511 U.S. 825, 834 (1994) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). The subjective component requires a showing that the official acted with a "sufficiently culpable state of mind." Sims, 25 F.3d at 983 (citing Hudson v. McMillan, 503 U.S. 1, 8 (1992)). "The core judicial inquiry . . . is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Wilkins v. Gaddy, 559 U.S. 34, 37, 39 (2010) (citation and internal quotations omitted) (holding that there is no "significant" or "non-*de minimis*" threshold injury requirement).

In order to determine whether the official used force maliciously and sadistically to cause harm or in good faith to restore order, courts consider the following factors: (1) the need for the exercise of force; (2) the relationship between the need for force and the amount of force applied; (3) the extent of injury inflicted on the inmate; (4) the extent of the threat to the safety of staff and other inmates; (5) and any efforts taken to temper the severity of a forceful response. Fennell v. Gilstrap, 559 F.3d 1212, 1217 (11th Cir. 2009)). These factors are viewed from the correctional officer's point of view based on the facts known at the relevant time, and courts are to "give a wide range of deference to prison officials acting to preserve discipline and security." Id. Deference,

however, "is not absolute and does not insulate from review actions taken in bad faith or for no legitimate purpose." Id. (citing Ort v. White, 813 F.2d 318, 322 (11th Cir. 1987)). "Once a prisoner has stopped resisting there is no longer a need for force, so the use of force thereafter is" unconstitutionally excessive. Danley v. Allen, 540 F.3d 1298, 1309 (11th Cir. 2008).

The Eighth Amendment also "imposes a duty on prison officials" to "take reasonable measures to guarantee the safety of the inmates." Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099–1100 (11th Cir. 2014) (quoting Farmer, 511 U.S. at 832). Pursuant to this duty, "an officer can be liable for failing to intervene when another officer uses excessive force." Priester v. City of Riviera Beach, 208 F.3d 919, 924 (11th Cir. 2000) ("If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable[.]" (alteration in original) (quoting Ensley v. Soper, 142 F.3d 1402, 1407–08 (11th Cir. 1998))); see also Skrtich v. Thornton, 280 F.3d 1295, 1301 (11th Cir. 2002). "Even if an officer personally did not use excessive force, an officer who is present at the scene can be alternatively liable for failing to take 'reasonable steps to protect the victim of another officer's use of excessive force.'" Johnson v. White, 725 F. App'x 868, 878 (11th Cir. 2018) (per curiam) (quoting Hadley v. Gutierrez, 526 F.3d 1324, 1330–31 (11th Cir. 2008)).

"This liability, however, only arises when the officer is in a position to intervene and fails to do so." Priester, 208 F.3d at 924. A successful claim requires "facts showing the necessity or real opportunity for the defendant-officers to intervene in a fellow officer's unlawful conduct." Keating v. City of Miami, 598 F.3d 753, 764 (11th Cir. 2010). When events occur so quickly that the officer cannot intervene in the use of excessive force, he or she is not liable for another's constitutional violation. Fils v. City of Aventura, 647 F.3d 1272, 1290 n.21 (11th Cir. 2011) (citing

Brown v. City of Huntsville, 608 F.3d 724, 740 n.252 (11th Cir. 2010)).  Moreover, if there is no

underlying use of excessive force, there is no obligation to intervene.  Crenshaw v. Lister, 556

F.3d 1283, 1294 (11th Cir. 2009).

## I.      Summary Judgment as to Defendant Andrew McFarlane

At summary judgment, Plaintiffs maintain the following claims against Defendant

McFarlane: (1) failure to intervene in Plaintiff Stevenson's dorm altercation with officers, (2)

excessive force against Plaintiff Jackson in the dorm, and (3) failure to intervene and excessive

force during Plaintiffs' escort outside.[23]  (See Doc. 283-1, pp. 3–7, 10; see also doc. 283, pp. 1–2,

20–21.)  Defendant McFarlane seeks summary judgment as to all claims brought against him by

Plaintiffs.[24]  (Docs. 240, 240-2.)

---

[23]  In their First Amended Complaint, Plaintiffs allege a "Supervisory Liability" count against Defendant
McFarlane.  (Doc. 24, pp. 19–20.)  In responding to Defendant McFarlane's Motion for Summary
Judgment, however, Plaintiffs do not press this claim as an independent basis of liability for McFarlane.
(See Doc. 283.)  To the extent Plaintiffs seek to hold Defendant McFarlane independently liable based
solely on his supervisory capacity, such claim fails as a matter of law because *respondeat superior* liability
is not available in Section 1983 cases.  Bryant v. Jones, 575 F.3d 1281, 1299 (11th Cir. 2009); Braddy v.
Fla. Dep't of Labor & Emp't Sec., 133 F.3d 797, 801 (11th Cir. 1998).  A supervisor may be liable only
through personal participation in the alleged constitutional violation or when there is a causal connection
between the supervisor's conduct and the alleged violations.  Braddy, 133 F.2d at 802; see also Barr v. Gee,
437 F. App'x 865, 875 (11th Cir. 2011) (per curiam) (setting forth the avenues to state a viable claim against
a supervisory defendant).  Here, Plaintiffs have alleged, and presented evidence of, Defendant McFarlane's
direct involvement (or nonfeasance) in their excessive force and failure to intervene claims brought against
him.  Plaintiffs' supervisory allegations are redundant of these claims.  (See Doc. 24, pp. 19–20.)  Thus,
rather than seeking to hold Defendant McFarlane liable based on his supervisory status, Plaintiffs have
asserted direct claims against him.  See Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986) ("If a police
officer, *whether supervisory or not*, fails or refuses to intervene when a constitutional violation such as an
unprovoked beating takes place in his presence, the officer is directly liable under Section 1983." (emphasis
added)); Frederick v. Silva, No. 18-80483, 2018 U.S. Dist. LEXIS 138940, at *38–41 (S.D. Fla. Aug. 15,
2018) (discussing supervisory liability in the context of failure to intervene and excessive force claims).  As
such, the Court **GRANTS** Defendant McFarlane's Motion for Summary Judgment as to any supervisory
liability claim against him, (doc. 240), and **DISMISSES** that claim with regard to Defendant McFarlane.

[24]  As noted, in their First Amended Complaint, Plaintiffs set forth their excessive force and failure to
intervene allegations and claims generally against all Defendants in this action.  (See Doc. 24, pp. 5–19.)
Following discovery, however, Plaintiffs have indicated the undisputed facts show that Defendant
McFarlane did not use excessive force against Plaintiff Stevenson in the dorm, did not fail to intervene in
the force used against Plaintiff Jackson in the dorm, and did not commit any alleged constitutional violations
against either Plaintiff in the infirmary.  (See Doc. 283-1, pp. 3–7, 10–11; see also doc. 283, pp. 1–2, 20–

## A. The Parties' Arguments

As to Plaintiff Stevenson's in-dorm failure to intervene claim, Defendant McFarlane argues there is no evidence showing he was in a position to intervene during the events that took place on the upper ramp of D-2. (Doc. 240-2, pp. 14–15.) As to Plaintiff Jackson's in-dorm excessive force claim, Defendant McFarlane contends that his eyeball raking allegation is a "fantastic assertion," which is belied by medical records and video evidence. (Id. at pp. 10–12.) Additionally, to the extent Plaintiff Jackson can actually show the eye raking occurred, Defendant McFarlane asserts any injuries were *de minimis* and any recovery is thereby limited to nominal damages pursuant to the PLRA. (Id. at pp. 16–18.) As to Plaintiffs' excessive force and failure to intervene claims arising from their escort from the dorm to the infirmary, Defendant McFarlane argues that, in this situation, there is no evidence showing he used excessive force or was positioned to intervene in a use of excessive force. (Id. at pp. 14–15.) Lastly, based on his position that Plaintiffs cannot show an Eighth Amendment violation, Defendant McFarlane asserts qualified immunity with respect to all claims. (Id. at pp. 24–25.)

In response, Plaintiffs contend that the evidence shows Defendant McFarlane "was present at the scene of both Stevenson's beating in the dorm and both Stevenson and Jackson's beatings outside the dorm." (Doc. 283, p. 1.) Plaintiffs assert that Defendant McFarlane saw Catanzariti striking Stevenson on the upper ramp "and did nothing to intervene," (id. at pp. 12–13), despite his supervisory authority, (id. at p. 20). They contend Defendant McFarlane's testimony to the contrary is contradicted by the record. (Id.) Plaintiffs further assert that Defendant McFarlane went outside "immediately after Stevenson and Jackson were escorted out of the building," (id. at

---

21.) Because the parties agree Defendant McFarlane did not act unlawfully in these situations, the Court **GRANTS** his Motion for Summary Judgment as to these excessive force and failure to intervene claims, (doc. 240), and **DISMISSES** those claims with regard to Defendant McFarlane. Fed. R. Civ. P. 56(a).

pp. 17–18), thus creating a triable issue as to whether he participated in, or failed to intervene in, the use of excessive force outside, (id. at pp. 20–21). Lastly, Plaintiffs argue that, because "precedent clearly establishe[s] that government officials may not use gratuitous force against a prisoner who has been already subdued," Defendant McFarlane is not entitled to qualified immunity. (Id. at pp. 21–23.)

In reply, Defendant McFarlane notes the "apparent[] withdraw[al]" of Plaintiff Jackson's eyeball raking claim, (doc. 290, p. 4), which was not explicitly discussed by Plaintiffs in their Response, (see doc. 283). As to Plaintiff Stevenson's in-dorm failure to intervene claim, Defendant McFarlane acknowledges that he witnessed Catanzariti deliver some strikes, while looking up from the second floor, but explains he looked away while assisting with other inmates on the bottom floor. (Doc. 290, pp. 4–5.) Defendant McFarlane also contends that Plaintiffs misconstrue deposition testimony in an effort to show he was around Stevenson on the second floor during the time in question, which he disputes. (Id. at pp. 5–6.) As to both Plaintiffs' escort claims, Defendant McFarlane argues the evidence that he exited D-2 at some point does not reasonably support excessive force or failure to intervene claims against him. (Id. at pp. 6–7.)

**B.      Plaintiff Jackson's In-Dorm Excessive Force Claim**

In support of Plaintiff Jackson's allegation that Defendant McFarlane raked his eyeballs while he was handcuffed, Plaintiffs state only the following: "Due to the benefit of discovery, Jackson's use of force claim is also based on McFarlane's failure to intervene and participation in Jackson's beating outside the dorm." (Doc. 283-1, p. 4.) They offer no additional argument or record evidence to support the specific claim of in-dorm excessive force by McFarlane. (See Docs. 283, 283-1.) In fact, Plaintiffs do not mention this purported claim whatsoever in their four-hundred forty-eight paragraph global statement of material facts. (See Doc. 259.)

Furthermore, there is no evidence that Plaintiff Jackson suffered any injury to his eyes. In his Statement of Material Facts, Plaintiff Jackson lists his injuries, but he does not include any damage to his eyes. (Id. at p. 67.) At his deposition, when asked about the injuries he received as a result of this incident, Plaintiff Jackson stated, *inter alia*, his tooth was knocked out, his nose was broken, and his face was lacerated in three places, but he did not claim any eye injury resulted. (Doc. 240-4, p. 21.) A GDC medical report shows that Plaintiff Jackson had lacerations on his face that required sutures, but it does not indicate any injury to his eyes. (Doc. 240-8, pp. 1–2; see also doc. 233-2, p. 84.) Likewise, Plaintiff Jackson underwent a facial examination at Evans Memorial Hospital that found he had a fractured nose and tooth, as well as facial swelling, but no eye injury. (Doc. 240-8, pp. 3–13.) The reviewing doctor actually noted that Plaintiff Jackson's "orbital contents appear intact." (Id. at p. 7.)

Moreover, the video evidence of record tends to disprove Plaintiff Jackson's version of the events surrounding the alleged eye raking by Defendant McFarlane. According to Plaintiff Jackson, an unknown officer commanded him to get down on his knees and handcuffed him, at which point the handcuffing officer placed him in a chokehold. (Doc. 240-4, p. 13.) Other officers then joined and allegedly attempted to throw Plaintiff Jackson over the second-tier railing, which he prevented by holding on to the rail with his legs. (Id.) They next placed Plaintiff Jackson up against a door. (Id.) As he stood facing the wall by the door, Plaintiff Jackson alleges that Defendant McFarlane came down the ramp raking and scratching his and other inmates' eyes. (Id. at p. 14.) Defendant McFarlane's alleged action caused "excruciating" pain. (Id.)

Surveillance camera footage, however, does not support these allegations with respect to Defendant McFarlane. Defendant Eason testified that Plaintiff Jackson was being handcuffed between the 22:07:50 and 22:08:35 marks on the surveillance cameras. (Doc. 270, p. 25.) This

footage does not appear to show officers trying to throw Plaintiff Jackson over the rail, but in any event, it depicts Plaintiff Jackson and another inmate being stood up and placed against the wall. (CAM 8 at 22:08:35–22:09:15; CAM 9 at 22:08:35–22:09:15.) Plaintiff Jackson and the other inmate stood there without officers around them for approximately thirty seconds, at which point two officers came up by them while other officers either passed by or stood in the general vicinity. (CAM 8 at 22:09:10–22:10:30; CAM 9 at 22:09:10–22:10:30.) Although this video sequence is not clear enough to show whether any of these officers scratched Plaintiff Stevenson's eyes, it is undisputed that Defendant McFarlane descended the nearby stairs prior to this juncture.

Defendant McFarlane identified himself going down these steps beginning at 22:08:45, which precedes the point in time where Plaintiff Jackson was stood against the wall after being handcuffed by at least ten seconds. (Doc. 240-15, p. 26; CAM 8 at 22:08:35–22:09:00.) Before descending the stairs, Defendant McFarlane assisted with an inmate located to the right of the staircase while Plaintiff Jackson was located to the left of it. (Id.) To be sure, Defendant McFarlane did momentarily go over to Plaintiff Jackson's area prior to going down the stairs, but this occurred before Jackson was stood up against the wall, *i.e.* before he alleges an officer scratched his eyes.[25] (See id.) By the time officers stood Plaintiff Jackson up and made him face the wall, Defendant McFarlane was already downstairs. (CAM 8 at 22:08:35–22:09:20.) Tellingly, Plaintiffs do not counter or attempt to explain this evidence raised by Defendant McFarlane. (See Docs. 283, 283-1.) Other than Plaintiff Jackson's deposition testimony, which

---

[25] At 22:08:33, Defendant McFarlane, who had been kneeling over an inmate to the right of the stairs, stood up and walked from right to left past the staircase, and then stood over Plaintiff Jackson and the other inmate, who were both still on the ground with other officers tending to them. (CAM 8 at 22:08:30–22:08:45; doc. 240-15, p. 26.) Defendant McFarlane remained in this position for less than ten seconds before turning away and descending the stairs. (CAM 8 22:08:37–22:08:45.)

is entirely inconsistent with the record before the Court, Plaintiffs offer nothing in the way of evidence to corroborate this claim, (see id.).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott, 550 U.S. at 380. Here, the medical evidence, which includes a head examination by third-party medical providers, does not indicate any notable eye injuries to Plaintiff Jackson. Moreover, Plaintiff Jackson did not list an eye injury among those he suffered during the disturbance. Even more critically, the undisputed video evidence shows that Defendant McFarlane was *not* in Plaintiff Jackson's vicinity during the time period he alleges an officer scratched or raked his eyes. Given these facts, there is no evidence by which a reasonably jury could find Defendant McFarlane liable for Plaintiff Jackson's eye raking claim. Accordingly, the Court **GRANTS** Defendant McFarlane summary judgment as to Plaintiff Jackson's in-dorm excessive force claim alleged against him.[26]

### C. Failure to Intervene During Plaintiff Stevenson's Dorm Altercation

On a failure to intervene claim, the "plaintiff has the burden to demonstrate that the defendant was in a position to intervene but failed to do so." Ledlow v. Givens, 500 F. App'x 910, 914 (11th Cir. 2012) (per curiam) (citing Hadley, 526 F.3d at 1330–31). To meet this burden, the plaintiff must adduce "facts showing the necessity or real opportunity for the defendant-officers to intervene in a fellow officer's unlawful conduct." Keating, 598 F.3d at 764.

To show Defendant McFarlane could have intervened in Catanzariti's attack on Stevenson, Plaintiffs argue that he "was on the top range when the fight broke out." (Doc. 283-1, p. 5.) As recounted above, there is an evidentiary dispute in this regard: Defendant McFarlane contends he

---

[26] As such, the Court need not, and does not, address whether and to what extent Plaintiff Jackson's recovery for this claim would be limited by the PLRA..

was on the lower range when the fighting began, but Plaintiffs aver he was on the upper range when the fight broke out. While Defendant McFarlane is correct that Plaintiffs overstate officer Hill's testimony on this point—she only testified McFarlane was on the upper range at some point during the night, (doc. 267, pp. 12, 25–26)—he does not account for Defendant Ritchie's clear testimony placing him on the upper range when the disturbance began:

> Q. . . . So let me ask you, you were standing outside the cell that Catanzariti went inside?
> A. I was standing outside the cell to make sure that none of the inmates went in there . . . because he was trying to get something out of the heater vent . . . .
> Q. Uh-huh.
> A. [Inmate Jackson] had walked by me on the top range a couple times . . . but I instructed him to go back down range and then at one point in time he come up there and he told me . . . you need to get out of here.
> Q. What did you do at that point?
> A. And, well, I thought he was like trying to threaten me to start with but then after this [incident] occurred maybe he was trying to warn me . . . maybe he knew, you know, something was fixin' to go on and I thought maybe he was trying to warn me to get out. But I do remember Lieutenant McFarlan[e] coming in and he was up on the top range walking down towards whatever cell it was, 234 I think is what the cell number was.
> Q. Uh-huh.
> A. And somehow Jackson, I think, was walking towards Lieutenant McFarlan[e] or might have come up on the stairs but somehow Jackson was up there and about that time Caz walked out of the cell and Jackson walked up to him and grabbed it, something in his hand. . . . [A]nd everything blew up from there.
> …
> Q. Who else [besides Catanzariti] do you know for certain was on the top range [when the fighting broke out]?
> A. Lieutenant McFarlan[e].
> Q. Okay. Who else?
> A. I know there was more people and officers and more inmates, but I don't remember.

(Doc. 260, pp. 14–15.) Moreover, while Defendant McFarlane testified to "standing downstairs" when this event occurred, (doc. 240-15, p. 15), Catanzariti's testimony indicates "McFarlane [was] coming up the stairs" just before the fighting took place, (doc. 274, p. 16).

These testimonial contradictions and inconsistencies aside, the video evidence of record indicates Defendant McFarlane was on the upper range when the fighting began. Defendant McFarlane identified himself—black male wearing a zipped-up dark blue jacket, grey slacks, and a dark colored knit cap—on camera eight near the staircase, on the bottom range, approximately four minutes prior to the start of the disturbance. (Doc. 240-15, p. 26; CAM 8 at 22:03:22.) He can then be seen circling around the bottom range checking cell doors, (CAM 8 at 22:03:40–22:03:50; CAM 9 at 22:03:50–04:50; CAM 7 at 22:04:40–22:05:35), before going up the stairs and making his way leftward toward where Catanzariti and Plaintiffs were located on the upper ramp, (CAM 9 at 22:05:32–22:05:50; CAM 8 at 22:05:40–22:06:05).[27] This is the same staircase that Defendant McFarlane later identified himself coming down. (Doc. 240-15, p. 26; CAM 8 at 22:08:35–22:09:00.) Thus, per the video evidence, Defendant McFarlane was on the upper ramp when the disturbance commenced.[28]

Nevertheless, Plaintiffs must still point to evidence showing that Defendant McFarlane was in a position to intervene in the continued use of force against Plaintiff Stevenson when he was restrained on the ground in handcuffs on the upper ramp. As the surveillance camera shows, Defendant McFarlane was far away from Plaintiff Stevenson, subduing an inmate to the right of the staircase, just before he left the upper ramp. (CAM 8 at 22:07:56–22:08:46.) It further appears that, in the preceding time period, Defendant McFarlane had been involved in a shifting (from left to right) mass of officers and inmates to the left of the top of stairs. (Id. at 22:07:39–22:07:56.) However, leading up to this point, a pole to the left of the staircase partially obscured the camera's

---

[27] Additionally, Harrison identified Defendant McFarlane going up these stairs at the 10:59:22PM mark on the handheld video, (see doc. 268, p. 21; HHV at 10:59:22PM), which corresponds to 22:05:49 on the surveillance camera footage.

[28] To repeat, the fighting and ensuing disturbance began at 22:07:24 on the surveillance cameras and at 11:00:57PM on the handheld video. (See Doc. 290-1.)

view of this skirmishing group, and the surveillance camera video quality is not sufficient to track Defendant McFarlane's movements back to when the disturbance began, to see when he joined the skirmishing group. (See CAM 8 at 22:07:24–22:07:39; CAM 9 at 22:07:24–22:07:39.) At best, then, assuming Defendant McFarlane joined this skirmish at the exact point it became obscured, the evidence shows he would have had less than fifteen seconds—from the fighting's onset to when he became involved in the skirmish—to ascertain that Catanzariti and other officers were using excessive force against Plaintiff Stevenson to the left of this group and to have intervened. This is a very difficult, if not improbable, timeline to meet.

According to Plaintiff Stevenson, Defendant McFarlane was one of the officers who "had come upstairs" that he saw prior to the disturbance as Catanzariti and Ritchie were searching for contraband. (Doc. 240-3, pp. 8–10.) By that time, Plaintiff Stevenson explained, it was shift change and additional officers were "coming up the steps" while some were "going downstairs." (Id.) As more officers were coming up the steps, an officer downstairs deployed pepper spray at Plaintiff Stevenson and everyone else in the vicinity. (Id.) After Plaintiff Stevenson got hit with the spray, Defendant Deloach and another officer handcuffed him and then laid him down on his stomach. (Id.) At least a "few seconds" passed between the time the disturbance began and when Plaintiff Stevenson was handcuffed on the ground. (Id. at p. 22.)

Accepting Plaintiffs' position that Defendant McFarlane was on the upper ramp when the disturbance began, and assuming he was in immediate proximity to Plaintiff Stevenson initially (rather than down the ramp) and also assuming he did not join the skirmish by the stairs as it first coalesced, Defendant McFarlane would still have had an exceedingly narrow window of opportunity in which to intervene. When accounting for the time it took to handcuff and lay Plaintiff Stevenson on the ground and the time it would have taken Defendant McFarlane to

traverse the ramp to where the stairs were, Defendant McFarlane would have had less than ten seconds to intervene in any force being used against a restrained Plaintiff Stevenson.[29]

Given this rather scant amount of time and the chaotic scene which developed, Defendant McFarlane would not have had a reasonable opportunity to intervene prior to his engaging inmates near the staircase.  See Johnson, 725 F. App'x at 878 (finding no constitutional violation on a failure to intervene claim where "the whole incident lasted only a few seconds"); Crane v. Fort, No. 5:15-CV-345CAR-CHW, 2016 WL 8678447, at *10 (M.D. Ga. Nov. 4, 2016) ("The most significant shots, to [the plaintiff's] face occurred only at the end of [a thirty second] period. [Thus], the other officers were not in a position to intervene once it arguabl[y] became apparent that the use of force had escalated beyond necessity."), *report and recommendation adopted by* 2017 WL 132846 (M.D. Ga. Jan. 13, 2017); Warren v. City of Birmingham, No. CV-09-RRA-1025-S, 2012 U.S. Dist. LEXIS 188874, at *24 (N.D. Ala. Jan. 17, 2012) ("In this case, the event occurred over a time period of ten seconds.  It cannot be said that [the defendant-officer] had a realistic opportunity to intervene in that time frame, especially since he was not first on the scene." (citation omitted)).

Even in the light most favorable to Plaintiffs, this was a rapidly developing situation at the outset, with multiple inmates refusing to lockdown and physically confronting officers, which left

---

[29] Viewing the evidence of record in the light most favorable to Plaintiffs, the Court proceeds on the twin assumptions that Defendant McFarlane (1) was near Plaintiff Stevenson when the disturbance erupted and (2) moved to the area where he later identified himself at the latest conceivable time in light of what the video shows.  See Tolan v. Cotton, 572 U.S. 650, 656–660 (2014).  However, the Court notes that Plaintiff Stevenson did not identify Defendant McFarlane as an officer who was involved in restraining him or using force against him, despite knowing his identity.  (See Doc. 240-3, pp. 8–10, 18–20.)  Moreover, Plaintiffs do not cite any eyewitness testimony showing that Defendant McFarlane was directly involved with restraining or using force against Plaintiff Stevenson.  (See Docs. 283, 283-1, 259.)  The one inmate upon whom Plaintiffs rely, Neely, (doc. 283-1, pp. 5–6), actually testified that he did not recall Defendant McFarlane as one of the officers who struck a handcuffed inmate, (doc. 263, pp. 7–8), and further, Neely did not identify McFarlane as one of the officers who was around Plaintiff Stevenson while he was beaten, (id. at p. 11).

Defendant McFarlane with little time to intervene before he was forced to engage the situation near the staircase. In such a situation, the law permits officers discretion to decide where their attention is most immediately needed. See Ensley, 142 F.3d at 1407 (citing Riley v. Newton, 94 F.3d 632, 635 (11th Cir. 1996)). Moreover, the undisputed facts show that Defendant McFarlane was not "an officer [who] stood idly by while a fellow officer mistreated" an inmate. Id. Instead, he worked to quell the disturbance away from Plaintiff Stevenson's location, and by doing so, he lacked a "real opportunity" to intervene in the alleged continued use of force against a restrained, compliant Stevenson. Keating, 598 F.3d at 764. Thus, despite resolving factual disputes and making all reasonable inferences in Plaintiff's favor, they still cannot sustain a failure to intervene claim against Defendant McFarlane regarding the force used against Plaintiff Stevenson in D-2.[30] Accordingly, the Court **GRANTS** Defendant McFarlane summary judgment as to Plaintiff Stevenson's in-dorm failure to intervene claim alleged against him.

### D. Failure to Intervene and Excessive Force During Plaintiffs' Escort Outside of the D-2 Dormitory

Plaintiffs assert that Defendant McFarlane's "own testimony places him at the scene outside the building precisely when Jackson and Stevenson allege, and eye witnesses corroborate, being beaten." (Doc. 283-1, p. 10 (citing doc. 240-15, p. 25).) Defendant McFarlane disclaims

---

[30] In the alternative, Plaintiffs seem to argue that Defendant McFarlane could be held liable for failing to intervene once he was downstairs and witnessed the strikes Catanzariti delivered to Plaintiff Stevenson that were captured on the handheld video. (See Doc. 283-1, pp. 6–7 (noting Defendant McFarlane's testimony that he "looked away").) Fully recounted, Defendant McFarlane testified that he "looked away" because he "was doing other inmates, making sure the place was locked down." (Doc. 240-15, p. 7.) Contrary to Plaintiffs' selective presentation, Defendant McFarlane did not look away out of a disregard for what he saw; he looked away because he was busy locking down inmates on the first floor. Accordingly, the facts here show that Defendant McFarlane was not in a position to intervene in this use of force either. See Riley, 94 F.3d at 635 ("The three blows were struck in such rapid succession that [the defendant] had no realistic opportunity to attempt to prevent them. This was not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator." (quoting O'Neill v. Krzeminski, 839 F.2d 9, 11–12 (2d. Cir. 1988)).

involvement in these events. (Doc. 290, pp. 6–7.) In reviewing the evidence adduced by the parties, the Court finds that the undisputed evidence shows Defendant McFarlane was not outside during the events in question where Plaintiffs alleged continued force occurred.

First and foremost, Plaintiffs misconstrue Defendant McFarlane's testimony in this regard. Although he noted that he went outside, he made clear that it was much after Plaintiffs' escort.

> Q. Okay. So did you exit the building? Are you saying you did exit the building?
> A. I believe so. . . . Once I left [D-2], I think I went towards medical to check on them guys, to make sure everybody was okay.
> . . .
> Q. About how long after Officer Harrison and Officer Catanzariti and Officer Eason exit[ed] the building did you exit the building?
> A. I believe it might have been a while. It's hard to say exactly how long I was in the building after that fact.
> . . .
> Q. Based on your recollection, was it more than three minutes?
> A. Like I say, it was a while before. By this time, as you can see, everybody is locked down except for ones in the front. It was a while.
> Q. More than five minutes"
> A. I would say so.
> . . .
> Q. Did you see any officers outside of the D-2 dormitory when you exited on the way to medical?
> A. No. I just walked up there by myself [and did not see any officers].
> . . .
> Q. Describe what you saw when you got to medical.
> A. When I got there, the offender, he was probably in restraints and bandaged up. That's about it.
> . . .
> Q. Did you talk to the offenders that were in the medical unit?
> A. No. Once I seen them, they were already shackled and bandaged up. I automatically assumed they were going to the hospital. That's the only place they could go.

(Doc. 240-15, pp. 24–26.) Although Defendant McFarlane mentioned "there probably was" blood on the ground when he walked outside, he explicitly testified that no other person was out there at this time. (Id.) Plaintiffs cite to no other testimony which contradicts Defendant McFarlane's account. (See Doc. 283-1, pp. 7–10.)

Second, Plaintiffs argue that video evidence places Defendant McFarlane outside of D-2 during the alleged events, but they fail to point to any footage showing McFarlane leaving D-2 at the relevant time—or at any time for that matter. (See Docs. 283, 283-1.) It is true that approximately two minutes after officers escorted Plaintiff Jackson from D-2 an officer can be overhead on the handheld video asking where McFarlane was. (HHV at 11:09:48–11:09:49PM; doc. 263, pp. 21–22.) However, this is circumstantial evidence that neither places Defendant McFarlane outside soon after Plaintiffs' escorts nor indicates his actual location at the time of the query. At his deposition, Defendant McFarlane noted that he exited through the same exit as Plaintiffs. (Doc. 250-15, p. 25.) Review of the relevant surveillance camera video does not show an individual matching Defendant McFarlane's description leaving the dorm after Plaintiff Stevenson, (CAM 8 at 22:13:18–22:14:20), or within two minutes of Plaintiff Jackson's departure, (id. at 22:14:20–22:16:30).[31]

As such, Plaintiffs have failed to produce any evidence showing that Defendant McFarlane was present outside of D-2 when Plaintiffs allege officers continued to beat them, much less any evidence showing that McFarlane took part in any such use of force. Moreover, Plaintiffs did not offer any evidence to contradict Defendant McFarlane's account that he remained in D-2 following Plaintiffs' escort for at least five minutes and that the injured inmates were already at the infirmary upon his arrival. Without any competent evidence, Plaintiffs cannot maintain excessive force and failure to intervene claims against Defendant McFarlane regarding the alleged events which took place during their escort outside of D-2. See Celotex Corp., 477 U.S. at 322 (Summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence

---

[31] Moreover, at this time, an individual matching Defendant McFarlane's description walks across the bottom floor and up the stairs to where McFarlane was engaged with inmates shortly after the incident began. (CAM 8 at 22:14:40–22:15:30.)

of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). Accordingly, the Court **GRANTS** Defendant McFarlane summary judgment as to Plaintiffs' escort failure to intervene and excessive force claims against him.

## II. Summary Judgment as to Defendant Melvin Wells

At summary judgment, Plaintiffs maintain the following claims against Defendant Wells: (1) failure to intervene in Plaintiff Stevenson's dorm altercation with officers, and (2) failure to intervene in the excessive force used against Plaintiffs during their escort outside. (See Doc. 283-1, p. 11; doc. 283, pp. 2, 13, 18–20.) Defendant Wells seeks summary judgment as to all claims brought against him by Plaintiffs.[32] (Docs. 240, 240-2.) Plaintiffs contend that Defendant Wells was a supervisor on the night in question and that he witnessed the use of force on Plaintiffs. (Doc. 283-1, p. 11; doc. 283, pp. 13, 18.) Defendant Wells argues that his supervisory status is insufficient to hold him liable for Plaintiffs' claims. (Doc. 290, p. 8; doc. 240-2, p. 12.) The Court agrees.

With respect to all claims against Defendant Wells, Plaintiffs rely only on his status as a supervising lieutenant at Smith State to hold him liable for their claims. (See Doc. 283, pp. 13, 18; doc. 283-1, p. 11; see also doc. 259 (identifying Wells and providing only that he "was a supervisory the night of the subject incident")). It is a matter of blackletter law, however, that *respondeat superior* liability is not available for claims brought under Section 1983. Bryant, 575

---

[32] As noted, in their First Amended Complaint, Plaintiffs set forth their excessive force and failure to intervene allegations and claims generally against all Defendants in this action. (See Doc. 24, pp. 5–19.) Following discovery, however, Plaintiffs have indicated the undisputed facts show that Defendant Wells did not use any force against Plaintiffs during the disturbance, did not fail to intervene in the force used against Plaintiff Jackson in the dorm, and did not commit any alleged constitutional violations against either Plaintiff in the infirmary. (See Doc. 283-1, p. 11; doc. 283, pp. 2, 13, 18–20.) Because the parties agree Defendant Wells did not act unlawfully in these situations, the Court **GRANTS** his Motion for Summary Judgment as to this failure to intervene claims and to all excessive force claims, (doc. 240), and **DISMISSES** those claims with regard to Defendant Wells. Fed. R. Civ. P. 56(a).

F.3d at 1299; Braddy, 133 F.3d at 801. Therefore, Plaintiffs cannot maintain claims against Defendant Wells merely because he was a supervising officer during the disturbance.

A supervisor may be liable only through personal participation in the alleged constitutional violation or when there is a causal connection between the supervisor's conduct and the alleged violations. Braddy, 133 F.2d at 802; see also Barr, 437 F. App'x at 875. To maintain a claim against a supervisory defendant, the plaintiff must show "(1) the supervisor's personal involvement in the violation of his constitutional rights, (2) the existence of a custom or policy that resulted in deliberate indifference to the plaintiff's constitutional rights, (3) facts supporting an inference that the supervisor directed the unlawful action or knowingly failed to prevent it, or (4) a history of widespread abuse that put the supervisor on notice of an alleged deprivation that he then failed to correct." Id. (citing West v. Tillman, 496 F.3d 1321, 1328–29 (11th Cir. 2007) (providing factors at summary judgment stage)).

In this case, Plaintiffs have only presented evidence that Defendant Wells was a supervisor who was present in D-2 during the disturbance. These facts alone do not establish personal participation, nor are they indicative of a custom or history of failing to intervene in the use of excessive force. Moreover, they do not at all support an inference that Defendant Wells directed officers to use force against handcuffed and restrained inmates or directed other officers to refrain from intervening. And while Plaintiffs take issue with Defendant Wells' reliance on his "self-serving" declaration that he never witnessed force being used against Plaintiffs, (doc. 283-1, p. 11), it is *Plaintiffs' burden* to prove their case. They offer zero evidence concerning Defendant Wells' whereabouts during the disturbance, and thus, they fail to show he was ever in a position to intervene in the dorm or during the escort. When the nonmoving parties fail to make a sufficient showing of an essential element of their claims—e.g., that Defendant Wells was in a position to

reasonably intervene but did not—summary judgment is appropriate. <u>Celotex Corp.</u>, 477 U.S. at 323. In light of Plaintiffs' complete omission of any evidence against Defendant Wells other than his supervisory status, they cannot maintain their failure to intervene claims against him.

Accordingly, the Court **GRANTS** Defendant Wells summary judgment as to Plaintiffs' in-dorm and escort failure to intervene claims against him.

### III. Summary Judgment as to Defendant Nathaniel Milton

At summary judgment, Plaintiffs maintain the following claims against Defendant Milton: (1) failure to intervene in Plaintiff Stevenson's dorm altercation with officers, and (2) failure to intervene in the excessive force used against Plaintiffs during their escort outside and to the infirmary. (<u>See</u> Doc. 283-1, pp. 11–14; doc. 283, pp. 2, 13, 18–20.) Defendant Milton seeks summary judgment as to all claims brought against him by Plaintiffs.[33] (Docs. 240, 240-2.)

#### A. The Parties' Arguments

In support of their claims, Plaintiffs contend the evidence shows that Defendant Milton was "around" when Catanzariti struck Plaintiff Stevenson in the dorm, (doc. 283, p. 13), and that he participated in Plaintiffs' escort, (doc. 283-1, pp. 13–14). They also take issue with Defendant Milton's version of events regarding the hammer. (<u>Id.</u> at pp. 11–13.) Defendant Milton counters that Plaintiffs have no competent evidence which disputes his statement that he neither used force

---

[33] As previously noted, in their First Amended Complaint, Plaintiffs set forth their excessive force and failure to intervene allegations and claims generally against all Defendants in this action. (<u>See</u> Doc. 24, pp. 5–19.) Following discovery, however, Plaintiffs have indicated the undisputed facts show that Defendant Milton did not use any force against Plaintiffs during the disturbance, did not fail to intervene in the force used against Plaintiff Jackson in the dorm, and did not commit any alleged constitutional violations against either Plaintiff in the infirmary. (<u>See</u> Doc. 283-1, pp. 11–14; doc. 283, pp. 2, 13, 18–20.) Because the parties agree Defendant Milton did not act unlawfully in these situations, the Court **GRANTS** his Motion for Summary Judgment as to this failure to intervene claim and as to all excessive force claims, (doc. 240), and **DISMISSES** those claims with regard to Defendant Milton. Fed. R. Civ. P. 56(a).

on Plaintiffs nor observed the use of force on restrained inmates. (Doc. 290, pp. 9–10.) The Court agrees.

### B.    Failure to Intervene During Plaintiff Stevenson's Dorm Altercation

Although Plaintiffs contend Defendant Milton was in a position to intervene in Catanzariti's use of gratuitous force on Plaintiff Stevenson, (doc. 283, p. 13), they offer no evidence or record citations for this claim, (see id.).    Within in their responsive fact statement, Plaintiffs provide evidence tending to show, contrary to Defendant Milton's claim, that the hammer he retrieved had blood on it.    (Doc. 283-1, pp. 12–13.)    Be that as it may, the evidence giving rise to this fact dispute is immaterial to whether Plaintiff Stevenson was ever in a position to intervene on behalf of Plaintiff Stevenson.    Plaintiffs provide no evidence regarding this essential element of their claim.    (See id. at pp. 11–14.)

Furthermore, the video evidence that shows Defendant Milton handing the objects he retrieved over to another officer, (see id. at p. 13; see also doc. 290-1), conclusively establishes Defendant Milton was never in a position to intervene during the subject time period.[34]    At the start of the disturbance, Defendant Milton—the black male officer with gray hair wearing a cap and light blue shirt—was on the bottom range speaking to an inmate on the far side from where Plaintiffs were located.    (CAM 9 at 22:07:20–22:07:30.)    He remained in this area, helping to lock inmates down until he went and picked the fallen objects up off the floor.    (Id. at 22:07:30–

---

[34] Plaintiffs' attempts to dispute this video evidence are both unconvincing and tangential to the issue of whether Defendant Milton was in a position to intervene.    (See Doc. 283-1, p. 13.)    Plaintiffs complain that Defendant Milton relies on his declaration to support his story of handing the hammer to Officer Davis, yet Plaintiffs concede that they chose to not depose Milton, (id.); they also accuse Milton of not providing citations to the surveillance video as evidence of his account, (id.), despite his having done so, (see doc. 290-1).    And while it is true, as Plaintiffs claim, that Catanzariti's strikes caught on the handheld video occurred before Defendant Milton passed the hammer off, (doc. 283, p. 13), this claim is largely irrelevant as the surveillance video undisputedly shows that the items retrieved off the first floor by Defendant Milton fell before this sequence, (see doc. 290-1.)    These quibbles thus do not create a genuine dispute of material fact regarding the video.

22:09:12.) After retrieving the hammer, shank, and cell phone from the floor, Defendant Milton walked across the first-floor range and handed them to Officer Davis. (Id. at 22:09:12–22:09:30; doc. 290-1; see also CAM 8 at 22:09:23–22:09:37.) He continued around the bottom range locking down inmates for several minutes thereafter, long after the disturbance had been brought to order. (CAM 9 at 22:09:30–22:12:29; CAM 8 at 22:10:20–22:12:15.)

Against this backdrop, Plaintiffs have provided no video or testimonial evidence showing that Defendant Milton could have intervened in the force used against Plaintiff Stevenson while he was on the upper range, restrained on the ground in handcuffs. The evidence shows Defendant Milton was on the bottom range for the duration of the alleged use of excessive force against Plaintiff Stevenson on the upper range. Therefore, regardless of whether the video shows a bloody hammer being handed off, Defendant Milton was never in a position to intervene in the use of force against Plaintiff Stevenson. Being occupied on the bottom range, Defendant Milton could not have reasonably intervened in the mass of officers and inmates surrounding a prone Plaintiff Stevenson, and he denies witnessing any use of force against Stevenson, (doc. 240-11, p. 1). Plaintiffs, moreover, do not offer any counter evidence that Defendant Milton was even aware of Stevenson's situation or evidence that would support such an inference. (See Doc. 283, pp. 13, 19–20; doc. 283-1, pp. 11–13.)

As such, Plaintiffs have not met their burden to produce evidence from which a reasonable jury could find that Defendant Milton was in a position to intervene in the use of excessive force but failed to do so. Because there is no evidence that Defendant Milton saw force being used against Plaintiff Stevenson or was ever in a position to intervene on his behalf, Defendant Milton cannot be liable for failure to intervene. See Militello v. Sheriff of the Broward Sheriff's Office, 684 F. App'x 809, 815 (11th Cir. 2017) (per curiam) (finding no duty to intervene where, *inter*

*alia*, the defendant-officers were not "physically present" in area where force was used); Riley, 94 F.3d at 635 (holding that defendant-officer who did not observe other officer's force had no duty to intervene). Accordingly, the Court **GRANTS** Defendant Milton summary judgment as to Plaintiff Stevenson's in-dorm failure to intervene claim against him.

### C. Failure to Intervene and Excessive Force During Plaintiffs' Escort Outside of the D-2 Dormitory

Plaintiffs' claim against Defendant Milton in this regard is predicated on Officer Henderson's witness statement, wherein he identified Defendant Milton as an officer who escorted Plaintiff Jackson to the infirmary. (Doc. 283-1, pp. 13–14; doc. 266-2.) At his deposition, Officer Henderson testified that he was unsure whether he escorted Plaintiff Stevenson or Plaintiff Jackson and that he did not recall whether Defendant Milton was involved. (Doc. 266, pp. 6, 8.)

Putting Officer Henderson's admittedly uncertain testimony aside, much like Plaintiffs' other claim against Defendant Milton, the video evidence of record conclusively shows that he did not participate in either Plaintiffs' escort. In other words, the surveillance camera footage "blatantly contradicts" Plaintiffs' escort claims against Defendant Milton and the evidence upon which they rely. Scott, 550 U.S. at 380. Plaintiff Stevenson's escort down from the upper ramp and out of D-2 occurred from 22:13:18 to 22:13:40 as shown on surveillance camera eight; Plaintiff Jackson's escort down from the upper ramp and out of D-2 occurred from 22:14:10 to 22:14:32 as shown on this same camera. Plaintiffs do not endeavor to identify Defendant Milton on this video footage or at any relevant point thereafter. (See Doc. 283-1, pp. 13–14.)

As explained above, Defendant Milton remained on the bottom range after passing off the retrieved object to Officer Davis. (CAM 9 at 22:09:30–22:12:29.) At 22:12:35, Defendant Milton ascended the stairs on the opposite side of the dorm from where Plaintiffs were located. (CAM 7 at 22:12:29–22:12:50.) He remained there, on the opposite-side upper range, locking inmates

44

down for several minutes until descending the stairs well after Plaintiffs had been escorted out of the dorm. (Id. at 22:12:50–22:23:20.) Defendant Milton exited D-2 shortly thereafter. (Id. at 22:23:20–22:24:27; CAM 8 at 22:23:33–22:24:27.) Given that Defendant Milton was in the dorm for approximately ten minutes following Plaintiff Jackson's escort, there is no evidence that Milton was ever a participant in either Plaintiff's escort. And, based on the evidence cited by Plaintiffs to support their allegations that officers continued to use gratuitous force on them during their escort, these beatings lasted for approximately two minutes. (Doc. 283-1, p. 9.) During this two-minute period, Defendant Milton was inside and thus neither used force against Plaintiffs outside nor failed to intervene.

Therefore, based on the undisputed facts, the Court finds that Defendant Milton did not use excessive force against Plaintiffs during their escort and that he was not in a position to intervene in any such use of force in this instance. Accordingly, the Court **GRANTS** Defendant Milton summary judgment as to Plaintiffs' escort failure to intervene and excessive force claims against him.

## IV.    Summary Judgment as to Defendant Gary Mitchell

At summary judgment, Plaintiffs maintain the following claims against Defendant Milton: (1) failure to intervene and excessive force during Plaintiff Stevenson's dorm altercation with officers, and (2) failure to intervene and excessive force during Plaintiffs' escort outside. (See Doc. 283-1, pp. 14–17; see also doc. 283, pp. 2, 12–13, 19–20.) Defendant Milton seeks summary judgment as to all claims brought against him by Plaintiffs.[35] (Docs. 240, 240-2.)

---

[35]  As noted, in their First Amended Complaint, Plaintiffs set forth their excessive force and failure to intervene allegations and claims generally against all Defendants in this action. (See Doc. 24, pp. 5–19.) Following discovery, however, Plaintiffs have indicated the undisputed facts show that Defendant Mitchell did not use force or fail to intervene in the force used against Plaintiff Jackson in the dorm and did not commit any alleged constitutional violations against either Plaintiff in the infirmary. (See Doc. 283-1, pp. 14–17; see also doc. 283, pp. 2, 13, 19–20.) Because the parties agree Defendant Mitchell did not act

### A.     The Parties' Arguments

Plaintiffs argue Defendant Mitchell was present with Defendant Attical "at the same time" Attical was involved with Plaintiff Stevenson on the upper range, which includes the time frame when excessive force was allegedly used against Stevenson.  (Doc. 283-1, pp. 14–17.)  They thus conclude that Defendant Mitchell can be held liable for participating in this force or for failing to intervene to stop it.  (Doc. 283, pp. 12–13.)  Plaintiffs, however, provide no evidence or discussion of their claims regarding Defendant Mitchell's supposed involvement in their escort.  (See Doc. 283-1, pp. 14–17; see also doc. 283, pp. 2, 12–13, 19–20.)  Defendant Mitchell contends he is entitled to summary judgment because Plaintiffs offer no competent evidence to support their claims or to dispute his assertion that he was not involved in the use of force against them. (Doc. 290, p. 10.)  The Court agrees.

### B.     Failure to Intervene and Excessive Force During Plaintiff Stevenson's Dorm Altercation

Plaintiffs base their entire case against Defendant Mitchell on the testimony of inmate Cratic, who identified Defendant Mitchell as being with Attical at some point during the disturbance.  (Doc. 283-1, pp. 15–16.)  The body of evidence that Plaintiffs cite specifically concerns Defendant Attical's role in this incident rather than what Defendant Mitchell did or did not do.  (Id.)  Based on this evidence, Plaintiffs conclude that "Mitchell's presence with Attical at the same time places Mitchell at the scene when [Catanzariti] was beating Stevenson with the hammer—with a clear opportunity to intervene and stop [him] from beating a nonresistant inmate with a metal object in the face and head."  (Id. at 16.)

---

unlawfully in these situations, the Court **GRANTS** his Motion for Summary Judgment as to these failure to intervene and excessive force claims, (doc. 240), and **DISMISSES** those claims with regard to Defendant Mitchell.  Fed. R. Civ. P. 56(a).

However, a full reading of inmate Cratic's deposition testimony does *not* support the notion that Defendant Mitchell was present alongside Attical during the relevant time. Cratic testified that he witnessed Attical help Defendant Mitchell, who had a bloody nose and had been hitting inmates with his flashlight, up from the floor of the bottom range.[36] (Doc. 190, pp. 9, 23.) Defendant Mitchell and Attical then, according to Cratic, proceeded to strike with their flashlights "maybe one or two inmates" who had yet to lockdown. (Id. at p. 10.) Cratic did not indicate that either of these inmates were Plaintiffs. (See id.) More importantly, Cratic testified that, after seeing Defendant Mitchell helped up from the floor, he never witnessed Mitchell use any force against Plaintiff Stevenson. (Id. at p. 23.) He explained that Defendant Mitchell "was involved in the day's events, but [as far as] having a direct physical altercation with the two guys in question, no." (Id. at pp. 23–24.) What Cratic witnessed of Defendant Mitchell and Attical was "unrelated." (Id. at p. 23.) As such, Cratic's testimony provides no proof that Defendant Mitchell ever used excessive force against Plaintiff Stevenson or was in a position to intervene in such force. In short, it is of no moment to these issues.

Given that Plaintiffs point to no other evidence against Defendant Mitchell, they have failed to create a genuine dispute as to Mitchell's declaration that he neither used force against restrained inmates nor saw officers use force against restrained inmates. (Doc. 240-12, pp. 1–2.) Accordingly, the Court **GRANTS** Defendant Mitchell summary judgment as to Plaintiff Stevenson's in-dorm failure to intervene and excessive force claims against him.

---

[36] Notably, Cratic's observation that Defendant Mitchell used a flashlight against inmates is consistent with Mitchell's own claim that he used his flashlight to defend himself after being struck by an inmate. (See Doc. 240-12, p. 1.)

### C. Failure to Intervene and Excessive Force During Plaintiffs' Escort Outside of the D-2 Dormitory

As to their escort claims against Defendant Mitchell, Plaintiffs offer no supporting facts or evidence. (See Doc. 283, pp. 14–17; doc. 283, pp. 13, 19–20; doc. 259, p. 53.) In fact, Plaintiffs do not mention this purported claim against Defendant Mitchell whatsoever in their four-hundred forty-eight paragraph global statement of material facts. (See Doc. 259.) Their only mention of Defendant Mitchell in this document concerns the unsupported allegation that he failed to intervene on Plaintiff Stevenson's behalf in the dorm. (Id. at p. 53.) Thus, the Court finds that Plaintiffs have failed to support their escort failure to intervene and excessive force claims against Defendant Mitchell with evidence from which a reasonable jury could find in their favor. In short, these claims are nothing more than conclusory allegations devoid of any evidence.

Because Plaintiffs lack any evidence that Defendant Mitchell used force past the point of restraint or was in a position to intervene in the events outside of D-2, these claims cannot proceed to trial. See Moton, 631 F.3d at 1341 (summary judgment proper where "there is a lack of evidence to support the essential elements"). Accordingly, the Court **GRANTS** Defendant Mitchell summary judgment as to Plaintiffs' escort failure to intervene and excessive force claims against him.

### V. Summary Judgment as to Defendant Gordon Pittman

At summary judgment, Plaintiffs maintain the following claims against Defendant Pittman: (1) failure to intervene in Plaintiff Stevenson's dorm altercation with officers, and (2) failure to intervene and excessive force during Plaintiffs' escort outside. (See Doc. 283-1, pp. 17–18; see

also doc. 283, pp. 2, 13, 16, 18–20.)  Defendant Pittman seeks summary judgment as to all claims brought against him by Plaintiffs.[37]  (Docs. 240, 240-2.)

### A. The Parties' Arguments

Plaintiffs argue that video evidence, along with deposition testimony, places Defendant Pittman at the scene of Catanzariti's beating of Plaintiff Stevenson and also outside during Plaintiffs' escorts.  (Doc. 283-1, pp. 17–18.)  As such, they conclude that he can be found liable for failure to intervene on Plaintiff Stevenson's behalf in the dorm, and for both failure to intervene and excessive force during Plaintiffs' escort outside of the dorm.  (Id.)  Defendant Pittman contends Plaintiffs' video evidence does not "correspond to a use of force" with respect to Plaintiff Stevenson's in-dorm failure to intervene claim.  (Doc. 290, p. 11.)  As to Plaintiffs' escort claims, Defendant Pittman argues the evidence does not place him in sufficiently close proximity to a use of force.  (Id.)

### B. Failure to Intervene During Plaintiff Stevenson's Dorm Altercation

In support of this claim, Plaintiffs point to video evidence of Defendant Pittman standing behind Plaintiff Stevenson, specifically at the 11:06:54PM mark on the handheld video.  (Doc. 283-1, pp. 17–18.)  At this juncture, Defendant Pittman was helping Defendant Harrison escort Plaintiff Stevenson down the steps.  (HHV at 11:06:54PM; doc. 274, p. 41.)  In addition, Plaintiffs point to deposition testimony and video evidence showing that Defendant Pittman

---

[37]  As previously noted, in their First Amended Complaint, Plaintiffs set forth their excessive force and failure to intervene allegations and claims generally against all Defendants in this action.  (See Doc. 24, pp. 5–19.)  Following discovery, however, Plaintiffs have indicated the undisputed facts show that Defendant Pittman did not use force against Plaintiff Stevenson in the dorm, did not use force or fail to intervene in the force used against Plaintiff Jackson in the dorm, and did not commit any alleged constitutional violations against either Plaintiff in the infirmary.  (See Doc. 283-1, pp. 17–18; see also doc. 283, pp. 2, 13, 16, 18–20.)  Because the parties agree Defendant Pittman did not act unlawfully in these situations, the Court **GRANTS** his Motion for Summary Judgment as to these failure to intervene and excessive force claims, (doc. 240), and **DISMISSES** those claims with regard to Defendant Pittman.  Fed. R. Civ. P. 56(a).

ascended these same stairs at the exact moment Catanzariti delivered strikes to a prone, handcuffed Plaintiff Stevenson. (HHV at 22:02:48–22:02:50PM; doc. 190, p. 33.) Defendant Pittman had just entered D-2 before going up the subject staircase and crossing the upper ramp toward where Plaintiff Stevenson was restrained on the ground. (CAM 8 at 22:09:02–22:09:21; doc. 240-13.)

This evidence undisputedly shows that Defendant Pittman was not in a position to intervene when Catanzariti and other officers continued to use force on a restrained and handcuffed Plaintiff Stevenson. The handheld video, in combination with the surveillance camera footage, establishes that Defendant Pittman was coming up the stairs as Catanzariti struck Plaintiff Stevenson farther down the range, and he thus could not have reasonably intervened. From his position and movement on the stairs, it is doubtful Defendant Pittman could have even observed the quick strikes Catanzariti delivered, and he denies seeing them or any other use of force, (doc. 240-13). Moreover, the video shows that Defendant Pittman was not in the dorm prior to ascending the steps, which indicates that Pittman would have had no way to observe any earlier use of force against Plaintiff Stevenson not caught on video.

Although Plaintiffs have shown that Defendant Pittman was on the upper range close to Plaintiff Stevenson *after* Catanzariti delivered the recorded strikes, they have not provided any evidence showing that Pittman was on the upper range, in sufficiently close proximity to Stevenson, during a use of force. (See Doc. 283-1, pp. 17–18; doc. 259, p. 53.) In their fact statement, Plaintiffs indicate that witnesses saw excessive force being used against Plaintiff Stevenson *prior to* the specific period of force by Catanzariti that was captured on the handheld video, (doc. 283-1, p. 13), but Plaintiffs offer no evidence that force continued to be applied once these strikes were over such that Pittman would have had reason and an opportunity to intervene, (see docs. 283, 283-1, 259, pp. 10–37). Additionally, Plaintiffs offer no witness testimony

indicating that Defendant Pittman was around Plaintiff Stevenson when any officer used force against him.[38]  (See Doc. 283-1, pp. 17–18.)  As such, Plaintiffs have failed to provide sufficient evidence from which a jury could find that Defendant Pittman was in a position to intervene when officers used force against Plaintiff Stevenson while he was restrained.  See Moton, 631 F.3d at 1341 (summary judgment proper where "there is a lack of evidence to support the essential elements").  Given that Defendant Pittman had just entered D-2 and was going up the stairs as Catanzariti struck Plaintiff Stevenson, no reasonable jury could find that he was in a position to intervene.

Accordingly, the Court **GRANTS** Defendant Pittman summary judgment as to Plaintiff Stevenson's in-dorm failure to intervene claim against him.

### C.    Failure to Intervene and Excessive Force During Plaintiffs' Escort Outside of the D-2 Dormitory

As recounted above, Defendant Pittman escorted Plaintiff Stevenson down from the upper ramp and out of D-2.  (HHV at 11:06:52–11:07:59; CAM 8 at 22:13:18–22:13:40; doc. 263, p. 18; doc. 192, p. 11.)  Defendant Harrison assisted him in this effort.  (Id.)  Per the video evidence, Defendant Pittman did not reenter the dorm prior to Plaintiff Jackson's escort, which occurred approximately one minute later.  (See CAM 8 at 22:13:18–22:14:32.)  Defendant Pittman does not directly dispute this evidence, but he instead argues that it does not put him in proximity to a use of force.  (Doc. 290, p. 12.)  His declaration is silent regarding his escort of Plaintiff Stevenson, though it does acknowledge later transporting Stevenson to the hospital.  (Doc. 204-13.)

---

[38]  To be sure, Plaintiffs cite the testimony of inmates Cratic and Briscoe in support of their claim that Defendant Pittman stood behind Plaintiff Stevenson "just after [Catanzariti] beat Stevenson with a hammer," but this testimony concerns Defendant Pittman escorting Stevenson down the stairs approximately four minutes after Catanzariti delivered the strikes to Plaintiff Stevenson that are captured on video.  (See Doc. 283-1, p. 18 (citing doc. 190, pp. 14, 17–18; doc. 191, pp. 8–11).)  Thus, these inmates' testimonies do not support the notion that Defendant Pittman was in proximity to Plaintiff Stevenson contemporaneously with Catanzariti's use of force.

Plaintiffs' allegations that they continued to be subjected to force while being escorted, in handcuffs, from D-2 to the infirmary are corroborated by multiple inmate witnesses. (See 283-1, pp. 7–9; doc. 259, pp. 64–71.) These witnesses either saw officers striking the inmates as they were being escorted out or heard the commotion as well as the inmates' cries of pain. (Id.) As described in more detail in the Order on co-Defendants Eason, Attical and Ritchie's Motions for Summary Judgment, which is being filed contemporaneously herewith, the Court has reviewed the evidence put forth by Plaintiffs and has determined that, if found credible by a jury, it would support an excessive force claim, a failure to intervene claim, or both against the officers involved in Plaintiffs' escort to the infirmary.[39] (Doc. 312.) Regarding Defendant Pittman's involvement, Plaintiff Stevenson testified that, after the escorting officers got him out of the dormitory, "they jumped [him] in front of the building." (Doc. 240-3, p. 13.) Although Plaintiff Stevenson did not specifically identify Defendant Pittman, he noted that he lost consciousness at times and could not recall all the officers who took part in this use of force or who watched. (Id. at pp. 13–14.) Nonetheless, Plaintiff Stevenson testified that "nobody ever even tried to intervene. It was just like they didn't care." (Id. at p. 15.)

Plaintiff Stevenson's testimony, as well as that of several inmate eyewitnesses creates a genuine dispute of material fact as to whether Pittman failed to intervene in other officers' use of excessive force against Plaintiff Stevenson outside D-2. See Velazquez v. City of Hialeah, 484 F.3d 1340, 1342 (11th Cir. 2007) (finding the plaintiff's testimony that he was beaten by two, unidentified defendant-officers, "coupled with their admission that they were present, permits the jury, if it believes that he was beaten, to find that . . . one [officer] beat him while the other failed to intervene").

---

[39] The Court incorporates by reference, and adopts, this discussion of Plaintiffs' evidence regarding their escort failure to intervene and excessive force claims as if fully restated herein. (Doc. 312.)

Plaintiff Jackson, who was escorted out of D-2 after Plaintiff Stevenson, testified that, upon being taken outside, he was attacked at the fence by several awaiting officers. (Doc. 240-4, p. 15.) Next, he claims that two unnamed correctional officers continued to strike him, specifically his head, as they took him the rest of the way to the infirmary, all in the presence of other officers who did not intervene. (Id. at p. 17; see also doc. 281, p. 4.) While Defendant Pittman has not explicitly been identified by Plaintiff Jackson as being amongst those officers, the surveillance camera footage indicates that Defendant Pittman undoubtedly was outside of D-2 when Jackson emerged less than one minute after Pittman escorted Plaintiff Stevenson outside. (See CAM 8 at 22:13:18–22:14:45.) Defendant Pittman neither reentered the dorm after his escort of Plaintiff Stevenson nor did he do so shortly after Plaintiff Jackson was escorted out. (See id.) Furthermore, in his account, Defendant Pittman does not dispute that he was outside of D-2 at this time; rather, he is silent with respect to his apparent role in escorting Plaintiff Stevenson from the dorm. (Doc. 240-13.)

Defendant Pittman's failure to directly dispute these events notwithstanding, Plaintiff Jackson has submitted sufficient evidence to create a triable issue as to whether Defendant Pittman took part in the attack against him outside or failed to intervene despite his presence there. The relevant video and testimonial evidence supports the reasonable inference that Defendant Pittman, after escorting Plaintiff Stevenson, was still in the walkway area outside of D-2 when Plaintiff Jackson emerged soon thereafter and was beaten. This evidence, if believed by a jury, shows that Defendant Pittman either used gratuitous force against a handcuffed Plaintiff Jackson when he arrived outside or stood idly by while other officers did so.

In sum then, the Court finds Plaintiffs' evidence, when viewed in their favor, would permit a finding that "the amount of force used [by officers during their escort] was not reasonable" and

that Defendant Pittman, as an escorting officer who was present outside, "had the opportunity to observe that a handcuffed, non-violent [inmate] was being beaten but failed to intervene." King v. Reap, 269 F. App'x 857, 860 (11th Cir. 2008) (per curiam). Stated differently, at present "[w]e do not know what the true facts are, but we do know that a genuine dispute of material fact exits, and it precludes granting summary judgment to [] correctional officer[] [Pittman] on [Plaintiffs'] § 1983 excessive force and deliberate indifference by failure to intervene claims." Sears v. Roberts, 922 F.3d 1199, 1209 (11th Cir. 2019).

Accordingly, the Court **DENIES** Defendant Pittman summary judgment as to both Plaintiffs' escort excessive force and failure to intervene claims against him.

## VI. Summary Judgment as to Defendant Jarrod Bennett

At summary judgment, Plaintiffs maintain the following claims against Defendant Bennett: (1) failure to intervene during Plaintiff Stevenson's dorm altercation with officers, and (2) failure to intervene and excessive force during Plaintiffs' escort outside. (See Doc. 283-1, pp. 19–20; see also doc. 283, pp. 2, 13–14, 16, 18.) Defendant Bennett seeks summary judgment as to all claims brought against him by Plaintiffs.[40] (Docs. 240, 240-2.)

### A. The Parties' Arguments

Because the undisputed evidence shows Defendant Bennett was on the upper range alongside Catanzariti both before and after the disturbance, Plaintiffs argue he was positioned to

---

[40] As previously noted, in their First Amended Complaint, Plaintiffs set forth their excessive force and failure to intervene allegations and claims generally against all Defendants in this action. (See Doc. 24, pp. 5–19.) Following discovery, however, Plaintiffs have indicated the undisputed facts show that Defendant Bennett did not use force against Plaintiff Stevenson in the dorm, did not use force or fail to intervene in the force used against Plaintiff Jackson in the dorm, and did not commit any alleged constitutional violations against either Plaintiff in the infirmary. (See Doc. 283-1, pp. 19–20; see also doc. 283, pp. 2, 13–14, 16, 18.) Because the parties agree Defendant Bennett did not act unlawfully in these situations, the Court **GRANTS** his Motion for Summary Judgment as to these failure to intervene and excessive force claims, (doc. 240), and **DISMISSES** those claims with regard to Defendant Bennett. Fed. R. Civ. P. 56(a).

intervene on Plaintiff Stevenson's behalf. (Doc. 283-1, pp. 19–20.) Plaintiffs also contend Defendant Bennett participated in Plaintiff Stevenson's escort. (Id. at p. 20.) Defendant Bennett disputes this evidence and denies being present in D-2 when the disturbance began or being near any fighting or use of force. (Doc. 290, pp. 11–12.)

### B. Failure to Intervene During Plaintiff Stevenson's Dorm Altercation

It is undisputed that Defendant Bennett was searching the D-2 dorm with Catanzariti and Ritchie before the disturbance. (Doc. 283-1, pp. 19–20.) Plaintiffs assert Defendant Bennett was in the area around Catanzariti throughout the relevant time and could have intervened to protect Plaintiff Stevenson. (Id.) Defendant Bennett claims, however, that after retrieving tools for Catanzariti, he left D-2 and was neither in the dorm when the disturbance began nor ever in a position to intervene. (Id.) On this issue, the parties have submitted contradictory evidence that gives rise to a genuine dispute of material fact.

Specifically, against Defendant Bennett's declaration that he left the dorm after retrieving tools for Catanzariti and did not arrive back in time to intervene, Plaintiffs point to inmate Neely's testimony. (Id.) Neely identified Defendant Bennett as an officer who was "around" Plaintiff Stevenson when he was struck with a hammer. (Doc. 263, p. 11.) He also testified to witnessing Defendant Bennett come in with Ritchie and seeing the two of them search a cell together several minutes before the disturbance broke out, (id. at pp. 13, 26), and he also identified Bennett as an officer who "was there later on" when handcuffed inmates were struck, (id. at p. 11). In addition to this testimony, undisputed video evidence shows that Defendant Bennet was on the upper ramp, in close proximity to Catanzariti and Plaintiff Stevenson, less than eighty seconds after the handheld video captured Catanzariti striking Stevenson. (HHV at 11:02:47–11:04:08PM; doc. 290, p. 12.) Notably, Defendant Bennett does not cite any video evidence—such as footage

of him leaving D-2 after passing the tools to Catanzariti or footage of him entering D-2 once the disturbance had already begun—to disprove Neely's testimony of Bennett's presence on the upper ramp at the relevant time. (See Doc. 240-2, pp. 6, 13; doc. 283-1, p. 19; doc. 290, pp. 11–12.)

Taken together, and viewed in the light most favorable to Plaintiffs, the evidence adduced on this claim supports the reasonable inference that Defendant Bennett was present and remained on the upper range for the duration of the force used against Plaintiff Stevenson. If a jury were to credit inmate Neely's eyewitness testimony, it would be authorized to find that Defendant Bennett was in a position to intervene in the hammer incident yet did not do so. Moreover, in light of the undisputed evidence that Defendant Bennett assisted in the contraband search and was near Catanzariti after he struck Plaintiff Stevenson (as shown on the handheld video), it cannot be said that Neely's testimony is facially implausible. Even if his "sworn statements turn out to be exaggerations or false, they are enough to raise a genuine issue of material fact about" whether Defendant Bennett "witnessed the incident but did not attempt to intervene." Sears, 922 F.3d at 1209 (citations omitted).

Accordingly, the Court **DENIES** Defendant Bennett summary judgment as to Plaintiff Stevenson's in-dorm failure to intervene claim.

### C. Failure to Intervene and Excessive Force During Plaintiffs' Escort Outside of the D-2 Dormitory

As to this claim, Plaintiffs cite testimony and video that purportedly establish Defendant Bennett escorted Plaintiff Stevenson out of the dorm, thereby placing him outside when Plaintiffs allege that they continued to be beaten. (Doc. 283-1, p. 20.) Plaintiffs, however, misconstrue this evidence.

At the point in time when inmate Neely and officer Hill identified Defendant Bennett on the video footage, he was indeed helping to escort Plaintiff Stevenson, (doc. 263, p. 18; doc. 267,

p. 29), but the video shows Bennett ceased doing so once he reached the bottom of the stairs, (HHV at 11:06:56–11:07:09PM). On the bottom range, surveillance camera video depicts Defendant Bennett remaining in D-2 while officers escorted Plaintiff Stevenson out. (CAM 8 at 22:13:20–22:13:42; CAM 9 at 22:13:35–22:14:24.) This video further shows that Defendant Bennett remained on the bottom range while Plaintiff Jackson was escorted out, before later going back upstairs. (CAM 8 at 22:14:09–22:15:05.) Because Defendant Bennett remained in the dorm while other officers escorted Plaintiffs to the infirmary, he necessarily did not use excessive force against them or fail to intervene in the use of such force during this time. Thus, the Court finds that, based on the undisputed video evidence, Defendant Bennett was not a participant in the alleged events that occurred during Plaintiffs' escort outside of D-2.

Accordingly, the Court **GRANTS** Defendant Bennett summary judgment as to Plaintiffs' escort failure to intervene and excessive force claims against him.

## VII. Qualified Immunity

In addition, Defendants assert that Plaintiffs cannot show a violation of their Eighth Amendment rights, and they are thus entitled to qualified immunity on all claims. (Doc. 240-2, pp. 15–16.) Plaintiffs oppose. (Doc. 283, pp. 21–23.)

### A. Legal Standard

Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Lee v. Ferraro, 284 F.3d 1188, 1193–94 (11th Cir. 2002).[41] "Qualified immunity is intended to allow government officials to carry out their

---

[41] To rely upon qualified immunity, a defendant first must show that he or she acted within his or her discretionary authority. Mobley v. Palm Beach Cty. Sheriff Dept., 783 F.3d 1347, 1352 (11th Cir. 2015).

discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Hoyt v. Cooks, 672 F.3d 972, 977 (11th Cir. 2012) (citation and internal quotations omitted). However, it does not protect an official who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." Holmes v. Kucynda, 321 F.3d 1069, 1077 (11th Cir. 2003) (citations and internal quotations omitted). "Overcoming the official's qualified-immunity defense requires a plaintiff to establish both that the officer's conduct violated a constitutionally protected right and that the right was clearly established at the time of the misconduct." Alcocer v. Mills, 906 F.3d 944, 951 (11th Cir. 2018) (citation omitted). The Court has discretion in deciding which of these two prongs to address first. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

"[W]hether the law clearly established the relevant conduct as a constitutional violation at the time [the defendants] engaged in the challenged acts" turns on whether the defendants had "fair warning" that their conduct violated a constitutional right. Jones v. Fransen, 857 F.3d 843, 851 (11th Cir. 2017) (citing Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011)). In order to demonstrate "fair warning" and defeat qualified immunity, the plaintiff must "point to binding precedent that is materially similar," or show the challenged conduct violated federal law with "obvious clarity" such that "every objectively reasonable government official facing the circumstances would know that the official's conduct" was unlawful, despite the lack of materially similar case law. Id. at 852; Gaines v. Wardynski, 871 F.3d 1203, 1209 (11th Cir. 2017) (binding precedent comes from "the United States Supreme Court, the Eleventh Circuit, or the relevant State Supreme Court" (citation and alteration omitted)). When relying on the "obvious clarity"

---

Here, there is no dispute Defendants were acting within their discretionary authority. (See Doc. 283, pp. 21–23.) The question thus becomes whether qualified immunity bars the claims against them.

method, the plaintiff may invoke a "'broader, clearly established principle' that he asserts 'should control the novel facts [of the] situation.'" Fransen, 857 F.3d at 852 (citation omitted). Or, the plaintiff may show that defendant's conduct is "so bad that case law is not needed to establish" its unlawfulness. Id. (citation omitted). The "obvious clarity" category has been described as "narrow." Id. (citing Priester, 208 F.3d at 926–27).

At summary judgment, when assessing qualified immunity, the court "must take the facts in the light most favorable to the party asserting the injury," eliminating all issues of fact so "the court has the plaintiff's best case before it." Robinson v. Arrugueta, 415 F.3d 1252, 1257 (11th Cir. 2005). Thus, the court "determine[s] the legal issue of whether the defendant [is] entitled to qualified immunity using the version of facts most favorable to the plaintiff." Bates v. Harvey, 518 F.3d 1233, 1239 (11th Cir. 2008) (citation omitted).

## B.  Analysis as to Defendants McFarlane, Wells, Milton, and Mitchell

With respect to Defendants McFarlane, Wells, Milton, and Mitchell, the Court has already determined that Plaintiffs have failed to adduce sufficient evidence for a reasonable jury to find that they used excessive force or failed to intervene, or both. *Supra* Discussion Sections I–IV. In its analysis, the Court took care to view the facts in the light most favorable to Plaintiffs and to resolve genuine disputes in their favor. See id. Even considering Plaintiffs' best case, Robinson, 415 F.3d at 1257, the Court found there was insufficient evidence for Plaintiffs to maintain Eighth Amendment claims against Defendants McFarlane, Wells, Milton, and Mitchell, see *supra* Discussion Sections I–IV. In other words, the Court has determined that these Defendants did not violate Plaintiffs' Eighth Amendment rights during the subject prison disturbance.

Accordingly, Defendants McFarlane, Wells, Milton, and Mitchell are entitled to qualified immunity on all of Plaintiffs' excessive force and failure to intervene claims alleged against them.

See <u>Alcocer</u>, 906 F.3d at 951 (officers entitled to qualified immunity where the plaintiffs cannot establish violation of constitutional right); <u>see also</u> <u>Butler v. Norman</u>, 766 F. App'x 924, 929 (11th Cir. 2019) (per curiam) (evidentiary failure on essential element of constitutional claim entitles the defendant to qualified immunity).  Therefore, the Court **GRANTS** Defendants McFarlane, Wells, Milton, and Mitchell summary judgement on the basis of qualified immunity.

    **C.**    **Analysis as to Defendant Pittman**

    With respect to Defendant Pittman, the Court has already determined that Plaintiffs failed to show he was ever in a position to intervene in the use of force against Plaintiff Stevenson in the dorm. *Supra* Discussion Section V.  In making this determination, the Court considered Plaintiffs' best case and found that their evidence was insufficient for a jury to find Defendant Pittman committed a constitutional violation against Plaintiff Stevenson in the dorm.  <u>See</u> <u>id.</u>  Specifically, Plaintiffs' evidence and the undisputed facts show that Defendant Pittman was never on the upper range in close enough proximity to Plaintiff Stevenson during the relevant time, and thus, he could not have intervened.  <u>Id.</u>  In other words, there is no evidence Defendant Pittman committed a constitutional violation against Plaintiff Stevenson inside of D-2.  Accordingly, Defendant Pittman is entitled to qualified immunity on Plaintiffs' in-dorm failure to intervene claim against him.  <u>See</u> <u>Alcocer</u>, 906 F.3d at 951 (officers entitled to qualified immunity where the plaintiffs cannot establish violation of constitutional right); <u>see also</u> <u>Butler</u>, 766 F. App'x at 929 (evidentiary failure on essential element of constitutional claim entitles the defendant to qualified immunity).

    However, on Plaintiffs' escort failure to intervene and excessive force claims against Defendant Pittman, the Court found that a genuine dispute of material fact existed as to whether Pittman was a participant in these events. *Supra* Discussion Section V.  As explained in Discussion Section V, Plaintiffs have proffered sufficient evidence, with the disputed facts resolved in their

favor, to establish that Defendant Pittman violated the Eight Amendment by failing to intervene whatsoever in Catanzariti and other corrections officers' use of excessive force against both Jackson and Stevenson while they were restrained outside of D-2. Suffice it to say here, the beatings that took place against Plaintiffs when they were escorted outside of D-2, as described by them and other witnesses, fall within the core of what the Eighth Amendment prohibits: "unnecessary and wanton infliction of pain" on restrained, non-resisting inmates "for the very purpose of causing harm." See Hudson, 503 U.S. at 4–6 (1992) (determining that prison guards who placed an inmate "in handcuffs and shackles" and beat him while escorting him to lockdown used excessive force in violation of the Eighth Amendment even though no serious injury occurred); Reid v. Neal, 688 F. App'x 613, 617 (11th Cir. 2017) (per curiam) (stating that corrections officers who are present at the scene and fail to "take reasonable steps to protect" prisoners from other officers' excessive use of force are liable under the Eighth Amendment for failure to intervene (citing Skrtich, 280 F.3d at 1300)).

The law of the Eleventh Circuit "prohibit[s] the use of excessive force by a prison guard against an inmate" who is restrained and "pose[s] no continuing threat." Davis v. Locke, 936 F.2d 1208, 1213 (11th Cir. 1991) (citations omitted) (threatening a handcuffed inmate with slurs and punishment and then pulling him by his ankles from a cage, causing him to fall, constitutes excessive force); see Harris v. Chapman, 97 F.3d 499, 505–06 (11th Cir. 1996) (evidence that group of officers restrained inmate with a towel and then beat and verbally harassed him, after he refused to submit to a haircut, sufficient to support jury's finding of Eighth Amendment violation); Williams v. Cash-C.O.I., 836 F.2d 1318, 1320 (11th Cir. 1988) (allegations that officers "deliberately broke [inmate's] elbow after he had ceased to resist their efforts to return him to his cell" sufficient to support Eighth Amendment excessive force claim at summary judgment). In

short, "[i]t is excessive force for a jailer to continue using force against a prisoner who already has been subdued." Nasseri v. City of Athens, 373 F. App'x 15, 19 (11th Cir. 2010) (per curiam) (citing Danley, 540 F.3d at 1309); see also Skrtich, 280 F.3d at 1303 ("By 1998, our precedent clearly established that government officials may not use gratuitous force against a prisoner who has been already subdued or, as in this case, incapacitated." (citations omitted)).

Here, both Plaintiffs allege that multiple corrections officers continued to attack them, outside of the dorm long after the inciting disturbance was over, while they were handcuffed and not resisting and that no one—including Defendant Pittman—intervened on their behalf. More specifically, under Plaintiffs' evidence and version of the facts, the officers escorting Plaintiff Stevenson, one of which was Pittman, used gratuitous force against Stevenson once outside of the dorm; and officers who were already outside D-2 when Plaintiff Jackson was escorted out, one of whom was presumably Pittman, attacked Jackson as he emerged. Given that Defendant Pittman's involvement with Plaintiff Stevenson's escort is undisputed, a reasonable jury could infer that Pittman was one of the officers who either attacked Plaintiffs or failed to intervene on their behalf, or both. Under the Eighth Amendment, "an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable for his nonfeasance." Skrtich, 280 F.3d at 1301 (citation omitted). Nonfeasance by an officer in the face of another officer's excessive force, when that officer is in a position to intervene, violates clearly established law. Id. (collecting cases); see also Velazquez, 484 F.3d at 1341–42 (rejecting award of qualified immunity because the plaintiff did not know which officer beat him and concluding that a jury is permitted to find that both defendant-officers "administered the excessive force or that one beat him while the other failed to intervene").

Because Plaintiffs' facts, accepted as true and viewed in their favor, see *supra* Discussion Section V, show that they were subjected to gratuitous force while outside D-2 and that Defendant Pittman did *nothing* to intervene in this use of force despite being in a position to respond in some manner, he is not entitled to qualified immunity on Plaintiffs' escort excessive force and failure to intervene claims. Skrtich, 238 F.3d at 1303 (noting that it is clearly established "that government officials may not use gratuitous force against a prisoner who has been already subdued"); Priester, 208 F.3d at 927 ("Nor do we think particularized case law is necessary to overcome [the defendant's] claim of qualified immunity. That a police officer had a duty to intervene when he witnessed the use of excessive force and had the ability to intervene was clearly established in February 1994." (citations omitted)). In short, Defendant Pittman is not entitled to qualified immunity on these claims as his conduct, under Plaintiffs' version of events, violated this broader clearly established principle.

Accordingly, the Court **GRANTS in part** and **DENIES in part** Defendant Pittman's request for summary judgment on the basis of qualified immunity. Defendant Pittman is entitled to qualified immunity as to Plaintiff Stevenson's in-dorm failure to intervene claim, but he is not entitled to qualified immunity on Plaintiffs' failure to intervene and excessive claims arising from their escort outside of D-2.[42]

### D.     Analysis as to Defendant Bennett

With respect to Defendant Bennett, the Court has already determined that Plaintiffs failed to show he was a participant in their respective escorts outside of D-2. *Supra* Discussion Section

---

[42]   As to this denial of qualified immunity, the Court emphasizes "that the 'facts,' as accepted at the summary judgment stage of the proceedings, may not be the 'actual' facts of the case." Priester, 208 F.3d at 925 n.3. However, based on the applicable standard and the facts assumed thereunder, Defendant Pittman is not entitled to qualified immunity on these claims. If appropriate, Defendant Pittman may reassert qualified immunity based on the facts found at trial by the jury.

IV.  In making this determination, the Court considered Plaintiffs' best case and found that their evidence was insufficient for a jury to find Defendant Bennett committed a constitutional violation against Plaintiffs during their escort from the dorm.  See id.  Specifically, Plaintiffs' evidence and the undisputed facts show that Defendant Bennett neither escorted Plaintiffs nor exited D-2 during the time in which other officers escorted them; thus they cannot show Defendant Bennett committed a constitutional violation against them during their escort.  Id.  Accordingly, Defendant Bennett is entitled to qualified immunity on Plaintiffs' escort failure to intervene and excessive force claims against him.  See Alcocer, 906 F.3d at 951 (officers entitled to qualified immunity where the plaintiffs cannot establish violation of constitutional right); see also Butler, 766 F. App'x at 929 (evidentiary failure on essential element of constitutional claim entitles the defendant to qualified immunity).

However, on Plaintiff Stevenson's in-dorm failure to intervene claim against Defendant Bennett, the Court found that a genuine dispute of material fact existed as to whether Bennett failed to intervene.  *Supra* Discussion Section VI.  As explained in Discussion Section VI, Plaintiffs have proffered sufficient evidence, with the disputed facts resolved in their favor, to establish that Defendant Bennett violated the Eight Amendment when he failed to intervene whatsoever in Catanzariti's use of excessive force against Stevenson while he was restrained on the upper ramp of D-2.  Suffice it to say here, based on the video and testimonial evidence adduced by Plaintiffs, and making all reasonable inferences in their favor, the Court concludes a reasonable jury could find that Defendant Bennett was on the upper range during the time in question and was involved in, or was in close proximity to, the use of force against Plaintiff Stevenson while he was restrained and handcuffed.  Thus, in view of Plaintiffs' best case, Robinson, 415 F.3d at 1257, the Court finds

there is sufficient evidence that Defendant Bennett violated Plaintiff Stevenson's Eighth Amendment rights by not intervening in Catanzariti's use of excessive force in the dorm.

Moreover, as previously set forth, it is a violation of longstanding clearly established law for an officer to not intervene in the use of excessive force when that officer is in a position to do so. E.g., Skrtich, 238 F.3d at 1301–03; Priester, 208 F.3d at 927. Likewise, it is a violation of clearly established law to use force against a restrained, compliant inmate. Danley, 540 F.3d at 1309. Here, there is eyewitness testimony placing Defendant Bennett in sufficient proximity to Plaintiff Stevenson when Catanzariti used an object to strike Stevenson past the point of restraint. Accepting as true Plaintiffs' evidence in this regard, which a jury will be entitled to believe, the Court concludes that no reasonable officer would find it lawful to allow another officer, in his presence, to strike a subdued inmate with a hammer or otherwise. In short, Defendant Bennett is not entitled to qualified immunity on Plaintiff Stevenson's in-dorm failure to intervene claim.

Accordingly, the Court **GRANTS in part** and **DENIES in part** Defendant Bennett summary judgment on the basis of qualified immunity. Defendant Bennett is entitled to qualified immunity as to Plaintiffs' failure to intervene and excessive force claims arising from their escort outside of D-2, but he is not entitled to qualified immunity on Plaintiff Stevenson's in-dorm failure to intervene claim.[43]

## CONCLUSION

For the above stated reasons, the Court **GRANTS in part** and **DENIES in part** Defendants McFarlane, Milton, Wells, Bennett, Pittman, and Mitchell's Motion for Summary Judgment.

---

[43] As to this denial of qualified immunity, the Court again emphasizes "that the 'facts,' as accepted at the summary judgment stage of the proceedings, may not be the 'actual' facts of the case." Priester, 208 F.3d at 925 n.3. However, based on the applicable standard and the facts assumed thereunder, Defendant Bennett is not entitled to qualified immunity on Stevenson's in-dorm failure to intervene claim. If appropriate, Defendant Bennett may reassert qualified immunity based on the facts found at trial by the jury.

(Doc. 240; <u>see also</u> doc. 240-2.)  As a result, the Court **DISMISSES with prejudice** all of Plaintiffs' failure to intervene and excessive force claims alleged against Defendants McFarlane, Wells, Milton, and Mitchell as well as Plaintiffs' supervisory liability claim alleged against Defendant McFarlane; the Court **DIRECTS** the Clerk of Court to **TERMINATE** Defendants McFarlane, Wells, Milton, and Mitchell as Defendants upon the docket and record of this case. Furthermore, the Court **DISMISSES with prejudice** the following claims against Defendant Pittman: Plaintiffs' in-dorm failure to intervene and excessive force claims as well as Plaintiffs' claims regarding failure to intervene and excessive force in the infirmary.  And the Court **DISMISSES with prejudice** the following claims against Defendant Bennett: Plaintiff Stevenson's in-dorm excessive force claim, Plaintiff Jackson's in-dorm excessive force and failure to intervene claims, Plaintiffs' claims regarding excessive force and failure to intervene during their escort outside of D-2, and Plaintiffs' claims regarding the same during time in the prison's infirmary.  However, as explained above, the following Eighth Amendment claims have survived summary judgment and remain pending: both Plaintiffs' escort failure to intervene and excessive force claims against Defendant Pittman, and Plaintiff Stevenson's in-dorm failure to intervene claim against Defendant Bennett.

In light of the foregoing disposition, the Court **ORDERS** the remaining parties to file one joint updated status report within **twenty-one (21) days** of the date of this Order.  The parties shall address the status of this case and whether the parties are prepared to proceed to trial.  The parties' report must also address the status of those Defendants who were not subject to this Order or the companion Order filed contemporaneously herewith, (doc. 312).  As previously indicated, (docs. 174, 231), the parties have discussed voluntarily dismissing, pursuant to Federal Rule of Civil Procedure 41(a), the following yet to be dismissed Defendants: Carolyn Carrol, Kim Hardee,

Jeffery Mullis, and Joseph White.  However, in their Stipulation of Dismissal, (doc. 232), the parties declined to dismiss these Defendants, and they remain in this case.  Furthermore, Plaintiffs have failed to file the requisite proof of service as to Defendants Brandon Cearnel, Christopher Henderson, Candice Hill, John Jones, Justin Swope, and Gene Tootle.  Pursuant to Federal Rule of Civil Procedure 4(m), the Court **ORDERS** Plaintiffs to show cause, within **twenty-one (21) days** of the date of this Order, as to why these Defendants should not be dismissed from this action for lack of timely service.  In so doing, Plaintiffs must explain these Defendants' continued relevancy to this case and what actionable claims, if any, remain against them.  Alternatively, Plaintiffs may move to dismiss these Defendants rather than showing cause regarding their failure to properly comply with Federal Rule of Civil Procedure 4(m).

**SO ORDERED**, this 2nd day of October, 2019.

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA